IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

STERLING ASKEW, as Father, Next of Kin
and as Administrator Ad Litem/Personal
of the Estate of STEVEN ASKEW, Deceased, and
SYLVIA ASKEW, as Mother and Next of Kin
of STEVEN ASKEW, Deceased,

        Plaintiffs,

v.                                   No. 2:14-cv-02080-STA-tmp

CITY OF MEMPHIS,
TONEY ARMSTRONG, Individually,
and in His Official Capacity as the
Police Director of the Memphis Police Department,
OFFICER NED AUFDENKAMP (#11914),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,
OFFICER MATTHEW DYESS (#12402),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,

        Defendants.

## MEMORANDUM IN SUPPORT OF
## MOTION TO EXCLUDE TESTIMONY OF
## PLAINTIFFS' PROPOSED EXPERT GARRY L. McFADDEN

Defendant City of Memphis submits this Memorandum in support of its Motion to Exclude

Testimony of Plaintiffs' witness Garry L. McFadden.

### BACKGROUND

This case arises out of a police shooting which occurred on January 17, 2013, at a complex

known as Windsor Place Apartments.

On the date in question, Memphis Police Officers Ned Aufdenkamp and Matthew Dyess received

a loud music disturbance called at 3193 Tyrol Court. While checking the area, they encountered an

individual who was passed out behind the wheel of a running vehicle at 3197 Royal Knight which is in

the same general area.  While trying to assess the situation, Officer Aufdenkamp noticed a hand gun on the subject's lap and alerted his partner.  According to the officers, when they awakened the subject, he pointed the gun at Officer Aufdenkamp and both officers opened fire resulting in the fatal wounding of the suspect who was determined to be Steven Askew.

Following the shooting an investigation was conducted by the Homicide Squad and the Internal Service Bureau (ISB) to determine whether any criminal charges were to be filed or whether there were any administrative violations.  The Homicide Bureau submitted a report to the Attorney General for the State of Tennessee who after reviewing same declined to submit the matter to the grand jury.  On the administrative side after conducting its investigation in connection with the Homicide Bureau ISB determined that there were no administrative violations and that the shooting was justified.

Thereafter a civil rights action was filed pursuant to 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution by Sterling Askew as father and next-of-kin and administrator of the Estate of Steven Askew and Sylvia Askew, as mother and next-of-kin of Steven Askew in the Circuit Court of Shelby County, Tennessee.  Thereafter the case was removed to Federal Court.

The Plaintiffs take issue with the findings of the ISB that the shooting was justified.  Among other things they challenge the practice, procedures and training within the Department and the adequacy of the investigation.  In furtherance of their position, Plaintiffs' counsel retained the services of Mr. Gary McFadden who submitted a report in this case. (DE 134) Thereafter Mr. McFadden's deposition was taken.  (DE 131)

## APPLICABLE LAW

### Rule 702.  Testimony by Expert Witness

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

2

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product or reliable principles and methods; and

(d)      the expert has reliably applied the principles and methods to the facts of the case.

The Rule obligates the trial court to act as the gatekeeper and to insure that any expert evidence – scientific or otherwise – is relevant and reliable.  Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 147, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589.  Although not a definitive checklist or test, the Daubert factors guide a trial court in its gatekeeping inquiry which must be "tied to the facts of a particular case."  509 U.S at 591.  Where the expert testimony factual basis, data, principles, methods or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the expert.  Kumho, 526 U.S. at 149.

If the witness is relying solely or primarily on experience, he or she must explain how that experience leads to the conclusion reached and how that experience is reliably applied to the facts. Thomas v. City of Chattanooga, 398 F.3d 426, 431 (6th Cir. 2005).  To be considered reliable, the expert's proposed testimony must be based on more than a subjective belief or unsupported speculation.  Federal Rules of Evidence 702; Daubert, 509 U.S. at 590.  It must be properly supported.  Federal Rules of Evidence 703.  If relevant, the probative value of the evidence must be weighed against "the danger of unfair prejudice, confusion of the issues or misleading the jury" as well as "considerations of undue delay, waste of time or needless presentation of cumulative evidence."  Federal Rules of Evidence 403.  Expert opinion evidence may be properly excluded if its prohibitive value is substantially outweighed by these considerations.  Id.  "It is the proponent of the testimony that must establish its admissibility, i.e. a preponderance of proof."  Federal Rules of Evidence 702; Nelson v. Tennessee Gas Pipeline Company, 243 F.3d 244, 251 (6th Cir. 2001).

## QUALIFICATIONS

Mr. McFadden's qualifications are set out in his report dated January 20, 2015.  (DE 134, p. 28-37) From 1985 to 1990 he was with the Charlotte-Mecklenburg Police Department's Violent Crime

Division, Commercial Theft and Burglary.  From 1990 to 1991, he was in the Department's Violent Crime Division assigned to the Robbery Task Force.  From 1991 to 2011, he was assigned to the Department's Violent Crime Division as a Homicide Detective.  From 2011 to 2013, he was assigned to the North Carolina Office of the Chief in its Intelligence Unit/Dignity Protection Unit and from 2013 to the present he is assigned to the Office of the Chief as Homicide Support-Real Time Crime Center-Dignitary Protection. His formal education consists of a B.S. degree in physical education from the Johnson C. Smith University in Charlotte, North Carolina, which he obtained in 1982. (DE 134, p. 28)

In 2012, he formed a consulting business known as McFadden's Solutions, LLC.  (DE 131, p. 3) This is the first case in which he has been engaged by a lawyer to be an expert witness in a case involving a police shooting.  (DE 131, p. 4) Consequentially, prior to this case he has never given a deposition, or submitted a report or testified at trial.  (DE 131, p. 4) Other than being a homicide detective there is nothing in his CV to indicate that he has ever served with an Internal Affairs Unit.  He has never authored any treatises, papers or writings.  (DE 131, p .67)

Rule 26(a)(2)(B) states as follows:

[D]isclosure [of expert testimony] must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;
(ii) the facts or data considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B). The requirements of FRCP 26 "are to be taken very seriously." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 657 F. Supp. 2d 905, 908 (N.D. Ohio 2008). Indeed, Rule 37(c)(1) requires "absolute compliance" with Rule 26, as Rule 37 calls for the exclusion of any information or witness to supply evidence if a party fails to provide the information required by Rule 26. *Id.* at 908-09 (quoting *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir 2003)).

