IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

STERLING ASKEW, as Father, Next of Kin
and as Administrator Ad Litem/Personal
of the Estate of STEVEN ASKEW, Deceased, and
SYLVIA ASKEW, as Mother and Next of Kin
of STEVEN ASKEW, Deceased,

     Plaintiffs,

v.                                     No. 2:14-cv-02080-STA-tmp

CITY OF MEMPHIS,
TONEY ARMSTRONG, Individually,
and in His Official Capacity as the
Police Director of the Memphis Police Department,
OFFICER NED AUFDENKAMP (#11914),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,
OFFICER MATTHEW DYESS (#12402),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,

     Defendants.

---

NOTICE OF FILING OF REPORT
OF MICHAEL A. KNOX

---

     COMES NOW Defendant City of Memphis, by and through its counsel of record, and

hereby gives notice that the report of Michael A. Knox was filed with the Court on October

1, 2015.

Respectfully submitted,
/s/ Henry L. Klein
Henry L. Klein, #8856

/s Richard J. Myers
Richard J. Myers #15577
APPERSON CRUMP PLC
6070 Poplar Ave., Suite 600
Memphis, TN 38119
Phone: 901-756-6300
hklein@appersoncrump.com
rmyers@appersoncrump.com
Attorneys for City of Memphis

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a true and correct copy of the foregoing has been forwarded to the following via U.S. mail, postage prepaid this the 1st day of October, 2015:

Howard Brett Manis, Esq.
MANIS LAW FIRM
1000 Ridgeway Loop Road
Suite 320
Memphis, TN 38120

Zayid Saleem
City Attorney's Office
125 N. Main Street
Ste. 336
Memphis, TN 38103

Jeffrey S. Rosenblum, Esq.
Matthew T. May, Esq.
ROSENBLUM & REISMAN
6070 Poplar Avenue
Suite 500
Memphis, TN 38119

Elijah Noel, Jr., Esq.
Harris Shelton Dunlap Cobb & Ryder
One Commerce Square
Suite 2700
Memphis, TN 38103

Deborah E. Godwin, Esq.
Mary Elizabeth McKinney, Esq.
Godwin Morris Laurenzi & Bloomfield, P.C.
Morgan Keegan Tower
50 N. Front St.
Suite 800
Memphis, TN 38103

/s/ Henry L. Klein



# Knox & Associates, LLC

Forensic Consulting  *WE BRING TRUTH TO LIGHT*

## Forensic Analysis & Reconstruction Report

**Case:**

Sterling Askew v. City of Memphis Police Department
United States District Court, Western District of Tennessee
Case No. 2:2014cv02080

**Author:**

Michael A. Knox
Chief Forensic Consultant
Knox & Associates, LLC
P. O. Box 8081
Jacksonville, FL 32239
(904) 619-3063
mike@knoxforensics.com
http://www.knoxforensics.com

**Prepared For:**

Jeff Rosenblum, Esq.
Rosenblum & Reisman, P.C.
6070 Poplar Avenue, Suite 550
Memphis, Tennessee 38119
(901) 527-9600
jeffr@randrfirm.com

**Date of Report:**  January 20, 2015

**K&A Case No.:**  14-0053

1. **Purpose and Scope**

   1.1. The purpose of this report is to present findings with regard to the analysis and reconstruction of this incident and to offer opinions about the appropriateness of the procedures used by the involved officers.

   1.2. The scope of this report covers reconstruction and physical evidence and an analysis of the procedures used by the involved officers.

2. **Qualifications & Expertise**

   2.1. Education

      1. Ph.D. Candidate, Criminal Justice (Nova Southeastern University)

      2. M.S., Forensic Science (University of Florida)

      3. B.S., Mechanical Engineering (University of North Florida)

   2.2. Experience

      1. Forensic Consultant, Knox & Associates, LLC (2010 - Present)

      2. Police Officer/Detective, Jacksonville Sheriff's Office (1994 - 2010)

   2.3. Professional Training Relevant to Crime Scene Reconstruction

      1. Glock Advanced Armorer's Course, Glock Professional, Inc., 16 hours (Smyrna, GA, 2011)

      2. Optics, Lighting & Visibility for the Forensic Investigator, Clearly Visible Presentations, 32 hours (West Chester, OH, 2011)

      3. Glock Armorer's Course, Glock Professional, Inc., 8 hours (Smyrna, GA, 2011)

      4. Collision Reconstruction Using PhotoModeler, EOS Systems, Inc., 24

hours (Chicago, IL, 2009)

5. Homicide Investigation, IPTM, 40 hours (Jacksonville, FL, 2006)

6. Advanced Bloodstain Pattern Analysis, IPTM, 40 hours (St. Petersburg, FL, 2006)

7. Crime Scene Reconstruction of Shooting Incidents, IPTM, 40 hours (Maitland, FL, 2006)

8. Firearms Instructor, Northeast Florida Criminal Justice Training Center, 44 hours (Jacksonville, FL, 2005)

9. Digital Photography for Law Enforcement, IPTM, 24 hours (Jacksonville, FL, 2005)

10. Bloodstain Pattern Analysis, IPTM, 40 hours (St. Petersburg, FL, 2003)

11. Crime Scene Reconstruction, IPTM, 40 hours (Jacksonville, FL, 2002)

12. Scene Mapping Using Speed Lasers, IPTM, 40 hours (Jacksonville, FL, 2001)

13. Light Energy Applications for Law Enforcement, IPTM, 24 hours (Jacksonville, FL, 2001)

14. Crime Scene Processing Workshop, IPTM, 40 hours (Jacksonville, FL, 2000)

15. Crime Scene Techniques for Buried Bodies & Surface Skeletons, IPTM, 40 hours (Jacksonville, FL, 2000)

16. Basic Evidence Technician, Northeast Florida Criminal Justice Training Center, 40 hours (Jacksonville, FL, 1996)

2.4.    Certification & Accreditation

1. Certified Crime Scene Reconstructionist, International Association for Identification, Crime Scene Certification Board, Certification No. 3024

2. Accredited Traffic Accident Reconstructionist, Accreditation Commission for Traffic Accident Reconstruction, No. 1120

2.5. Additional Qualifications

1. Additional qualifications, including teaching experience and publications are outlined in my current curriculum vitae.