The Rule requires among other things that the witness' qualifications include a list of all publications authored in the past 10 years as well as all of the cases in which he has testified as an expert at trial or by deposition for the past 4 years.  Since this is Mr. McFadden's first foray into the expert witness field in a Section 1983 case, obviously he has not testified as an expert at trial or by deposition. He confirms this in his deposition.  (DE 131, p. 4)  While these factors in and of themselves may not be sufficient to disqualify Mr. McFadden this along with other shortcomings in his opinion, should have some bearing on his qualifications and whether his testimony should be excluded.

## McFADDEN'S OPINIONS
### 48-HOUR RULE

The basic premise in Mr. McFadden's opinion is that based upon his knowledge, skill, experience, training or education and a careful consideration of the totality of circumstances and facts, the Memphis Police Department conducted a "woefully inadequate" investigation of the homicide of Steven Askew by ignoring viable and compelling and available information.  (DE 134, p. 6) He states that the policies and practices of the Memphis Police Department that he has reviewed leads him to the opinion that this case was not traditionally investigated like the homicide cases he was involved in.  (DE 131, p. 11) He refers to the 48-hour rule and says it hinders the homicide investigation because it allows the officers to wait that period of time before giving a statement.  (DE 131, p. 11) He goes on to state that he knows of no other departments that wait 48 hours before requiring the officers to give a statement.  (DE 131, p. 11) He has been to many investigative schools and has been to seminars around the country and this is his first time hearing that officers have to wait and cannot be investigated, cannot talk with homicide detectives and cannot do a walk through.  (DE 131, p. 11)

Apparently, Mr. McFadden is not familiar with studies made regarding the efficacy of the 48-hour rule.  See A.E.L.E. Monthly Law Journal, 2008 (8) AELE Mo.L.J. 2001, *Administrative Investigations of Police Shootings and Other Critical Instances: Officer Statements and use of Force Reports Part Two:  The Basics* (August 2008).  In no case should a formal interview be conducted in less

than 24 hours even if the officer is willing to participate.  Villejoubert, O'Keefe, Alison & Cole, *Hindsight bias and shooting incidents,* 16th Conference of the European Assn. of psychology & law, Liverpool, U.K. (June 2006).  It is better to wait 48 to 72 hours before conducting the interview. An officer's recall can improve during this period.  Sergeant Barry E. Roy, *Management of Officer Involved Shootings,* University of Arkansas System Criminal Justice Institute (March 2010) Affected officers are encouraged to go home and get some sleep and rest before giving an official statement.  *Id.* (citing A Artwohl, *Perceptual and Memory Distortion During Officer Involved Shootings,* FBI Law Enforcement Bulletin, Oct. 2002, at 18, *available at* http://www.alexisartwohl.com/pdf/FBI%20article.pdf).  It is suggested that an officer wait 24 to 48 hours before giving a statement, A. Artwohl, *Perceptual and Memory Distortion During Officer Involved Shootings,* FBI Law Enforcement Bulletin, Oct. 2002, at 18, *available at http://www.alexisartwohl.com/pdf/FBI%20article.pdf).* Obviously, Mr.  McFadden has not made any studies regarding the 48-hour rule, and irresponsibly uses that as a reason to state that the Memphis Police Department investigation was woefully inadequate.

### HOMICIDE V. ISB

He admits that there are two investigations going on in this case, one of which is homicide and the other internal.  (DE 131, p. 12) For whatever reason he concludes that ISB investigations actually supercede and hinder the homicide investigation.  (DE 131, p. 12-13) For example, he states that when there is a walk through, it was done with ISB rather than Homicide.  (DE 131, p. 13) He concludes that whatever information the ISB learned, Homicide did not have the luxury of receiving that information. (DE 131, p. 13) He fails to take into consideration that because Homicide would be investigating a potentially criminal offense, the officers would not be required to give a statement at the scene without first being giving the Miranda warnings and even at that they could decline and probably would do so on the advice of Union Representatives on the scene.[1]  He acknowledges that Miranda may play a part in the investigation.  (DE 131, p. 12)

---

[1] There was a union representative with the officers. (Exhibit 1 Cobb Depo., p. 58)

He agrees that as part of their investigation, Homicide has the benefit of statements taken by Internal Services. (DE 131, p. 13) Then he complains about the statements that were taken by Internal Services stating that he would look for one longer statement than eight pages. (DE 131, p. 13) He says that having only eight pages in the statement appears to him to be simply a questionnaire and not an interview. (DE 131, p. 13)  In these cases he would expect a more in-depth interview. (DE 131, p. 13) Attached as Exhibit 2 is a copy of an eight page interview taken by ISB of Officer Aufdenkamp which demonstrates that ISB obtained a complete statement of the events, which apparently does not meet Mr. McFadden's standards.  However, it can hardly be said that it is woefully inadequate.  This is a classic situation where an expert is saying that the investigation is inadequate simply because he says so without any substantive support for his opinion.  Where a court has been presented with only the expert's qualifications, his conclusions and his assurances of reliability under Daubert, that is not enough. Thomas v. City of Chattanooga, 398 F.3d 426, 431.

## PRIOR CASES

In his report Mr. McFadden states that the Memphis Police Department did a woefully inadequate job of conducting a thorough investigation in this officer involved shooting which displays a lack of training, supervision, sufficient policies and practice and an overall custom practice of conduct that violates civil rights.[2]  (DE 131, p. 13) He has reviewed investigations in 39 other cases. (DE 131, p. 15) He says that if you look at these cases they are all similar.  The Internal Services Bureau controls the scene and Homicide comes in and receives the information later.[3] (DE 131, p. 14) The officers are not separated on the scene, all of which shows the lack of training, custom and practice of the Memphis

---

[2] It is for the court and jury to determine what conduct violates civil rights. See Cutlip v. City of Toledo, 488 Fed.Appx. 107, 120, 121 (6th Cir. 2012)

[3] He refers to no authorities that are critical of this approach.