## 3. Items Reviewed

3.1. Documents and Information Supplied by Counsel:

1. crime scene photographs (299);

2. autopsy photographs (420);

3. two cell phone videos;

4. audio interview of Officer Dyess;

5. audio interview of Officer Aufdenkamp;

6. medical examiner's report (17 pages);

7. principal officer statement of Officer Aufdenkamp (8 pages);

8. principal officer statement of Officer Dyess (8 pages);

9. crime scene diagrams (3 pages);

10. MPD Inspectional Services Bureau Case File (4 pages);

11. MPD Case Notes (2 pages);

12. MPD Police Involved Shootings Scene Supplement (4 pages);

13. MPD Memorandum from A. Webb (2 pages);

14. MPD Memorandum from J.B. Cobb (1 page);

15. MPD Affidavit of Complaint (1 page);

16. homicide witness statement of Alicia Tucker (4 pages);

17. homicide witness statement of Deneshia Bowen (3 pages);

18. homicide witness statement of Demetria Bailey (6 pages);

19. homicide witness statement of Officer J. Roney (2 pages);

20. MPD incident report by Officer Roney (7 pages);

21. case notes by Watson (1 page);

22. MPD incident report by Lt. J. Mannon (1 page);

23. MPD response to resistance report (2 pages);

24. MPD crime scene investigation report by S. Wright (3 pages);

25. MPD evidence report (3 pages);

26. MPD CSI photo logs (8 Pages);

27. MPD CSI request for vehicle Processing (2 pages);

28. MPD CSI report by J.P. Smith (3 pages);

29. crime scene log (1 page);

30. MPD CSI report by A. Barbarotto (1 page);

31. MPD CSI request for chemical processing (1 page);

32. MPD property and evidence report (3 pages);

33. MPD event chronology (18 pages);

34. scene investigation by Sgt. Merritt (2 pages);

35. follow-up supplement by Sgt. Merritt (1 page);

36. communications request supplement (1 page);

37. video information supplement by Sgt. Merritt (1 page);

38. call from attorney supplement by Sgt. Merritt (2 pages);

39. area canvass supplement by Sgt. Merritt (2 pages);

40. Alicia Tucker's statement supplement by Sgt. Merritt (4 pages);

41. supplement by Sgt. Lundy (1 page);

42. video supplement by Sgt. Merritt (1 page);

43. medical examiners supplement by Sgt. Merritt (1 page);

44. Deneshia Green supplement follow-up by Sgt. Merritt (1 page);

45. counterfeit cash supplement by Sgt. Merritt (1 page);

46. Tyrol Circle follow-up by Sgt. Merritt ( 1 page);

47. Dominique Wells supplement by Sgt. Merritt (1 page);

48. morgue evidence supplement (2 pages);

49. vehicle processing supplement by Sgt. Poindexter (1 page);

50. processing weapon supplement (1 page);

51. gun trace supplement by Sgt. Merritt (1 page);

52. latent print supplement by Larry Preston (1 page);

53. officer statement supplement by Sgt. Merritt (1 page);

54. case synopsis by Sgt. Merritt (4 pages);

55. ATF Firearms Trace Summary (2 pages);

56. TBO crime lab request (2 pages);

57. MPD felony response supplement (2 pages);

58. deposition testimony of Officer Dyess;

59. deposition testimony of Officer Aufdenkamp;

60. personnel file of Officer Dyess;

61. personnel file of Officer Aufdenkamp; and,

62. investigative materials from personal inspection of vehicle.

3.2.    Examinations carried out by Knox & Associates, LLC:

    1. On Saturday, November 15, 2014, I examined and photographed the vehicle and obtained:

        a.   photographs (89).

    2. I examined the bullet strikes in the vehicle and inserted trajectory rods to depict the various angles.

## 4.    Background

4.1.    On January 17, 2013, at approximately 9:45 p.m., Memphis Police Department Officers Ned Aufdenkamp and Matthew Dyess were dispatched to 3193 Tyrol Court on a report of loud music.

4.2.    While Officers Aufdenkamp and Dyess checked the immediate area for the source of the loud music they found a vehicle, with the engine running, backed into a

parking space in front of 3197 Royal Knight Cove, Windsor Place Apartments, which was not the scene to which they were originally dispatched.

4.3.    A Ford Crown Victoria with a black male occupant, later identified as Steven Askew, appeared to be either passed out or sleeping in the left front driver's seat.

4.4.    Looking in through the right front passenger window, Officer Aufdenkamp saw a firearm in Askew's lap and alerted Officer Dyess who was at the left front door.

4.5.    Askew was awakened by the officers and is alleged to have pointed a .380 Auto pistol at Officer Aufdenkamp.

4.6.    Both officers fired their .40 S&W caliber pistols multiple times, killing Steven Askew.

4.7.    On November 14, 2014, Knox & Associates, LLC was retained by the law firm Rosenblum & Reisman in reference to performing a crime scene reconstruction in this case and to offer opinions concerning this case.

## 5.    Statements

5.1.    Demetria Bailey gave a recorded statement to detectives and stated the following (Homicide Witness Statement, pp. 1-6):

1. She observed the two police officers from her living room window.

2. The officers were yelling for Askew to get out of the car.

3. The officers had their guns drawn and pointed at the vehicle.

4. The officers told Askew to get out of the car four or five times.

5. The officers were at the back of Askew's vehicle when they started shooting (p. 2).

5.2.    Deneshia Bowen gave a recorded statement to detectives and stated the following

(Homicide Witness Statement, pp. 1-3):

1. She was in the living room when she heard the officers yelling for Askew to put his hands up and get out of the vehicle.

2. One officer was on the driver's side of the vehicle and one was on the passenger side.

3. She stated she saw Askew's hands on the steering wheel but did not know if he was reaching for something when he was shot.

4. She could not see what Askew was doing inside the vehicle.

5. She stated the officers yelled at least three times for Askew to get out of the vehicle.

5.3.   Officer Ned Aufdenkamp was interviewed by detectives and stated the following (Principal Officer Interview, January 21, 2013):

1. He and Officer Dyess were dispatched to a report of loud music (p. 2).

2. They found a vehicle running with a male, later identified as Steven Askew, either sleeping or passed out behind the steering wheel.

3. They positioned their police vehicle facing the vehicle, illuminating the vehicle with their headlights and take down lights.

4. Using their flashlights, they both approached from the driver's side and saw a liquor bottle and a beer can inside a brown bag.

5. He then went to the passenger side and looked into the vehicle.

6. He tapped on the window to gain the attention of Askew.

7. Askew started to wake up and moved his hands revealing the handle of a gun between his legs.

8. He alerted Officer Dyess about the presence of a handgun in Askew's lap.

9. He drew his service weapon, gave verbal commands, and identified themselves as police.

10. When Askew woke up, he looked around and made what was assumed to be a gang sign with his left hand at Aufdenkamp.

11. Both officers continued to give verbal commands, which Askew ignored.

12. He advised dispatch they had a person with a gun and requested additional units.

13. Askew then grabbed the gun with his left hand and started to turn toward Aufdendamp, smiled at him and pointed the gun at his face; Aufdenkamp then started to fire (pp. 2-3).

14. He radioed for additional units to respond (p. 4).

15. He did not notice anything in the right hand of Askew.

16. He said he was about four feet from Askew when he fired.

17. He fired through the back windshield as he was retreating.

18. He did not see Askew make any movement or try to get out of the vehicle (p. 5).

19. He said neither he nor Officer Dyess entered the vehicle after the shooting.

20. When Aufdenkamp fired, Dyess was standing toward the rear of the driver's side (p. 6).

21. Aufdenkamp said he was the first to fire (p. 8).

22. Aufdenkamp testified that they had plenty of time do what they needed to after first approaching the vehicle because Askew was either asleep or

passed out (Deposition of Officer Aufdenkamp, pp. 45-46, 53-53, 56).