Police Department.[4]  (DE 131, p. 14)  In all the cases he reviewed, he says they have the same issue with regard to the 48-hour rule and no field notes.  (DE 131, p. 15)

He refers to a specific case which he reviewed being Inspectional Service Bureau Case SH 2013-031 by Joseph Jackson.  (DE 131, p. 16) He says this case follows the same patterns and practice where it contains a lot of memos, a lot of pictures, event photos of the officers with about 120 (sic) officers on the scene and 22 pages of event chronology that is printed off the computer.  However, it has no notes or diagrams.  (DE 131, p. 16) He says that of the 22 officers on the scene customarily the Homicide Investigators would ask for the officer who responded on the scene to produce a supplement report.  (DE 131, p. 16) He acknowledges that statements were taken of the principal officers, homicide and witnesses. (DE 131, p. 17) He states that the file shows that the matter was referred to the District Attorney who decided not to present it to the Grand Jury.  (DE 131, p. 17) He cannot testify as to whether there were any challenges to any of these investigations.  (DE 131, p. 18) Further, he does not know how many of these were determined to be justified and how many not justified.  (DE 131, p. 18) In summary, Mr. McFadden bases his opinion that these other investigations were inadequate due to the use of the 48-hour rule, ISB taking the lead from homicide; not separating the officers on the scene; and not finding field notes in the files.  He refers to no authorities, papers, treatises, other writings, or experts in the field of police practices to support his conclusions.  His only support is that he had attended classes that deal with these subjects.  (DE 131, p. 72) As the Court said in Thomas, "If the witness is relying solely or primarily on the experience, then the witness must explain how the experience leads to the conclusions reached. . . . and how the experiences reliably apply to the facts.  The Trial Court's gate keeping function requires more than simply 'taking the expert's word for it."  398 F.3d at 431.

The bottom line is Mr. McFadden is attempting to impose his standards without more on the Memphis Police Department.  He emphasizes the lack of field notes in the reports and the failure to take

_____

[4] He does not point to anything in the reports that says the officers were not separated.  In his deposition testimony Major Mark Winters who was an ISB investigator from 2000 to 2005 and came back in 2009 states that officers are separated as part of the investigation.  (Exhibit 3 Winters Depo., pp. 21, 39)

statements from every officer on the scene. Referring to the field notes, he simply testified that he did not see any in any of the files. (DE 131, p. 16) This is not to say that there may have been notes taken and the information incorporated in the file and then the notes are discarded. (DE 131, p. 16) Mr. McFadden's only response to that inquiry is that in his training do not discard the notes. (DE 131, p. 16) He does not cite any authorities for his position nor does he refer to any other departments around the country regarding their use of notes. As far as taking statements from every officers on the scene, it is difficult to see the need to take a statement from an officer who is merely responding to a call, exercising crowd control, directing traffic or isolating the crime scene. The investigators are the primary functionaries and their findings are in the report.

Although Mr. McFadden concludes that the Memphis Police Department's investigation is woefully inadequate, even if some of the aspects of the investigation might have been better and may suggest negligence or inadvertence, this is insufficient to maintain a Section 1983 action. See <u>Daniels v. Williams</u>, 474 U.S. 327 (1986). Also this fails to take into consideration that under Section 1983 failure to conduct a meaningful investigation after an individual's rights have been violated cannot logically be the moving force behind the alleged constitutional violation. <u>Daniels v. City off Columbus</u>, 2002 U.S. Dist. Lexis 28130.

Mr. McFadden goes on to say, "The absence of such documentation produce an inadequate investigation and certainly creates the appearance but Memphis Police Department either does not want to discover any evidence to contradict the self-serving statement about the officers that killed Steven Askew or they did discover facts that would support prosecuting the officers and chose to sweep these facts under a rug to avoid the embarrassment of having to prosecute two (2) white officers, one with lengthy history of conduct for the death of an innocent black man with no criminal record."[5] (DE 131, p. 38) He says that there was a lot of racial tension in the United States at that time and Memphis would have had a riot. (DE 131, p. 38) These statements by Mr. McFadden are self-serving, unsupported, inconclusive, rank

---

[5] At the time of the shooting, Mr. Askew had a blood alcohol content of .119, was in possession of a firearm and had marijuana in his system. (DE 131, pp. 39-40)

speculation and improper testimony for an expert.  No matter how good an expert's credentials may be they are not permitted to speculate.  Federal Rules of Evidence 702; <u>Tamraz v. Lincoln Elec. Company</u>, 620 F.3d 665, 667 (6th Cir. 2010).

Pushing on Mr. McFadden opines that "the chain of command simply provided incomplete and inadequate summaries of evidence that the investigating officers wanted to the chain of command to see, as if the whole investigation was just an exercise to exonerate the officers without really trying to get to the truth."  (DE 131, p. 42) Again, Mr. McFadden is dealing in speculation, conclusions, credibility and state of mind all of which should be excluded.  <u>Johnson v. Baker</u>, 2009 U.S. Dist. Lexis 99080.  As to Mr. McFadden's take on the 48-hour rule, the failure to take field notes and the failure to have a statement from all officers on the scene, it is based solely on his "say so."  Under <u>Daubert</u> the Court noted that "another consideration is whether the theory or techniques has been subjected to peer review and publication."  <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1349 (6th Cir. 1994).  There is nothing in Mr. McFadden's report that refers to peer review or publications.  Furthermore, Mr. McFadden has not written any articles on police procedure or policy.  (DE 131, p. 67)

In reviewing the 39 cases Mr. McFadden is basing his opinion on ISB files that were furnished to him.  There has been no showing of an in-depth review of the underlying facts, to determine if the 48-hour rule was used, if the officers were not separated, if no notes were taken and if ISB interfered with the homicide investigation.  See, <u>Berry,</u> Id at 1352.

Since Mr. McFadden testified that he was not aware of any challenges to the investigations in the 39 cases, the City cannot be said to have a policy of ratifying unconstitutional conduct by failing to properly investigate a complaint when no complaint was made.  <u>Morrison v. Bd. of Trs.</u>, 529 F. Supp. 2nd 807, 825 (D.C. Ohio 2007).  In addition there is no evidence that the City was on notice of any inadequate investigations in the past and failed to act.  <u>Thomas</u>, 398 F.3d at 432.  <u>Stemler v. City of Florence</u>, 126 F.3d 856, 865 (6th Cir. 1997).