23. Aufdenkamp stated as they tried to wake Askew, he began to move and he (Aufdenkamp) saw a gun in his lap and alerted Dyess. Both officers began yelling loudly at Askew to keep his hands away from the gun (Deposition of Officer Aufdenkamp, pp. 78-80).

24. Aufdenkamp stated he was shouting loud verbal commands at Askew which included police, put your hands up, and do not touch the gun. He stated Askew started acting weird, leaned over, and made a hand gesture like a gang sign. (Deposition of Officer Aufdenkamp, pp. 83-85).

25. Aufdenkamp then saw Askew laugh and he grabbed the pistol with his left hand, turn towards him, and point the pistol at his face so he started shooting and retreating (Deposition of Officer Aufdenkamp, p. 87).

26. He did not remember seeing a cigar or cigarillo (Deposition of Officer Aufdenkamp, p. 87).

5.4.  Officer Dyess was interviewed by detectives and stated the following (Principal Officer Interview, January 21, 2013):

1.  Dyess said that while he was trying to awaken Askew, Askew rolled over on his left shoulder and looked at him (p. 3).

2.  While he was standing near the post of the left front door, Askew looked at him and with two fingers and his thumb, as if symbolizing a gun, pointed it at him, and simulated pulling the trigger before turning back around in the seat.

3.  He did not remember which hand Askew used to make the gesture, but believed it was the left (p. 4).

4.  Officer Aufdenkamp then told Dyess that Askew had a pistol between his

legs.

5. He then took one or two steps back toward the rear of the car and began giving loud verbal commands to Askew.

6. He loudly yelled four to six verbal commands while near the left rear door when he saw Askew look down at his lap, laugh a little bit, shake his head, and then very quickly and suddenly lean out of his seat and turn to his right.

7. He saw Askew's arm extend straight out toward Officer Aufdenkamp and saw the muzzle of the pistol protrude from his hand.

8. When he saw Askew point the gun at Aufdenkamp, he and Aufdenkamp started firing.

9. He does not know how many times he fired.

10. He did not remember seeing a cigarette or cigar in Askew's hand (p. 4).

11. He does not remember Askew going across his body with the pistol. He recalls seeing Askew lean forward and pivot his body to the right toward Aufdenkamp, and believes the gun was in his right hand which he extended which is the same hand with which Steven Askew was holding a cigar (p. 5).

12. He was between four and six feet from Askew when he fired his pistol (p. 6).

13. As he fired his pistol, he remembers Askew turning his body near the end of the confrontation and falling backward in between the front seats.

14. He never entered Askew's vehicle after the shooting (p. 7).

15. He does not believe Aufdenkamp entered Askew's vehicle after the

shooting.

16. He was firing his pistol as he moved from the left side of the vehicle to the rear of the vehicle.

17. He said he was done firing when he reached the rear of the vehicle.

18. He does not remember if he fired first or Officer Aufdenkamp fired first (p. 8).

19. Dyess testified that they had plenty of time do what they needed to after first approaching the vehicle because Askew was either asleep or passed out (Deposition of Officer Dyess, pp. 204-205).

20. Dyess stated as they tried to wake Askew, he began to move and he (Aufdenkamp) saw a gun in his lap and alerted Dyess. Both officers began yelling loudly at Askew to keep his hands away from the gun (Deposition of Officer Dyess, pp. 207-209)

21. Dyess stated he and Aufdenkamp were issuing very loud verbal commands at Askew to put his hands up and do not touch the gun when he saw Askew take his hand out of his lap and seeing the muzzle of the pistol protruding from Askew's left hand and pointing it at Officer Aufdenkamp (Deposition of Officer Dyess, p. 198).

6. **Dispatch Audio**

6.1.   Officers Matthew Dyess and Ned Aufdenkamp, radio call sign 325D, were riding together on January 17, 2013, when they were dispatched to 3193 Tyrol Court on a report of loud music.

1. From the time they notified dispatch that they were on scene until they advised they had a man with a gun, 00:03:04.68 had elapsed.

2. From the time they notified dispatch they had a man with a gun until they advised "shots fired," 00:00:24.55 had elapsed.

3. There was no audible evidence on the audio of either officer yelling commands to Steven Askew when Officer Aufdenkamp called for backup units to respond.

## 7. Scene & Vehicle Description

7.1. The vehicle was a green, four-door, 1995 Ford Crown Victoria, bearing Tennessee tag 202-ZSJ and VIN 2FALP74WXSX118194 (Scene Investigation, Det./Sgt. William D. Merritt, January 18, 2013, pp. 1-2; MPD Incident Report, Vehicle Section, p. 6).[1]

1. The Ford was backed into the parking space in front of 3197 Royal Knight Cove with the front facing the Northeast.

2. After the shooting took place, Steven Askew was positioned on the driver's seat with:

   a. the driver's seat backrest reclined;

   b. Askew leaning against the front passenger's seat;

   c. Askew's right arm and hand positioned across the console and resting on the passenger seat;

   d. Askew's left forearm and palm positioned in an upward position; and,

   e. Askew holding a cigarillo between his right index and right middle fingers.

---

[1] There were a number of variances in the reported tag number and VIN of the vehicle throughout the MPD reports; however, these errors are of no consequence to this reconstruction.

        3.   There was a bullet on the waist of Askew's pants.

7.2.   Det./Sgt. Merritt described the conditions of the windows in the Ford Crown Victoria as follows (p. 1):

        1.   The left front window was rolled up and undamaged.

        2.   The left rear window was shattered.

        3.   The right front window was rolled up and undamaged.

        4.   The right rear window was shattered.

7.3.   The .380 Auto pistol was on the driver's side floorboard under the steering wheel (p. 2).

7.4.   The Ford was towed to Frank's Wrecker storage lot.

7.5.   Officer J.P. Smith with the Memphis Police Department Crime Scene Unit stated the following in the narrative section of his report (MPD Crime Scene Investigation Report, J.P. Smith).

        1.   "Officer Dyess stated that loud music was coming from the Ford as they approached the vehicle" (pp. 1-2).[2]

        2.   "The victim DOE, was 'slumped' over toward the right with his right hand lying with the palm upper ward and a wrapped cigar between the two index fingers" (p. 2).

## 8.   Bullet Strikes

8.1.   Bullet strikes were documented in the following locations on the Ford Crown Victoria:

---

[2] This statement was inconsistent with his later statements (Deposition of Officer Dyess, p. 148).