## WITNESSES

Next on the issue of notes, Mr. McFadden says that there are none to be found in connection with the walk-thru by the Internal Services Bureau with Officers Aufdenkamp and Dyess and that the officers failed to canvas the area to look for potential witnesses. (DE 131, p. 18) He refused to assume that there was a possibility that notes were taken and what they found was incorporated into the ISB report. (DE 131, p. 18) He states that the Memphis Police Department failed to canvas the area to look for potential witnesses and it was three (3) days before they went back out. (DE 131, p. 20) He acknowledges that they did go back the third day and found witnesses. (DE 131, p. 20) He is not saying that there were not enough witness statements taken in the case but he finds fault with the timing and contents of the statements in that they could have been more in-depth. (DE 131, p. 21) Mr. McFadden produces no authorities regarding taking statements three (3) days after the incident, nor guidelines as to what constitutes an in-depth statement.

## OFFICERS' ACCOUNT OF INCIDENT

Mr. McFadden says there is a major inconsistency in the initial statements taken by Officer Drew at the scene wherein it is stated that the suspect fired his weapon but later said that it was unsure if he had fired a shot. (DE 131, p. 32-33) When asked if the officers could have been mistaken about the suspect firing shots first, he deflected the answer by saying it they were it was a huge mistake that cost the suspect his life. (DE 131, p. 34) As a follow up, Mr. McFadden was asked if the suspect ever pointed his weapon at either one of the officers, he responds by saying that based upon the facts he has his opinion does not support that. (DE 131, p. 34) He does not articulate what facts support his opinion. When again asked if the suspect pointed a gun at the officers would they be justified in using deadly force, he dodges the answer by saying that based on the facts that he has at the time he cannot answer that correctly. (DE 131, p. 34) When asked if the first officer fired a shot, the other officer could have mistakenly thought the shot was being fired by the suspect, Mr. McFadden states that goes to lack of training without elaborating on how the training applies to this situation. (DE 131, p. 35)

## INAPPROPRIATE USE OF FACTS

An example he uses is that the report of Detective Jason Randolph, the lead investigator for the Internal Services Bureau, did not contain critical information that was provided by witnesses Alicia Tucker and Deneshia Bowen. (DE 131, p. 43) He states that Officer Randolph did not take into consideration the fact that one witness said she saw Mr. Askew's hands on the steering wheel. (DE 131, p. 43) However, in her statement the witness said she was not able to see exactly what the shooting victim was doing inside the car. (DE 131, p. 44) Mr. McFadden said that was not contradictory and he did not feel like Officer Randolph properly conducted the interview with the witness. (DE 131, pp. 44-45) When confronted by the testimony in Homicide Detective Merritt's deposition to the effect that he went up to the apartment where the witness was standing and it was clear that she could not see anything that was going on inside the car, Mr. McFadden's response was he had not finished reading Mr. Merritt's deposition and had not gotten to that point. (DE 131, p. 45) Under the circumstances it is unlikely the witness could have seen Mr. Askew's hand on the wheel. Mr. McFadden insists that the statement of the witness who said she saw his hands on the wheel is critical to the investigation. (DE 131, p. 46) This begs the question of the value of Mr. McFadden's opinion if he places the emphasis on a witness' statement where the evidence is virtually conclusive that she could not have seen Mr. Askew's hands on the wheel. See Crislip v. City of Toledo, 488 Fed. Appx. 107, 120 (court not required to accept expert opinion that lacks a basis in fact.)

## SEGMENTATION

Mr. McFadden questions why the officers left one area and went to the location where Mr. Askew was located. (DE 131, p. 48) They did not put on the blue lights nor did they activate the PA system. (DE 131, p. 48) It was inappropriate for the officers to approach the vehicle in the manner that they did and in tapping on the window and yelling and screaming. (DE 131, p. 49) He labels this action on the part of the officers as "impulsive behavior." (De 131, pp. 48-49) There is no reference to any studies regarding what constitutes impulsive behavior or what training Mr. McFadden has in this area. There is

12

no reference to any standards with regard to the appropriate way to approach a vehicle in these circumstances. The conclusion is that this is the way it is supposed to be done because the expert says so.

Also to be considered is the relevance of this line of testimony under the Segmenting Rule. In Livermore v. Lubelan, 476 F.3d 397, the court stated that the proper approach under Sixth Circuit precedent is to view excessive force claims in segments. Citing Gattas v. Redford TWT, 365 F.3d 763 (6th Cir. 2004); Dickerson v. McClallen, 101 F.3d 1151, 1162 (6th Cir. 1996); and Great House v. Couch, 433 Fed.Appx. 370, 371 (6th Cir. 2011). The court said that under the Segmenting Rule the court is to carve up the events surrounding the challenged police action and evaluate the reasonableness of the force by looking only at the moments immediately preceding the officer's use of force which approach "applies even to encounters lasting very short periods of time." Couch, at 371. Here the failure to put on blue lights, to activate the PA system, to approach Mr. Askew's vehicle in the manner the officers did and in tapping on the windows and yelling and screaming are all events leading up to the ultimate use of force and should be excluded under the segmenting rule.

**TRAINING**

Mr. McFadden acknowledges that he has received the training records of both officers which includes their basic training, their in-service training or any other training that they received. (DE 131, p. 52) For example, he says the training was not up to par in a de-escalating situation when approaching a high risk vehicle. (DE 131, p. 53) He admits that there was training in this area but according to him "it could have been better training." (DE 131, p. 53) He says that in the training they should show different scenarios and talk about it more, a lot of aspects of it. (DE 131, p. 53) When asked how do you know how much they talked about it, his response was, "Well, if ---- they did, then I would have been ---- I ----- what I don't so I don't know ----- so then that limits me to what they did." (DE 131, p. 53) He looked at use of force video tapes which were very generic, very basic which he says were inadequate (DE 131, p. 52) Without any plausible support for his opinion and something more than "it could have been better" or it was "very generic" his so called expertise would be of no benefit to the court and jury.