1. on the top of the right side rear passenger seat;

2. on the top of the rear driver's side seat;

3. to the inner side of the front passenger seat;

4. to the left front armrest;

5. to the lower, exterior, rear driver side door panel;

6. on the right front passenger dashboard;

7. on the right front passenger dashboard;

8. on the right front passenger dashboard;

9. on the right front passenger dashboard;

10. to the upper interior driver door panel; and,

11. to the upper interior driver door panel.

9. **Firearms**

9.1. Officer Dyess carried a .40 S&W caliber Sig Sauer model P229 semi-automatic pistol bearing serial number AM156863.

    1. When the pistol was inventoried, there were 12 cartridges in the magazine and one cartridge in the chamber.

    2. Dyess reloaded the pistol, and the original magazine, which was empty, was lying on the ground just in front of the left rear tire (evidence placard #3).

9.2. Officer Aufdenkamp carried a .40 S&W caliber Sig Sauer model P229 semi-automatic pistol bearing serial number AM116994.

    1. When the pistol was inventoried, there were 12 cartridges in the magazine

and a cartridge in the chamber.

2. Aufdenkamp reloaded the pistol, and the original magazine, which still had two live cartridges in it, was lying on the ground near the right rear corner of the Ford (evidence placard #13).

9.3.    Askew had a Cobra .380 Auto caliber Model CA-380 semi-automatic pistol bearing serial number CP063010 on the floor of the Ford.

1. There were four live cartridges in the magazine and one in the chamber.

2. The pistol was recovered from the left front floorboard.

3. The Memphis Police Department Crime Scene Lab processed the Cobra .380 Auto pistol for fingerprints (MPD Crime Scene Investigation Report, A. Barbarotto).

   a. The pistol was processed with superglue and black powder.

   b. Two fingerprints were developed on the side of the magazine.

   ➢ The latent lift cards were submitted to the latent print examiners for evaluation.

   c. The latent print examiner determined there were no prints of value recovered on the .380 Auto caliber pistol (Supplement Report by Det./Sgt. Merritt, February 9, 2013, p. 1).

## 10.    Shots Fired

10.1.   Investigators determined that a total of 22 gunshots had been fired by Officers Aufdenkamp and Dyess (MPD Police Involved Shootings Scene Supplement, Det. Randolph, p. 1):

1. Officer Aufdenkamp likely fired ten shots from his pistol before reloading.

      a.  A Sig Sauer P229 magazine with two live cartridges was recovered from the ground near the right rear corner of the Ford.

   2.  Officer Dyess likely fired 12 shots from his pistol before reloading.

      a.  An empty 12 round Sig Sauer P229 magazine was recovered from the ground near the left rear side of the Ford.

10.2.   Askew did not fire any shots.

## 11.  Cartridge Cases

11.1.   Twenty .40 S&W caliber Speer cartridge cases were submitted as evidence (MPD Evidence Report, p. 2).

11.2.   The locations of the twenty cartridge cases recovered at the crime scene were identified as follows (MPD Crime Scene Investigation Report, J.P. Smith, p. 2):

   1.  evidence placard #4 from the grassy area;

   2.  evidence placard #5 from the grassy area;

   3.  evidence placard #6 from the grassy area;

   4.  evidence placard #7 from the sidewalk near right rear of Ford;

   5.  evidence placard #8 from the sidewalk near right rear of Ford;

   6.  evidence placard #9 from the sidewalk near right rear of Ford;

   7.  evidence placard #10 from the grassy area;

   8.  evidence placard #11 from the sidewalk;

   9.  evidence placard #12 from the parking lot;

   10. evidence placard #14 from behind the Ford;

11. evidence placard #15 from the parking lot;

12. evidence placard #16 from the parking lot;

13. evidence placard #17 from the grassy area;

14. evidence placard #18 from the grassy area;

15. evidence placard #19 from the grassy area;

16. evidence placard #20 from the grassy area;

17. evidence placard #22 from the grassy area;

18. evidence placard #23 from the grassy area;

19. evidence placard #24 from the grassy area; and,

20. evidence placard #27 from the grassy area.[3]

11.3.    The recovered cartridge cases were not examined by the crime lab to determine which pistol fired which cartridge cases.

## 12.    Medical Examiner's Report

12.1.    Steven Askew was measured and weighed prior to autopsy at the Medical Examiner's Office (Report of Autopsy, p. 3).

1. Height: 5'6"

2. Weight: 166 lbf

12.2.    Evidence of Injury

1. Penetrating gunshot wound to the back of neck (pp. 4-5):

a.  A bullet entered the back of Steven Askew's neck about eight

---

[3] The location where this cartridge case was recovered is unknown. There were two close-up photographs with evidence placard #27; however, it was not measured or included in the crime scene diagram.

inches below the top of the head and about one inch left of the posterior midline, and terminated at the cervical vertebrae of C-3 and C-4.

b. The bullet created a wound path through the soft tissue of the back of the neck, perforation and penetration of C-3 and C-4 lacerating the cervical spine.

c. The wound track was from back to front without significant deviation.

d. There was no evidence of soot or gunpowder stippling.

2. Perforating gunshot wound to the upper left back (p. 5):

a. A bullet entered Askew's upper left back about 10 inches below the top of the head and about six inches left of the posterior midline. It exited the upper lateral left chest about 12 inches below the top of the chest, six inches left of the anterior midline, and about seven inches above and slightly lateral to the left nipple.

b. The bullet created a wound path through the soft tissue.

c. The wound track was from back to front and slightly downward.

d. There was no evidence of soot or gunpowder stippling.

3. Penetrating gunshot wound to the upper left back (pp. 5-6):

a. A bullet entered Askew's upper left back about 14 inches below the top of the head and about one inch left of the posterior midline, and terminated at the T-4 and T-5 vertebral body.

b. The bullet created a wound path through the soft tissue of the back, lacerating the spinal cord and penetrating the T-4 and T-5

vertebrae.

    c.  The wound track was from back to front.

    d.  There was no evidence of soot or gunpowder stippling.

4.  Penetrating gunshot wound to the upper left back (p. 6):

    a.  A bullet entered Askew's upper left back, about 15 inches below the top of the head and about six inches left of the posterior midline and terminated at the right front chest, right pectoralis major muscle, about 14 inches below the top of the head and about five inches right of the anterior midline

    b.  The bullet created a wound path through the posterior 6th left rib, upper portion of the lower lobe of the left lung, upper lobe of left lung, ascending aorta and pulmonary artery, middle section of the chest cavity, upper lobe of the right lung, anterior intercostal space between the 3rd and 4th right ribs and terminates in the right pectoralis muscle.

    c.  The wound track was from back to front, slightly left to right, and slightly upward.

    d.  There was no evidence of soot or gunpowder stippling.

5.  Perforating gunshot wound to the upper left back (pp. 6 - 7):

    a.  A bullet entered Askew's upper left back about 18 inches below the top of the head and seven inches left of the posterior midline before exiting the left front chest, about 17 inches below the top of the head and about two inches left of the anterior midline.

    b.  The bullet created a wound path through the posterior 6th left rib,

            lower lobe of the left lung, pericardial sac, left ventricle, anterior intercostal space between the 4th and 5th left ribs and exits the left front chest.

    c.   The wound path was from back to front, slightly left to right and slightly upward.

    d.   There was no evidence of soot or gunpowder stippling.