## LACK OF KNOWLEDGE OF THE FACTS

There are several fact inconsistencies in Mr. McFadden's testimony which calls into question how thorough he was in preparing his report. He was asked how many times the officers asked or told the shooting victim get out of his car. He responded he didn't think that that was ever asked by the detectives. (DE 131, p. 56) However, the witness statements which were available to Mr. McFadden clearly show that one witness said the officers told him to get out of the car at least three times and another witness acknowledged that the officers told him to get out of the car several times. (DE 131, p. 56) He states that Officer Dyess never saw Mr. Askew pick up the gun or grab the gun. (DE 131, p. 57) In his statement which was furnished to Mr. McFadden, Officer Dyess said he saw the subject's arm extend straight out toward his partner on the passenger side of the car and saw the muzzle of the gun protruding from his hand. (DE 131, p. 57) He says that Dyess did not know what side of the car he was on. He said it was unclear as to what side of the car Officer Dyess was standing on at the time. (DE 131, p. 57) In his statement, Officer Dyess said he walked up on the driver's side and his partner walked up on the passenger's side. (DE 131, p. 58)

## STATE OF MIND - PERCEPTIONS

Mr. McFadden states in his professional opinion he believes that Officer Dyess panicked, fired his weapon in the heat of the moment and for no other reason than simply firing when he realized Officer Aufdenkamp fired his weapon. (DE 131, p. 58) This is a conclusion on the part of Mr. McFadden as well as his opinion of Officer Dyess' state of mind. This testimony should be excluded. See <u>Johnson v. Baker</u>, 2009 U.S. Dist. Lexis 99080*13. He acknowledges, however, that if the officers perceive a threat they are justified in using their weapon. (DE 131, p. 58) In his report, Mr. McFadden states "It is apparently undisputed, however, that the victim had a cigar in his right hand and I believe that the officers mistakenly thought that the victim was pointing a gun at Officer Aufdenkamp when he was really just extending his right hand toward him with a cigar." (DE 134, pp. 3, 4, 19)

## INAPPROPRIATE LEGAL CONCLUSIONS,
## SPECULATION AND PEJORATIVE COMMENTS

Mr. McFadden testified that in accordance with his report, it is his opinion that the Memphis Police Department failed to train its officers, including Dyess and Aufdenkamp, in a way that would protect them and preserve the civil rights of citizens like Steven Askew.[6] (DE 134, p. 14-15) Moreover, as the officers testified that no supervising officer had been critical of their conduct on the night in question and as the Memphis Police Department chose not to discipline them for any of their actions, the Memphis Police Department has ratified their conduct and is sending the message to its other officers that they would be justified in using deadly force in a situation like the one at issue in this case. (DE 131, p. 50, emphasis added) Mr. McFadden concedes that in using the word "ratified" it is a legal term. (Depo., p. 195) In Berry, 25 F.3d at 1353, the Court said, "This circuit is in accord with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion." Citing Hygh v. Jacobs, 961 F.2d 359, 363 (2nd Cir. 1992). Mr. McFadden goes on to make an inappropriate conclusion that by ratifying the officers' conduct this is sending a message to other officers that they would be justified in using force in a situation like the one in this case.[7] (DE 131, p. 50) As the Court said in Berry this comment assumes, "without any basis in fact or logic, that police officers will be extravagant in their use of deadly force if they know discipline will not be severe if a shooting occurs. We are not talking about cheating on overtime here, or some other minor peccadillo; we are talking about the taking of the life of another person." Id., at 1351.

Mr. McFadden says in his report that Officers Dyess and Aufdenkamp demonstrated that their own unreliable and deliberate conduct created a high risk aspect of this encounter. (Depo., p. 193) They went from the scene and deliberately went over there and created another scene. (DE 131, p. 50) His use

---

[6]Violation of civil rights is a legal term which is repeatedly used by Mr. McFadden. (DE 134, pp. 5, 6, 15)

[7]He makes the same conclusory comment when he says that if officers are led to believe they will be exonerated any time they say they were in fear of their life or that they thought decedent had a gun will be a common excuse and result in increased number of officer involved shootings. (DE 134, p. 24)

of the word "deliberate" means that something was done on purpose or purposely done.  (DE 131, p. 50)
Deliberate equates to deliberate indifference which goes beyond the scope of acceptable expert testimony.
See Berry, 25 F.3d at 1352.

In the same vein, Mr. McFadden says that he thinks the officers purposely changed their
statement after getting information from the scene and realizing that ballistic evidence did not support
what they first told Officer Drew. (emphasis added)  (DE 131, p. 36)  In his own words this is the same as
deliberately doing something.  (DE 131, p. 50)

In summing up the activities of the officers in their approach to Mr. Askew, he states that all of
this displays a lack of training and/or inadequate policies or at least enforcement of policies on the part of
the Memphis Police Department as these officers testified they handled this situation the way they were
trained to do. (DE 131, p. 51)  This lack of training policy implementation was the moving force behind
the death of Mr. Askew.[8]  (DE 131, p. 51)  This is indeed a quantum leap which is beyond the realm of
his expertise.

Mr. McFadden discusses the approach by the officers to the Askew vehicle and testifies that by
not choosing to put on their blue lights or siren on, the officers put themselves in danger and put Mr.
Askew in extreme harm and ultimately caused his death.  (DE 131, p. 53) Another use of a legal
conclusion and indulgence in sheer speculation.

Apparently to place emphasis on his opinion, Mr. McFadden repeatedly states that investigation
in this case was "woefully" inadequate.  (DE 131, p. 13, 18, 24, 31, 36) These are conclusory
condemnations of the Memphis Police Department's investigation which is nothing more than attempting
to tell the jury what result to reach.  See Berry, 25 F.3d at 1353 citing High v. Jacobs, 961 F.3d at 364.  If
the rule was otherwise, "We would soon need a whole new category of 'liability experts' whose function
would be to tell the jury what result to reach."  Id. at 1354.

---

[8]Mr. McFadden uses "moving force" several times.  (DE 134, pp. 16, 17,21)

The culmination of the lack of objectivity in Mr. McFadden's report can be found in his inappropriate conclusion that police officers in this case "lied." (DE 131, p. 67)  (See Holcomb v. Washington, Metro Area Transit (526 F.3d 22, 29) (testimony excluded where expert implied that Defendant was untruthful.)   Lee v. Metro Gov't of Nashville & Davidson County, 432 F.Appx. 435, 448 (6th Cir. 2011) (witness credibility solely within jury's province)

## CONCLUSION

Based upon the foregoing, the expert's repeated attempt to enforce his legal conclusions, speculation and inappropriate comments justifies excluding his testimony in its entirety.  See Killion v. KeHe Distribs., LLC, 761 F.3d 574, 593 (6th Cir. 2014) (repeated improper use of terms basis for excluding entire report); Summerland v. County of Livingston, 240 Fed.Appx. 70 (6th Cir. 2007).