6.   Penetrating gunshot wound to the low left back (p. 7):

    a.   A bullet entered Askew's mid to low left back, about 23 inches below the top of the head, and three inches left of the posterior midline, and terminated in the lower front left chest, about 24 inches below the top of the head and four inches left of the anterior midline.

    b.   The bullet created a wound path through the soft tissue of the back, fractured the lower edge of the 12th left rib, the diaphragm, left kidney, small bowel, diaphragm, the intercostal space between the front 8th and 9th left ribs, and the soft tissue of the front left chest where it terminated.

    c.   The wound path was from back to front, slightly downward, and slightly right to left.

    d.   There was no evidence of soot or gunpowder stippling.

7.   Gunshot wound to the upper right back (p. 8):

    a.   A bullet entered Askew's upper right back about 16 inches below the top of the head and five inches right of the posterior midline and exits the right side chest about 17 inches below the top of the

head and 10 inches right of the anterior midline.

b. The bullet created a wound path through the soft tissue.

c. The wound path was from back to front, slightly downward, and slightly left to right.

d. There was no evidence of soot or gunpowder stippling.

8. Perforating gunshot wound to the right forearm (p. 8):

a. A bullet entered the back side of Askew's mid-right forearm about seven inches below the elbow and five inches above the right wrist and exited the back of the right forearm, about five inches below the elbow and seven inches above the right wrist.

b. The wound track was through the soft tissue.

c. The wound path was upward, slightly front to back, and slightly right to left.

d. There was no evidence of soot or gunpowder stippling.

9. Penetrating gunshot wound to the left forearm (pp. 8-9):

a. A bullet entered the backside of Askew's left forearm, about two inches above the left wrist.

b. The wound track was superficial through the soft tissue and a fractured left radius.

c. The wound path was back to front.

d. There was no evidence of soot or gunpowder stippling.

12.3. Additional Injuries

1. There was an abrasion to the tip of the left earlobe.

2. There was an abrasion present on the left side of the face, just below the left earlobe.

3. A metallic fragment was embedded in the skin on the left side of the neck.

4. There was an abrasion present on the right arm.

5. There were four abrasions present on the left ring finger.

6. There was an abrasion present in the mid-left back.

7. There was an abrasion present at the lower left back.

13. **Crime Scene Analysis & Reconstruction[4]**

13.1. An analysis and reconstruction of this incident was carried out by Knox & Associates.

13.2. Officers Aufdenkamp and Dyess entered the Windsor Place Apartment complex looking for the source of the loud music they had been dispatched on (Photograph DSC_0017.jpg).

13.3. Officers Aufdenkamp and Dyess saw a green Ford Crown Victoria with the engine running backed into a parking space in front of 3197 Royal Knight Cove; however, loud music was not emanating from the vehicle (Photograph DSC_0023.jpg).

13.4. The officers parked their marked police unit at an angle, aiming the vehicles headlights and the take down lights at the Ford before approaching on foot (Photograph DSC_0127.jpg).[5]

13.5. Both officers walked up to Steven Askew's vehicle with Officer Dyess positioned

---

[4] The paragraph numbers (i.e., 13.x) correspond with the slide numbers of the associated slide presentation.
[5] They did not activate their emergency lights or siren (Deposition of Officer Dyess, pp. 151-152, 179).

on the driver's side of the Ford and Officer Aufdenkamp positioned on the passenger side (Photograph DSC_0027.jpg).

    1. The left rear window, rear window, and right rear window had all been shattered by the multiple gunshots.

13.6. Steven Askew was found by Officers Dyess and Aufdenkamp either sleeping or passed out in the left front driver's seat of the Ford and the officers saw a bottle of alcohol in the car (Photograph DSC_0033.jpg).

13.7. The left front seat Steven Askew was sitting in had been leaned backwards (Photograph DSC_0071.jpg).

13.8. The angle of the left front seat back where Steven Askew was sitting was not determined by investigators (Photograph DSC_0067.jpg).

13.9. Officer Dyess stated that he was standing near the left front door post when Askew looked at him and with two fingers and his thumb, as if symbolizing a gun, pointed it at him and simulated pulling the trigger, before turning back around in the seat (Principal Officer Interview, January 21, 2013, p. 3) (Photograph DSC_0033.jpg).

    1. Officer Dyess also stated that Askew rolled over on his left shoulder and looked at him (Principal Officer Interview, January 21, 2013, p. 3).

13.10. Officer Aufdenkamp stated that he was standing on the passengers side of the vehicle looking in when he saw Askew wake up, look around, and make what he assumed to be a gang sign with his left hand, directed toward him (Aufdenkamp) (Principal Officer Interview, January 21, 2013, p. 2) (Photograph DSC_0034.jpg).

13.11. After the shooting concluded, Steven Askew was found with his upper body positioned diagonally, left to right, across the backrest that had been tilted back, and with his head located between the left and right front seats (Photograph

DSC_0070.jpg).

13.12.   The right arm of Steven Askew was extended straight out across the right front seat and the left arm was hanging down by the left leg with the fist clenched (Photograph DSC_0104.jpg).

      1.   Det./Sgt. William Merritt described Askew's left arm as "left forearm and palm positioned in an upward position" (Scene Investigation, William D. Merritt, January 18, 2013, pp. 1-2).

      2.   The .380 Auto caliber pistol was located on the left front floorboard near the feet of Steven Askew.

13.13.   The right hand of Steven Askew was holding a cigar between the thumb and index fingers (Photograph DSC_0104.jpg, cropped).

13.14.   The .380 Auto caliber pistol was photographed forward of the front seat on the left front floorboard (Photograph DSC_0115.jpg).

      1.   The location of the pistol was under the legs of Steven Askew.

      2.   The location of the pistol on the floorboard was consistent with falling from Steven Askew's lap.

13.15.   There was a cell phone located on the left front seat to the right side of Steven Askew with a bullet resting on top (Photograph DSC_0114.jpg).

13.16.   Steven Askew suffered six gunshot entrance wounds to the back (Photograph IMG_3586.jpg).

13.17.   Steven Askew suffered a gunshot entrance wound to the back of the neck (Photograph IMG_3595.jpg).

13.18.   Steven Askew suffered a gunshot entrance wound to the right forearm

(Photograph IMG_3581.jpg).

13.19.   Steven Askew suffered a gunshot entrance wound to the left wrist that fractured the radius (Photograph IMG_3616.jpg).

13.20.   Investigators used evidence placards to depict the cartridge cases on the parking lot, sidewalk, and the grass (Photograph DSC_0078.jpg).