Respectfully submitted,
/s/ Henry L. Klein
Henry L. Klein, #8856

/s Richard J. Myers
Richard J. Myers #15577
APPERSON CRUMP PLC
6070 Poplar Ave., Suite 600
Memphis, TN 38119
Phone:  901-756-6300
Attorneys for City of Memphis

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of the foregoing has been forwarded to the following via U.S. mail, postage prepaid this the _____ day of September, 2015:

Howard Brett Manis
MANIS LAW FIRM
1000 Ridgeway Loop Road
Suite 320
Memphis, TN 38120

Zayid Saleem
City Attorney=s Office
125 N. Main Street
Ste. 336
Memphis, TN 38103

Jeffrey S. Rosenblum
Matthew T. May
ROSENBLUM & REISMAN
6070 Poplar Avenue
Suite 500
Memphis, TN 38119

Elijah Noel, Jr.
Harris Shelton Dunlap Cobb & Ryder
One Commerce Square
Suite 2700
Memphis, TN 38103

Deborah E. Godwin
Mary Elizabeth McKinney
Godwin Morris Laurenzi & Bloomfield, P.C.
Morgan Keegan Tower
50 N. Front St., Suite 800
Memphis, TN 38103

<u>/s/ Henry L. Klein</u>

COPY

IN THE CIRCUIT COURT OF TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

---

STERLING ASKEW, as father, next of
kin, and as administrator ad litem/
personal representative of the
Estate of STEVEN ASKEW, Deceased, and
SYLVIA ASKEW, as mother and next of
kin of STEVEN ASKEW, Deceased,

        Plaintiffs,

VS.                    NO.  CT-000104-14
                        DIVISION II
CITY OF MEMPHIS;        JURY DEMANDED
TONEY ARMSTRONG, in his individual
capacity and official capacity as the
Police Director of the Memphis Police
Department; OFFICER NED AUFDENKAMP (#11914),
individually and in his official capacity
as a police officer with the Memphis Police
Department; OFFICER MATTHEW DYESS (#12402),
individually and in his official capacity
as a police officer with the Memphis Police
Department,

        Defendants.

---

DEPOSITION
OF
J.B. COBB
JULY 31, 2015

SAMANTHA E. COHEN, RPR, CRR, LCR(TN)
RIVERSIDE REPORTING
22 North Second Street
Suite 303
Memphis, Tennessee  38103
(901) 527-1100



1       well?

2       A     I know there were several.  I couldn't

3       tell you how many.

4       Q     Your note states that there was an

5       Officer G. Patrick there.  Do you remember him

6       being there and observing the walk-through?

7       A     If that would be the union

8       representative --

9       Q     I'll let you see what you wrote in your

10      notes that you actually documented concerning

11      the walk-through.

12      A     I mean, if he -- if -- I remember Officer

13      Patrick being there.  I don't -- in other

14      words, I don't know what he would -- if he

15      walked in this door right now, I wouldn't be

16      able to describe him.  I know that there

17      was --

18      Q     But let me ask --

19      A     -- a union rep with him.

20      Q     Let me ask you this way.  Do you have a

21      specific recollection of an officer that was a

22      union rep walking through -- going with

23      you-all through the walk-through?

24      A     Yes.

**City of Memphis**
**Police Division**
**Inspectional Services Bureau**

---

| Principal Officer Statement |
|---|

| | |
|---|---|
| **Officer's Name:** Aufdenkamp, Ned | **Rank:** POLICE OFFICER II |
| **DOB:** 11/24/1982    **DOE:** 07/09/2007 | **IBM:** 11914 |
| **Assignment:** Mt. Moriah Station | **Shift:** D |
| **Statement taken at:** 2714 Union Ext. | **Date\Time:** 1/21/2013, 10:51 A.M. |
| **Typed By:**  K. Gaines #12727 | **Date\Time:** 1/22/2013, 1:14 P.M. |
| **Questioned By:** Detective Jason Randolph & J. B. Cobb | |
| **Relative to ISB File:** SH2013-004 | |

Q: Could you state your name and IBM for the record.
A: Ned Aufdenkamp, IBM 11914.

Q: Are you aware this statement is being recorded?
A: Yes.

Q: Do you wish to have an advis..., advisor present during this statement?
A: Yes.

Q: Advisor could you state your name and IBM for the record?
A: Michael R. Williams, IBM 5702.

Q: Ah Officer Aufdenkamp have you read and did you understand the Garrity Advisory Form?
A: Yes.

Q: Have you dated and signed the form?
A: Yes.

Q: Do you understand that a refusal to answer questions relevant to this investigation constitutes a violation of policy and procedure?
A: Yes.

Q: Will you now participate in the interview by the Inspectional Services Bureau of this department?
A: Yes.

Q: Have you had an opportunity to read the affidavit of complaint prior to this statement being taken?
A: Yes.

Case #: SH2013-004


EXHIBIT
2

Page 1 of 8

NA 11914

Q: And how long have you been employed by the Memphis Police Department?
A: Just over three years.

Q: What is your current duty assignment?
A: Um Mt. Moriah, delta shift PII.

Q: What car were you assigned to on ah January 17, 2013?
A: 325 Delta.

Q: Was that a one or two man car?
A: Two man car.

Q: And who was your partner?
A: Officer Dyess.

Q: Were you involved in a police related shooting on January 17, 2013 at approximately 22:00 hours?
A: Yes.

Q: Was this a dispatched call?
A: Yes.

Q: What was the nature of the ~~car~~ *call*?
A: Loud music.

Q: What were the names of any other officers on the scene?
A: Officer Dyess.

Q: Did any other officer or civilian witness the shooting if so who?
A: No.

Q: In detail can you describe what happened ah after you arrived on the scene of this call?
A: Ah we made the scene regarding the loud music we went to the back ah the apartment complex saw a car running with ah male black slumped back in his seat, appeared to be passed out. Ah assuming that the music might have been coming from that vehicle, turned our car around to point at it turned the overheads on ah both my partner and I approached the driver side with our flashlights; peeped in ah saw the passenger or driver slumped back. Ah several items in the car includes a liquor bottle and ah what appeared to be beer can inside ah paper bag, I went around to the passenger side to get a better view to make sure to see is anything else in the vehicle that we needed to know about for officer safety. Ah I shined my light in shined it in his face ah tried to get his attention, tapped on the window ah when he started to wake up his hands moved and ah the handle of ah handgun was poking up from between his legs. I advised my partner we had a gun involved there was a gun in between his lap ah we started giving verbal commands I drew out with the flashlight still in my left hand drew out with my left hand drew out with my right hand, giving verbal commands he, advised him we were the police, put his hands up put his hands up several times. He woke up looked at myself looked at my partner he reached around with his left hand did like a gang sign that's the only thing I could interpret it as towards me and ah refused to comply. I kept telling him to put his hands up we got on the radio requested more cars saying we had one being uncooperative with a gun, continued to give verbal commands. At that point he grabbed the gun with his left hand started to turn towards me smiled

Case #: SH2013-004                                    Page 2 of 8

at me and pointed the gun ..... at in my face and that point I fired up..... in and my partner started firing, I backed up to the back of the car took cover.