     1.   Evidence placards #12 & #14 were .40 S&W caliber cartridge cases on the parking lot.

     2.   Evidence placard #13 was a magazine with two live cartridges from Officer Aufdenkamp's pistol.

     3.   Evidence placards #6, #7, #8, and #11 were .40 S&W caliber cartridge cases on the sidewalk.

     4.   Evidence placards #5, #9, #10, and #19 were .40 S&W caliber cartridge cases on the grass.

13.21.   Cartridge cases extended in a westerly direction across the grass toward the front of the apartment building at 3197 Royal Knight Cove (Photograph DSC_0100.jpg).

     1.   Evidence placards #17, #20, #22, and #23 were .40 S&W caliber cartridge cases in the grass.

13.22.   The Memphis Police Department completed a crime scene diagram of the parking lot and the physical evidence (MPD Crime Scene Diagram, Sketch "A").

     1.   The diagram was not a true and accurate depiction of the crime scene.

         a.   The location of the building at 3186 Royal Knight Cove was not accurate.

b. The locations of the two utility boxes was not accurate.

c. The locations of the evidence numbers on the diagram did not correspond with the evidence numbers in the crime scene photographs.

2. There were no measurements depicted on the MPD crime scene diagram.

   a. The measurement between the police vehicle and Askew's vehicle was not measured.

   b. The width of the sidewalk was not measured.

   c. The width of the "grass median" was not measured.

   d. The distance between the back of Askew's vehicle and the front of building "3197" was not measured.

3. The evidence numbers on the crime scene diagram indicate the following:

   a. Item 1 was the body of Steven Askew inside the vehicle.

   b. Item 2 was the location of the Ford Crown Victoria.

   c. Item 3 was an empty pistol magazine from Officer Dyess' pistol.

   d. Items 4 through 12 were .40 S&W caliber cartridge cases located on the grass, sidewalk, and parking lot.

   e. Item 13 was a pistol magazine with two live cartridges from Officer Aufdenkamp's pistol.

   f. Items 14 through 20 were .40 S&W caliber cartridge cases located on the parking lot, sidewalk, and grass.

   g. Item 21 was a bullet fragment in the grass between the utility

boxes.

h. Items 22 through 24 were .40 S&W caliber cartridge cases on the grass and sidewalk.

> ➤ Note: Evidence item 27, a .40 S&W caliber cartridge case was photographed; however, it was not measured and was not placed in the crime scene diagram, and the location remains unknown.

13.23.   When compared to the crime scene photographs, the MPD crime scene diagram was an inaccurate depiction of the scene.

1.   The locations of evidence placards #5, #6, #7, #8, #9, #10, #11, & #19 in the crime scene diagram do not correspond with the locations of the evidence placards as depicted in the crime scene photograph (Photograph DSC_0078.jpg).

13.24.   A satellite photograph was used to depict the orientation of 3197 Royal Knight Cove to 3186 Royal Knight Cove and the parking space where Steven Askew's Ford Crown Victoria was parked.

13.25.   Using the scaled satellite photograph of 3197 Royal Knight Cove as a reference and the evidence measurements recorded by the Memphis Police Department, Knox & Associates, LLC, was able to draw a scale overview diagram of the crime scene (K&A Diagram).

1.   The location of the evidence numbers on the K&A diagram more closely represent what was depicted in the crime scene photographs.

13.26.   When the two diagrams are compared, numerous evidence numbers on the Memphis Police Department diagram were determined to be out of place (MPD Crime Scene Diagram Sketch "A" and K&A Diagram).

1. This includes evidence placards #5, #6, #7, #8, #9, #10, #11, #16, #18, #19, and #23, which were out of place.

2. Evidence placard #27 was a .40 S&W caliber cartridge case; however, it was not measured and it was not placed on the MPD crime scene diagram.

13.27.  The Memphis Police Department completed a vertical view diagram of the left side of the Ford Crown Victoria depicting the locations of the bullet holes (MPD Crime Scene Diagram, Sketch B).

1. Evidence items A through H were bullet strikes to the left front door, left rear door, and windshield.

13.28.  The bullet strikes to the left side of the Ford were photographed at the crime scene and marked with yellow grease paint (Photograph DSC_0069.jpg).

13.29.  Steven Askew's Ford Crown Victoria was towed to a garage for processing (Photograph DSC_0051.jpg).

1. The bullet trajectories were never documented and measured.

2. The area of origin for the gunshots was never determined by the Memphis Police Department.

13.30.  The Ford Crown Victoria had numerous bullet holes in it, which were photographed for this reconstruction (KA.Vehicle.0013.14.0053.jpg).

1. Only the right rear door glass had been shattered by bullets.

2. There were no bullet strikes to the doors or vehicle body on the right side of the Ford.

13.31.  The bullet strikes to the left front and left rear doors of the Ford were documented using trajectory rods (KA.Vehicle.0055.14.0053.jpg).

13.32.  The bullet strikes to the right front dashboard of the Ford were documented using trajectory rods (K&A Vehicle Photograph 0057.14.0053.jpg).

13.33.  The trajectory rods in the right side dash indicated the shots originated from the left side of the Ford (K&A Vehicle Photograph 0058.14.0053.jpg).

13.34.  The trajectory rods inserted in the bullet holes on the right side dash indicated the gunshots originated somewhere to the left and rear of the Ford and entered the vehicle through the left rear window (KA.Vehicle.0062.14.0053.jpg).

13.35.  On November 15, 2014, Knox & Associate, LLC, consultant Michael A. Knox documented the bullet strikes through the front seat of the Ford by inserting trajectory rods and photographing (KA.Vehicle.0077.14.0053.jpg).

   1.  This gunshot originated to the rear of the Ford and entered through the rear window.

13.36.  Officers Ned Aufdenkamp and Matthew Dyess were likely positioned near the right rear and left rear, respectively, of Askew's vehicle when they fired their shots.

   1.  No shots were fired directly into the front seat compartment through the left front driver's door or window.

   2.  No shots were fired directly into the front seat compartment through the right front passenger door or window.

   3.  With the exception of one .40 S&W caliber cartridge case located in the parking lot (#16) all the recovered cartridge cases were behind Askew's vehicle.

   4.  The twelve gunshots that Officer Dyess fired either penetrated or perforated the left front door, left rear door, left rear door glass, and the

right front dashboard from an unknown angle.

    a.   All of these gunshots likely originated from somewhere behind and to the left of the left rear door.

5.   The ten gunshots that Officer Aufdenkamp fired perforated the right rear door glass and the rear window.

    a.   All of these gunshots likely originated from somewhere behind and to the right of the vehicles right side.

6.   Witness Demetria Bailey told investigators the officers were at the back of Askew's vehicle when they started shooting (Homicide Witness Statement, p. 2).

## 14.   Officer Approach, Tactics, & Reasonableness of Force

14.1.   Officers Dyess and Aufdenkamp were dispatched to a loud music complaint that did not specifically indicate that Steven Askew was involved in any disturbance, nor did it specify that the apartment complex at which the encounter occurred was related the complaint.