Q: Describe the weapon that you fired?
A: Ah its Sig ah 229 it's ah our duty weapon.

Q: Ok and how many rounds did you fire?
A: I don't know.

Q: If you had to approximate could you approximately state how many rounds you fired?
A: I really don't know, I couldn't tell you.

Q: Was it more than two?
A: I believe more than two yes.

Q: Was it more than five?
A: I don't know.

Q: Did you ah reload your magazine?
A: Yes sir.

Q: Ok ah did you fire empty did, did your slide lock to the rear?
A: No.

Q: But you performed ah tact reload?
A: Yes.

Q: When you approached the vehicle ah was it running was the car?
A: Yes.

Q: Turned on the ignition running?
A: Yes.

Q: Ah what drew you suspicion to the vehicle if anything?
A: Ah mainly the gentleman being slumped back, the fact that it was running and he was slumped back passed out.

Q: And when did you first see the suspect's weapon?
A: Um after I'd tapped on the window to get his attention he moves it cause his hands kind of move apart.

Q: And it was in between his legs?
A: Yes sir.

Q: And describe what you did again immediately after you saw the weapon?
A: Ah I drew out and I gave verbal commands advised that we were the police and continued to give verbal commands to put his hands up.

Q: You also stated you advised your partner gun, we have a gun.
A: Yes.

NA/1914

Q: And who called for bup ... p on the radio was that yourself or yo... ...ther?
A: I did.

Q: Did you see anything else in the suspect's hand?
A: No.

Q: You said he had the gun in his left hand?
A: When he picked it up he drew grabbed in his left hand, yes.

Q: Ok and pointed it at you?
A: Yes.

Q: Ah when you stated he did a gang sign or something towards you was that with his ah left or right hand?
A: That was with his left hand at that time also.

Q: Ok and this the same hand he picked the weapon up with?
A: Uh huh.

Q: Did you notice anything in his right hand?
A: Right hand no.

Q: You never saw a cigarette or marijuana cigarette or?
A: No.

Q: Cigar or anything like that?
A: No.

Q: Did the suspect say anything at all?
A: No.

Q: During this incident?
A: No

Q: What was the distance between ah you and the suspect when you discharged your weapon?
A: About four feet.

Q: And do you know what your rounds struck?
A: Um unsure.

Q: Did any of them go through the windows?
A: Yes.

Q: Did any go through the either the front or back windshield?
A: Ah front windshield I don't know, I know back windshield yes.

Q: So some of your rounds did go through the back windshield?
A: Yes sir.

Q: Was that because you was retreating to cover?
A: Yes sir.

**Case #: SH2013-004**

Page 4 of 8

Q: Was there any what, what did you use for cover.
A: I used the ah door frames, door frames in the back of the car.

Q: Was the suspect injured?
A: Yes.

Q: And the, the extent of that injury?
A: I I'm assuming gun shots.

Q: Um saying what was the was he pronounced DOA on the scene?
A: Yes sir.

Q: Ok ah could you tell what the suspects reaction was after the after the after or during the shooting?
A: No sir.

Q: Did he make any movement or anything that did he try to get out of the car or anything like that?
A: No sir.

Q: After the ah shooting did you or your partner ever go inside of the vehicle?
A: No sir.

Q: Was the suspect treated on the scene or was eh transported?
A: Treated on the scene.

Q: Did the rounds you fired cause any property damage, if so can you describe the damage?
A: Only to the vehicle that I know.

Q: To the suspect's vehicle?
A: Yes sir.

Q: Oh to your knowledge was any other vehicle in the parking lot struck?
A: Not that I know of.

Q: And you stated you gave loud verbal commands to the suspect prior to the shooting?
A: Yes sir.

Q: Had you had any previous encounter with this suspect?
A: No sir.

Q: Describe the suspect weapon again to me?
A: Ah its ah handgun, silver had like ah I believe a dark colored handle on the whole handle or just partial handle.

Q: Ok did he ever fire the weapon?
A: I don't know.

Q: What were the lighting conditions at the time you fired your weapon?
A: Ah we had artificial lighting from street lights from my overheads and my flashlight.

Q: And what was your background when you fired?
A: A wooden fence and a brick wall.

Q: Were there any officers or civilians in your line of fire when you fired?
A: No sir.

Q: Where was your partner standing when you fired?
A: He's standing towards the rear of the driver's side.

Q: And you was standing at the rear of the, I mean the rear of the passenger side?
A: I was at the passenger window yes.

Q: Did any other officer fire they weapon?
A: Yes sir.

Q: That was your partner?
A: Yes sir.

Q: Who notified the dispatcher of the shooting?
A: I did.

Q: And you stated when you ah when you and your partner got out of the, you both approached initially on the drivers side?
A: Yes sir.

Q: And then you walked around to the passenger side to get a better view?
A: Yes sir.

Q: And your partner stayed on the driver's side?
A: Yes sir.

Q: How was your um your weapon and your magazines loaded on this night?
A: Ah twelve in the magazine and one in the chamber.

Q: Is that the way you normally load it?
A: Yes sir.

Q: And how many extra magazines do you carry?
A: Two fully loaded magazines.

Q: Did anybody from Security Squad inspect your weapon ah that night on the scene?
A: Yes sir.

Q: Was it also tagged by Crime Scene?
A: Yes sir.

Q: You initially got the call as a loud music call correct?
A: Yes sir.

Q: Was that car in the immediate area of were the complaint was drawn toward?

Q: When you got out of your squad car was there loud music coming from that car?
A: Not at that moment no sir.

Q: Were there any civilians that pointed out this car as possibly being the car that or where ever the loud music was the source was coming from?
A: No sir.

Q: Did you fire any rounds from your second magazine?
A: No sir.