14.2.   The officers encountered Askew asleep in his vehicle with a firearm in his lap area.

14.3.   The officers decided to make contact with Askew to further investigate his whereabouts, though they did not have specific information that he was involved in any crime.

1.   At the time of the shooting, carrying a firearm in a vehicle was legal in Tennessee only for persons possessing a valid concealed carry permit.

2.   An appropriate measure to determine whether or not Askew was committing a crime by possessing a firearm in a vehicle would be to run

the vehicle's license plate to obtain the name of the registered owner and then run that name to determine if the individual held a valid concealed carry permit.

3. Askew had a valid concealed firearms carry permit at the time of this shooting incident and was not violating any laws by possessing a firearm inside his vehicle.

14.4. When approaching a person who is sleeping in a vehicle, it is reasonable and prudent to assume that, if startled or awakened quickly, the individual's immediate perception of his surroundings might not be clear.

1. The individual may not immediately recognize that the he has been awakened by police officers but may instead assume that he has been approaching by someone wishing to do him harm.

2. Verbal commands do not provide the best indicators of the presence of police.

   a. Verbal commands may not be heard clearly by a sleeping individual inside a closed motor vehicle.

   b. Verbal commands must be processed cognitively prior to an individual being able to comprehend and appropriately respond to those commands.

3. The officers could have relied on other options that did not place them in a position of danger in an effort to arouse Askew and gain his compliance:

   a. They could have turned on their blue flashing lights, which a universal sign of the presence of police.

   b. They could have used their police vehicle's siren, which is a universal sign of the presence of police or other emergency

personnel.

  c. They could have used their vehicle's public address system to give loud verbal commands that were spoken in a calm voice.

14.5. There was no need for the officers to place themselves in positions of danger in order to arouse Askew and gain his compliance.

  1. The standard protocol for handling an armed subject in a vehicle is to initiate high-risk traffic stop procedures, which involve officers remaining at or near their vehicles, seeking cover and/or concealment, and giving verbal commands, usually via the public address system in a police vehicle.

  2. High-risk traffic stop procedures involve having the armed subject step out of the vehicle following specific commands such as keeping his hands visible, facing away from the officers, and walking backward to a location suitable for handcuffing or searching.

14.6. The physical evidence in this case does not support the testimony of either officer with regard to the threat posed by Askew. The physical evidence indicates that Askew could not have pointed his pistol at either officer.

14.7. There is significant variance in the angles of the shots into the vehicle, particularly on the left side of the vehicle, which is inconsistent with the contention that the officers were covering Askew with their firearms and were responding to a specific threat as indicated in their testimony.

  1. A number of the shots into the vehicle were not aimed in the direction of Askew.

14.8. In light of these facts, the use of deadly force by both officers cannot be viewed as objectively reasonable.

## 15.    Investigation

15.1.    This shooting incident was investigated by the Memphis Police Department.

15.2.    There was no apparent effort put forth to analyze or reconstruct the shooting based on the physical evidence to determine if, in fact, the shooting took place as described by the officers.

1.    Understanding the physical evidence in light of the officers' statements is key to determining if, in fact, the officers have given an honest accounting of the circumstances surrounding a shooting incident or if they have fabricated any portion of their testimony.

2.    Failure to appropriately consider the physical evidence is tantamount to rubber stamping the officers' testimony and conduct.

15.3.    During the course of the investigation, the reporting process was sloppy.

1.    Steven Askew was driving a green, four-door 1995 Ford Crown Victoria bearing Tennessee tag 202-ZSJ and VIN 2FALP74WXSX118194 (MPD Incident Report, Vehicle Section, p. 6).

2.    Det./Sgt. William D. Merritt described the vehicle as a green, four-door, 1995 Ford Crown Victoria, bearing Tennessee tag 202-ZSJ, VIN 2C3CDXAT3CH237265 (Scene Investigation, January 18, 2013, pp. 1-2).

3.    In another report, the color of the vehicle was described as black (MPD Inspectional Services Memorandum, Det. Randolph, Security Squad, pp. 1-2).

4.    In another report, the vehicle was described with the incorrect Tennessee tag of 205-ZSJ and VIN 2FALP74WX5X118194 (MPD Police Involved Shootings Scene Supplement, Inspectional Services Bureau, Det. J.

Randolph, p. 2).

5. In another report, the VIN was incorrectly stated as 2C3CDXAT3CH237265 (Scene Investigation Supplement, Det./Sgt. W.D. Merritt, p. 1).

6. In another report, the vehicle was described with the incorrect Tennessee tag of 202-ZST and VIN ZFALP74WX118194 (MPD Crime Scene Investigation Report, J.P. Smith, p. 1).

## 16. Conclusions

16.1. The physical evidence in this case indicates that Steven Askew was in possession of a .380 Auto caliber semi-automatic pistol inside his Ford Crown Victoria.

1. The physical evidence indicates that Askew did not fire the pistol at any time during this encounter.

16.2. The physical evidence in this case indicates Steven Askew never pointed the pistol at Officer Aufdenkamp with either his left or right hand.

1. Steven Askew's pistol was found under his legs on the left front floorboard.

2. The pistol could not have fallen to this position if it was dropped while Askew's arm was outstretched, pointing the pistol toward Aufdenkamp as described by the officers.

16.3. Officer Aufdenkamp, looking through the right front door glass, would have been able to see the pistol located either on Askew's lap or between his legs.

16.4. Officer Aufdenkamp did not shoot into the vehicle from a position perpendicular to the right front door.

1. Officer Aufdenkamp testified that he had his pistol in a ready position and

was yelling commands at Askew to keep his hands away from the gun (Deposition of Aufdenkamp, pp. 96-98).

2. The right front door glass was closed and undamaged.

3. There were no bullet holes in the right front door.

16.5. Officer Dyess did not shoot into the vehicle from a position perpendicular to the left front door.

1. The left front door glass was closed and undamaged.

2. There were no bullet holes in the right front door originating from a 90-degree angle.

    a. One shot struck the front edge of the left front door; however, it originated from an area somewhere behind the left front door.

16.6. Officer Dyess and Officer Aufdenkamp were likely positioned very close to the rear of Askew's vehicle when they fired their shots.

1. All but one of the cartridge cases were recovered from behind the vehicle.

2. A witness, Demetria Bailey, told investigators the officers were behind the vehicle when they started shooting (Homicide Witness Statement, p. 2).

16.7. From his position located behind Steven Askew, Officer Dyess would have had a difficult time seeing the hand movements and/or facial expressions of Steven Askew.

1. Officer Dyess told detectives that after Officer Aufdenkamp advised him of the pistol between Askew's legs, he then took one or two steps back towards the rear of the car and began shouting loud verbal commands to Askew (Principal Officer Interview, January 21, 2013, p. 4).

2. Dyess stated he shouted four to six loud verbal commands while near the left rear door when he saw Askew look down at his lap and laugh (Principal Officer Interview, January 21, 2013, p. 4).