Q: And you and your were both in full uniform?
A: Yes sir.

Q: And you plainly identified as a police officer?
A: Yes sir.

Q: And you were driving a marked squad car?
A: Yes sir.

Q: Ok prior to the ah shooting did what was your ah I guess your initial assessment of the suspect what was his condition would you say?
A: Ah basically just he appeared highly intoxicated.

Q: Ok and the vehicle was still running?
A: Yes sir.

Q: And you stated you did not go inside the car?
A: No sir.

Q: And your partner did not go inside the car?
A: No sir.

Q: Who was the first person to go inside of that car?
A: Ah I believe it was paramedics.

Q: Did anybody else go in that car other than the paramedics?
A: I don't know.

Q: And you stated you shot more than two times?
A: Yes sir.

Q: Did you shoot more than five times?
A: I don't know sir.

Q: And why do you think it was necessary to shoot more than two times?
A: Until I got cover with ah the treat was still there until I was able to get some cover.

_threat_

Q: So were you shooting at the car before you actually got covered?
A: I had minimal cover at first and I retreated to the back of the car.

**Case #: SH2013-004**                                            **Page 7 of 8**

NA11914

Q: You were shooting and moving to cover simultaneously at the same time, correct?
A: Yes sir.

Q: Ok do you know who fired first was it you or your partner?
A: I did.

Q: Once you got cover at the back of the car did you fire anymore shots once you were at the back of the car?
A: Ah a few more while I was still moving towards the around the back bumper once I got there all shooting stopped.

Q: Is that were you conducted your tact reload?
A: Yes sir.

Q: Is that consistent with your training?
A: Yes sir.

Q: And for clarification the gun that the suspect had he did point it at you?
A: Yes sir.

Q: And it was in his left hand or his right hand?
A: His left hand he had it turned towards me to point at me.

Q: And did you see anything in his right hand?
A: No sir.

Q: Is there anything else you would like to add to your statement that may assist us in this investigation?
A: No sir.

Show this statement ending time is 11:07 am.
Typed By: Ketressa L. Gaines 12727
Completed 1/22/13 @ 1:14 pm

I will ask you to read the preceding pages of this typewritten statement and if you find the same to be true and correct as a statement given by you, I ask you to initial the bottom of the preceding pages and sign your name on the line below.

_____ 11914        _____
            **Signature**                              1/23/13
                                                    **Date**

**Case #: SH2013-004**                              **Page 8 of 8**

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF TENNESSEE

3                       WESTERN DIVISION

4    _____

5    STERLING ASKEW as father, next
     of kin and as Administrator
6    Ad Litem/Personal Representative of
     the Estate of STEVEN ASKEW, Deceased,
7    and SYLVIA ASKEW as mother and next
     of kin of STEVEN ASKEW, Deceased,
8              Plaintiffs,

9    VS.                     No. 2:14-cv-02080-STA-tmp

10   CITY OF MEMPHIS, TONEY ARMSTRONG,
     in his individual capacity and official
11   capacity as the Police Director of the
     Memphis Police Department; OFFICER NED
12   AUFDENKAMP (#11914), Individually and in
     his official capacity as a Police Officer
13   with the Memphis Police Department; OFFICER
     MATTHEW DYESS (#12402), Individually and in
14   his official capacity as a Police Officer
     of the Memphis Police Department,
15             Defendants.

16   _____

17       THE DEPOSITION OF MAJOR MARK WINTERS

18   _____

19                     May 18, 2015                 COPY

20

21

22            LISA C. VAUGHN, RPR, LCR
              Riverside Reporting Service
23         22 North Second Street, Suite 303
              Memphis, Tennessee  38103
24                  (901) 527-1100



EXHIBIT
3

1    actually involved in this particular

2    investigation?

3    A    The report would reflect how many people

4    was there.  I don't have it in front of me,

5    but I know there is myself.  Major Patterson

6    made the scene, Detective Randolph, I believe

7    Detective Cobb and probably a couple more.  I

8    just don't recall without notes, you know, or

9    the report knowing exactly --

10   Q    We'll look at that specifically in a

11   second.  Is Cobb the same rank as Randolph?

12   A    He is.

13   Q    So walk me through the standard operating

14   procedure for you whenever there's an

15   officer-involved shooting involving a serious

16   injury or death.  What do you all do?

17   A    Well, as previously said, we make the

18   scene.  We examine the evidence.  We notate

19   where the -- the crime scene area.  We -- you

20   know, there's -- do you want -- I mean...  We

21   do -- we go through all the steps, and those

22   steps -- you know, as I said previously, you

23   know, we're going to get on the scene.  We're

24   going to locate the witnesses, separate the

1    witnesses, locate the officers involved,

2    separate the officers.

3         At that point in time, we'll coordinate

4    with Homicide to start taking statements of

5    those witnesses, including officers that were

6    not involved in the shooting.  Those officers

7    that's actually involved in the shooting, of

8    course, are given 48 hours before we take

9    those statements.

10        We send those people to Homicide.  We

11   conduct a canvass of the area to locate any

12   possible witnesses.  We examine the physical

13   evidence on the scene.  Like, in this

14   particular matter, you -- this particular call

15   you have the car.  You have the suspect inside

16   the car.  You have a number of items inside

17   the car, the glass breakage, shell casings

18   around the area, those type of things; make

19   sure Crime Scene is taking the photographs

20   that we would require.

21        At that point in time, there is a drug

22   test for the officers, and then there's the

23   relief of duty.  And that's kind of what goes

24   on that night.  Make sure the car gets towed

1    where if they don't want to give a statement

2    they have that right.

3         So we're together, but we're separate at

4    the same time because we -- we have to balance

5    both of those.

6    Q    How many years have you been working with

7    ISB?

8    A    I was an investigator there from 2000 to

9    2005.  I came back in 2009 as a lieutenant,

10   and I've been there since.

11   Q    From 2000, when you first started

12   working, I've got a stack of investigations

13   here that we'll go through in just a bit, do

14   you know how many -- can you give me how many

15   lawsuits have been filed following

16   officer-involved shootings?

17   A    I don't -- I couldn't answer that

18   question.  I don't know.

19   Q    Is it something that's on your radar

20   screen that we could get sued when we're doing

21   this kind of investigation?

22   A    You can get sued doing anything, so --

23   Q    I'm not talking about --

24   A    I can --