16.8.   Steven Askew could not have pointed the pistol at Officer Aufdenkamp as Officer Dyess stated.

1. Officer Dyess stated that Steven Askew very quickly and suddenly leaned out of his seat and turned to the right. Dyess saw Askew's right arm extend straight out toward Aufdenkamp, and Dyess saw the muzzle of the pistol protrude from Askew's hand (Principal Officer Interview, January 21, 2013, p. 4).

   a. This could not have happened because the pistol was found on the left front floorboard under Steven Askew's legs, not on the right front seat or in the right hand of Steven Askew.

   b. The officers statements are inconsistent with the forensic evidence in this case.

2. Officer Dyess may have seen the cigar in the right hand of Steven Askew; however, from his position to the left and rear of Steven Askew, this would have been difficult.

16.9.   Steven Askew could not have pointed the pistol at Officer Aufdenkamp as Aufdenkamp stated.

1. Officer Aufdenkamp told investigators he saw Askew grab the gun with his left hand and start to turn towards him, smile at him, and then point the gun at his face; Aufdenkamp started to fire (Principal Officer Interview, January 21, 2013, pp. 2-3).

   a. Officer Aufdenkamp never fired at Askew through the right front

door.

      b. Aufdenkamp's shots all came from the right rear of Askew's vehicle.

    2. The pistol was found on the left front floorboard, under the legs of Steven Askew.

    3. The left arm and hand of Steven Askew was positioned to the left side of Askew's body.

16.10.   The statements of Officer Dyess, concerning Steven Askew pointing the pistol, contradict the statements of Officer Aufdenkamp.

    1. Officer Dyess stated that Steven Askew extended his right arm, and Dyess saw the muzzle of the pistol protrude from Askew's hand (Principal Officer Interview, January 21, 2013, p. 4).

    2. Officer Aufdenkamp stated he saw Askew grab the gun with his left hand and point the gun at him (Principal Officer Interview, January 21, 2013, pp. 2-3).

      a. Aufdenkamp's statement is inconsistent with the location of the pistol on the left front floorboard beneath Askew's legs.

16.11.   The Memphis Police Department never determined the shooting positions of Officers Dyess and Aufdenkamp based on the fired cartridge case locations.

    1. The recovered cartridge cases were never submitted for analysis and identified to the officer's pistols.

16.12.   The Memphis Police Department failed to determine the trajectories of the gunshots that entered the vehicle and body of Steven Askew.

16.13.   Steven Askew did not fire a shot from his .380 Auto pistol as stated in a report by

Officer Drew (Witness Statement, Officer Drew, January 21, 2013, p. 2).

1. There were no .380 Auto caliber cartridge cases recovered inside the vehicle.

2. There were no gunshots documented that originated from inside the vehicle.

16.14.    The use of deadly force by Officers Aufdenkamp and Dyess was excessive and was not objectively reasonable under the circumstances.

1. The officers used inappropriate tactics for approaching and gaining compliance from Askew, who was sleeping in his car having committed no crime.

2. The officers failed to investigate the fact that Askew possessed a firearms concealed carry permit. Had they determined that he did, they would have confirmed that they had no information to believe that Askew had been involved in any crime and, therefore, would have no reason to approach him.

3. There existed no exigency requiring that the officers awaken Askew while placing themselves in positions of potential danger.

4. The officers put themselves in a position where the use of deadly force was likely in the way that they handled the situation.

    a. The officers should have realized that awakening an armed, sleeping individual by yelling verbal commands and pointing their pistols at him was likely to cause him to respond in a manner that could lead to them using deadly force.

    b. The officers had other options available to them that would have allowed Askew time to awaken, regain his faculties, and respond to

their commands.

5. The discharge of firearms by the officers in this case is inconsistent with the disciplined use of deadly force by two officers responding to a specific threat for which they were prepared.

   a. The angles of the shots were inconsistent with officers firing in response to a single, specific perceived threat.

   b. A number of the shots were not aimed in the direction of Askew.

16.15. The Memphis Police Department failed to conduct a thorough investigation of this shooting and, by doing so, ratified the officers' conduct without regard to the factual circumstances surrounding the shooting.

1. The Memphis Police Department did not determine why the physical evidence contradicted the officers' statements as to the threat posed by Askew in the moments leading up to the shooting.

2. The Memphis Police Department did not address any issues with regard to the officers' pre-shooting handling of their encounter with Askew and, therefore, did not address the tactical decisions made by the officers that likely caused or contributed to this shooting.

3. By failing to adequately investigate an officer-involved shooting, the Memphis Police Department is rubber-stamping the officers' conduct and setting precedent for use of deadly force investigations.

   a. The underlying message to rank-and-file officers is that any use of deadly force is likely to be deemed justified as long as the officers assert that they were in fear.

16.16. Officers Aufdenkamp and Dyess testified that they handled this incident in accordance with their training and that they were told they did a good job with

regard to this shooting (Deposition of Aufdenkamp, pp. 91, 95, 101-103; Deposition of Dyess, pp. 84-88, 183-184).

1. Assuming the officers' testimony to be true and accurate, the Memphis Police Department failed to train the officers properly with respect to handling incidents of this nature.

2. It is incumbent on any law enforcement agency to train its officers to recognize situations in which their actions could lead to an unnecessary escalation of force.

16.17. Based on my training, education, and experience in law enforcement and crime scene reconstruction, and in light of my examination of the evidence in this case, I can render these conclusions to a reasonable degree of scientific certainty for the reasons previously stated.

# Disclaimer & Reservation of Rights

Knox & Associates, LLC, reserves the right to amend or otherwise change the conclusions contained herein if new information becomes available that was not known to Knox & Associates, LLC, at the time this report was prepared.

Knox & Associates, LLC, reserves all rights to the content of this report and stipulates that it is to be used solely for the purpose, and during the course, of litigation with respect to this case. Any other use of this material must be done only under written agreement between Knox & Associates, LLC, and the person using the material. Knox & Associates, LLC, reserves the right to refuse use of this material for any purpose not directly related to litigation arising out of this case.

# Certification of Truth and Accuracy

I, the undersigned, Michael A. Knox, as a qualified forensic consultant, do hereby certify this report and attest to its truth and accuracy to the best of my knowledge and ability. The conclusions made herein are my own, have been formed objectively, and have not been made under duress or promise of pecuniary benefit. The analysis and conclusions contained herein have been formed based on my training, education, and experience relevant to the forensic reconstruction of firearms incidents to a reasonable degree of scientific certainty.

Michael A. Knox
Forensic Consultant

# Knox & Associates

Forensic Consulting — We Bring Truth to Light

## CRIME SCENE RECONSTRUCTION

## Steven Askew v. Memphis Police Department

Michael A. Knox
Board Certified Crime Scene Reconstructionist
Knox & Associates, LLC
P.O. Box 8081
Jacksonville, FL 32239
(904) 619-3063
mike@knoxforensics.com

































