IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

STERLING ASKEW, as Father, Next of Kin
and as Administrator Ad Litem/Personal
of the Estate of STEVEN ASKEW, Deceased, and
SYLVIA ASKEW, as Mother and Next of Kin
of STEVEN ASKEW, Deceased,

    Plaintiffs,

v.                                         No. 2:14-cv-02080-STA-tmp

CITY OF MEMPHIS,
TONEY ARMSTRONG, Individually,
and in His Official Capacity as the
Police Director of the Memphis Police Department,
OFFICER NED AUFDENKAMP (#11914),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,
OFFICER MATTHEW DYESS (#12402),
Individually and in his Official Capacity
as a Police Officer with the Memphis Police Department,

    Defendants.

---

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY
OF PLAINTIFF'S PROPOSED EXPERT MICHAEL A. KNOX

---

Defendant City of Memphis submits this Memorandum in support of its Motion to Exclude Testimony of Plaintiff's Witness Michael A. Knox.

## BACKGROUND

This case arises out of a police shooting which occurred on January 17, 2013, at a complex known as Windsor Place Apartments.

On the date in question, Memphis Police Officers Ned Aufdenkamp and Matthew Dyess received a loud music disturbance called at 3193 Tyrol Court. While checking the area, they encountered an individual who was passed out behind the wheel of a running vehicle at 3197 Royal Knight which is in the same general area. While trying to assess the situation, Officer Aufdenkamp noticed a hand gun on the subject's lap and alerted his partner. According to the officers, when they awakened the subject, he pointed the gun at Officer Aufdenkamp and both officers opened fire resulting in the fatal wounding of the suspect who was determined to be Steven Askew.

Following the shooting an investigation was conducted by the Homicide Squad and the Internal Service Bureau (ISB) to determine whether any criminal charges were to be filed or whether there were any administrative violations. The Homicide Bureau submitted a report to the Attorney General for the State of Tennessee who after reviewing same declined to submit the matter to the grand jury. On the administrative side after conducting its investigation in connection with the Homicide Bureau, ISB determined that there were no administrative violations and that the shooting was justified.

Thereafter a civil rights action was filed pursuant to 42 U.S.C. §1983 and the Fourth and Fourteenth Amendments of the United States Constitution by Sterling Askew as father

and next-of-kin and administrator of the Estate of Steven Askew and Sylvia Askew, as mother and next-of-kin of Steven Askew in the Circuit Court of Shelby County, Tennessee. Thereafter the case was removed to Federal Court.

Based upon the physical evidence, the Plaintiffs take issue with the findings of the ISB that the shooting was justified. Among other things they challenge the practice, procedures and training within the Department and the adequacy of the investigation. In furtherance of their position, Plaintiffs' counsel retained the services of Mr. Michael A. Knox who submitted a report in this case. (DE 145) Thereafter Mr. Knox's deposition was taken. (DE 146)

## APPLICABLE LAW

Rule 702. Testimony by Expert Witness

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product or reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule obligates the trial court to act as the gatekeeper and to insure that any expert evidence – scientific or otherwise – is relevant and reliable. Kumho Tire Company, Ltd. v.

3

Carmichael, 526 U.S. 137, 147, citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589. Although not a definitive checklist or test, the Daubert factors guide a trial court in its gatekeeping inquiry which must be "tied to the facts of a particular case." 509 U.S at 591. Where the expert testimony factual basis, data, principles, methods or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the expert. Kumho, 526 U.S. at 149.

If the witness is relying solely or primarily on experience, he or she must explain how that experience leads to the conclusion reached and how that experience is reliably applied to the facts. Thomas v. City of Chattanooga, 398 F.3d 426, 431 (6th Cir. 2005). To be considered reliable, the expert's proposed testimony must be based on more than a subjective belief or unsupported speculation. Federal Rules of Evidence 702; Daubert, 509 U.S. at 590. It must be properly supported. Federal Rules of Evidence 703. If relevant, the probative value of the evidence must be weighed against "the danger of unfair prejudice, confusion of the issues or misleading the jury" as well as "considerations of undue delay, waste of time or needless presentation of cumulative evidence." Federal Rules of Evidence 403. Expert opinion evidence may be properly excluded if its prohibitive value is substantially outweighed by these considerations. Id. "It is the proponent of the testimony that must establish its admissibility, i.e. a preponderance of proof." Federal Rules of Evidence 702; Nelson v. Tennessee Gas Pipeline Company, 243 F.3d 244, 251 (6th Cir. 2001).

## KNOX'S OPINION

On January 22, 2015, Mr. Knox submitted his Forensic Analysis & Reconstruction Report (DE 145). Thereafter, on July 17, 2015, Mr. Knox's deposition was taken (DE 146).

According to his report, Mr. Knox is rendering an opinion as a forensic analyst and a reconstructionist dealing with the shooting of Mr. Askew. In addition he is opining on the action of the officers involved and their reasonableness of force together with the training that comes with that. (DE 146, p. 33)

## THE SHOOTING

Mr. Knox reviewed the statement and transcript of the deposition of Officer Aufdenkamp. (DE, 146 p. 23) He states that all aspects of his statement that are inconsistent with the physical evidence. (DE 146, p. 23) He takes issue with the assertion that Mr. Askew pointed his firearm at Officer Aufdenkamp. (DE 146, p. 23) He says that the physical evidence simply does not support that conclusion. (DE 146, p. 23) First he says the location of the pistol which was found on the floor board beneath Mr. Askew's legs is not anywhere near the area where it would be if he reached over and then was shot while he has his firearm pointing at the officer. (DE 146, pp. 23, 24) Next he says the gunshot wounds to his arms are inconsistent with the assertion that he was pointing a firearm at Officer Aufdenkamp. (DE 146, p. 24) He says the gunshot wound of the left arm is on the posterior side a little bit above the wrist and that the position where the officers were firing does not coincide with Mr. Askew reaching across with a gun in his left hand and pointing

5

it at the officer. (DE 146, pp. 24) He reiterates that Officer Aufdenkamp's statement that Mr. Askew had the gun in his left hand, reached across his body and pointed it at him on the passenger side of the vehicle is inconsistent with the location of the wound in his arm. (DE 146, p. 24) In other words the arm would have to be in an unnatural position to align it with the shots coming from Officer Aufdenkamp. (DE 146, p. 80) He further says that if Mr. Askew's left arm was across his body pointing at Officer Aufdenkamp there would be no way for him to drop it between his legs after the shooting. (DE 146, p. 25) He said this just would not happen and that he has never seen anything like that in all the shootings that he has looked at. (DE 146, p. 25) He says it was not conceivable that Mr. Askew had a gun in his hand at the time the officers fired. (DE 146, p. 25) If so, this begs the question of how the gun got to the floor either from his lap or otherwise without his handling it.

When asked if a body moves after someone is shot, he says that it can continue to move but depends on the particular shots and whether it is immediately incapacitating. (DE 146, p. 25) He then discusses the location of the wound stating that there were two shots sustained in the back which actually lacerated the spine and will result in very rapid incapacitation. (DE 146, p. 25) He says that that limits the ability of a person to turn back around and move their hands in a position and drop a firearm. (DE 146, p. 25) He excludes the possibility that after being shot Mr. Askew's arms would move around to a point where the gun would be dropped between his legs. (DE 146, p. 25) Mr. Knox does not support his opinion based upon any authorities with regard to movement of the body after a shooting and

6

particularly after multiple shootings. Mr. Knox's statement that wounds to Mr. Askew limited his ability to turn around and move his hands in a position and drop a firearm is inconclusive. The problem with this analysis is that it cannot be determined the order of shots that Askew sustained. (DE 146, p. 51) Mr. Knox says that, "In this particular case I don't have any of that. Most of the shots are pretty much straight in as we covered before so there's really no way to discern sequence of these shots." (DE 146, p. 51) There was an accounting by Mr. Knox of rounds fired that struck the vehicle and rounds that struck Mr. Askew. (DE 146, p. 50) Of those eleven struck the vehicle and six struck Mr. Askew. (DE 146, p. 50) Mr. Knox used trajectory rods in the doors of the car to determine where the shots landed but concluded that none of those could have struck Mr. Askew. (DE 146, p. 50) All in all there were twenty-two rounds fired by the officer. (DE 146, p. 49) He cannot account for shots unless it hits something and therefore there could be some that are not accounted for. (DE 146, p. 50)

Since Mr. Knox is focusing on the wounds to the arms saying that the gun could not have been pointed at Officer Aufdenkamp, this raises a question of which shots struck the arms. Was it the first, second, third or twenty-second? Assuming it was one of the later rounds, consideration must be given to the possibility that earlier rounds which struck him may have caused the body to twist and turn, therefore causing the arms to rotate or flail around moving them in various positions when they were struck. This also suggests that the gun which had been pointed at Officer Aufdenkamp could have dropped to the floor after the

7

initial shootings. Suffice it to say this is all speculation but not out of the realm of possibility and would tend to refute the conclusions of Mr. Knox.

Another scenario not considered by Mr. Knox is that there is a logical explanation to the wounds to Mr. Askew's arms which coincides with his pointing the gun at the officer. Officer Aufdenkamp who was on the passenger side of the vehicle stated that Mr. Askew who was seated on the driver's side moved his left arm across his body and pointed the gun at him. (DE 145, p. 13) Based upon the location of his right arm which was outstretched on the passenger side, it is likely that at the time Mr. Askew turned toward Officer Aufdenkamp his right arm was face down somewhere on the passenger seat. (DE 146, p. 30) Seeing the gun, the officers began to fire and Mr. Askew could have recoiled back to his original position dropping the gun between his legs landing on the floor board. In the process the back of his left arm would be facing Officer Dyess who was firing which would explain the location of the wounds.[1] As to the right arm on the passenger seat, if it was face down this would explain the location of the wounds to the back of the arm. This scenario is as logical if not more so than the conclusion of Mr. Knox.

Another relevant factor is the abrasion to the ring finger of Mr. Askew's left hand. (DE 149, pp. 58, 217. 219) For whatever reason Mr. Knox did not take that into consideration stating that the gunshot wounds is really what he is relying upon. (DE 146, p. 32) The significance of this is that if Mr. Askew's left arm was across his body and was

---

[1] The gunshot wound was to the back or posterior of the left arm. (Depo., p. 77)

8

pointing his gun at Officer Aufdenkamp, the left hand ring finger would be pointing in Officer Aufdenkamp's direction. Upon firing the officers' shots are coming through the rear and back windows which were shattered. (DE 146, p. 31) The abrasions to the left ring finger could be caused by glass shards or pieces of glass. (DE 149, pp. 74-78) According to Dr. Miguel Laboy, the medical examiner who performed the autopsy on Mr. Askew, this is consistent with Officer Aufdenkamp's contention that the gun was pointed at him. (DE 149, pp. 77, 78) Mr. Knox says that the location of the wounds to the arms, the hand have to be raised. (DE 146, p. 26) Dr. Laboy says if he had his hands up like he was surrendering, the abrasion to the left ring finger would not happen. (DE 149, p. 60) Likewise the wound to the right arm is not consistent with holding one's hands in a surrender position. (DE 149, pp. 65, 66) These inconsistencies refute Mr. Knox's reconstruction opinion.

Because of the various possibilities, Mr. Knox's opinion is based upon conjecture and speculation which is not within the province of an expert. See Federal Rules of Evidence 702, and <u>Tamraz v. Lincoln Elec. Co.</u>, 620 F.3d 665, 677 (6th Cir. 2010).

In his report, Mr. Knox's concludes that the physical evidence does not support the officers' contention that Mr. Askew pointed a gun at Officer Aufdenkamp. (DE 145, p. 37) He does not explain the basis for his opinion much less his reliance on the wounds to the arms to refute Officer Aufdenkamp's statement that the gun was pointed at him. (DE 145) It is only after his deposition is taken, for the first time he elaborates using the wounds to Mr. Askew's arms as the basis for his conclusion. (DE 146, pp. 24,25) An expert report under

9

Rule 26 is intended to set forth substance of the direct examination of the expert witness and must disclose the data and other information considered by the expert. To satisfy the Rule, the report must provide the substantial rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them. Duncan Donuts, Inc. v. Patel, 175 F.Supp.2d 202, 210 (6th Cir. 2001). Additionally, the failure of Mr. Knox to explain factually in his report how he reached his conclusion is basis for rejecting his testimony pursuant to Rule 26.[2]

## POLICE PRACTICES

Wearing his police practices hat, Mr. Knox renders the following opinions:

(a)  Officer Approach, Tactics and Reasonableness of Force.

In Officer Aufdenkamp's statement he says the following:

1. He and Officer Dyess were dispatched to a report of loud music (p. s).

2. They found a vehicle running with a male, later identified as Steven Askew, either sleeping or passed out behind the steering wheel.

3. They positioned their police vehicle facing the vehicle, illuminating the vehicle with their headlights and take down lights.

4. Using their flashlights, they both approached from the driver's side and saw a liquor bottle and a beer can inside a brown bag.

5. He then went to the passenger side and looked into the vehicle.

6. He tapped on the window to gain the attention of Askew.

---

[2] Query: Was this an oversight or an after thought in an attempt to support his opinion?

> 7. Askew started to wake up and moved his hands revealing the handle of a gun between his legs.
>
> 8. He alerted Officer Dyess about the presence of a handgun in Askew's lap.
>
> 9. He drew his service weapon, gave verbal commands, and identified themselves as police.
>
> 10. When Askew woke up, he looked around and made what was assumed to be a gang sign with his left hand at Aufdenkamp.
>
> 11. Both officers continued to give verbal commands, which Askew ignored.
>
> 12. He advised dispatch they had a person with a gun and requested additional units.
>
> 13. Askew then grabbed the gun with his left hand and started to turn toward Aufdenkamp, smiled at him and pointed the gun at his face; Aufdenkamp then started to fire (pp. 2-3).

(DE Report, 9-10).

Mr. Knox acknowledges that the officers were dispatched to a loud music complaint but that call had no bearing on their reason for approaching Mr. Askew. (DE 146, p. 33) He is not saying that they had no reason to approach the vehicle but the call to which they were dispatched is not a part of their approach to Mr. Askew. (DE 146, p. 33) He says that due to the fact that Mr. Askew was asleep in the car, in order to wake him up they should have turned on their blue lights and siren and used their PA system, rather than stand by the window and put themselves in potential danger, in the event the subject pulls a gun. (DE 146, p. 38) He says that just issuing verbal command and announcing that they are the police

11

and put your hands up is not enough. The use of blue lights flashing helps the subject to recognize that the police are there. (DE 146, pp. 38, 39) The officers' version of commands were inconsistent with the radio transmission. (DE 145, p. 28)

Then Mr. Knox goes on to analyze the possible reactions of someone who is awakened. (DE 146. p. 37) He goes on to say, "Their judgment may not be real great, but that's not the same as waking somebody up. When you wake a person up you have no idea where their brain is coming from. They could . . . like I said, he could be in the middle of a nightmare where he's being chased and all of a sudden there's somebody banging on the window waking him up. Most people will respond by being startled, scared and, if he's armed and he's afraid that somebody is coming after him, he might just pick up his gun and point it at you. I mean you just have to recognize that that's a possibility." (DE 146, p. 37) Now Mr. Knox is wearing the hat of a psychiatrist and delving into the mind of the subject. Another example of conjecture and speculation. See Johnson v. Baker, 2009 U.S. Dist Lexis 99080 (a party's state of mind is not within the knowledge of any expert).

Mr. Knox does not take into consideration that the officers saw the car parked with the motor running, and had no idea what the situation was, or that Mr. Askew had a gun. For all they knew, he may have been ill or in need of help.[3] It is not until they approach the vehicle and the attempt to awaken him did they know that he had a gun. (DE 145, pp. 12,

---

[3] Mr. Knox acknowledges at this point they don't know anything and had a right to inquire. (DE 146, p. 34)

12

13) Once they realize he has a gun and they give him commands to show his hands there is little time left for the officers to do anything but to take cover.

Be that as it may whether the officers' approach to the vehicle was reasonable it is immaterial as the sequence of events is governed by the Segmenting Rule. In <u>Livermore v. Lubelan</u>, 476 F.3d 397 (6th Cir. 2006) the court stated that the proper approach under the 6th Circuit precedent is to view excessive force claims in segments. Citing <u>Gattas v. Redford PEWP</u>, 365 F.3d 763, 722 (6th Cir. 2004); <u>Dickerson v. McCellan</u>, 101 F.3d 1151, 1161 (6th Cir. 1996) and <u>Greathouse v. Couch</u>, 433 F.Appx. 370, 371 (6th Cir. 2011). The court said that under the Segmenting Rule, the court is to carve up the events surrounding the challenged police action and evaluate the reasonableness of a force by looking only at the moments immediately preceding the officer's use of force which approach "applies even to encounters lasting very short periods of time." <u>Couch</u> at 371. Here all of the acts of the officers in approaching Mr. Askew's vehicle and the tactics involved leading up to the ultimate use of force should be excluded under the rule.

Mr. Knox concedes that if the gun is pointed at the officers, they have no other choice but to shoot. (DE 146, p. 38)

### **INVESTIGATION**

Mr. Knox states that during the course of the investigation the reporting process was "shoddy." (DE 146, p. 41) He refers to the fact that the license tags and VIN numbers were incorrectly recorded in various reports. (DE 145, p. 38, 39) However, he states in a footnote

13

that these variances were of no consequence in his reconstruction. (DE 145, p. 17) Mr. Knox follows up in this report by giving the reasons why he says the Memphis Police Department did not conduct a thorough investigation of the shooting.[4] (DE 145, p. 44) In his opinion the Department did not determine why the physical evidence contradicted the officer's statement. They did not address any issues with regard to the officers' pre-shooting handling of their encounter with Mr. Askew and did not address the tactical decisions made by the officers that likely caused and contributed to the shooting. (DE 145, p. 44) In his deposition, he reiterates that the investigation was poor and that the Department was not really trying to investigate anything. (DE 146, p. 40) To dispel this notion it is not necessary to look any further than the Internal Affairs documents which were supplied to Mr. Knox for review. This comprises some 60 items which include among other things crime scene reports, statements, photographs and numerous files. (DE 145, pp. 7-10) It is not as if there was no investigation at all. It is apparent that considerable time and effort was put forth.

Mr. Knox has labeled the investigation in this case as "poor" and "shoddy" in support of his opinion that the investigation was inadequate. (DE 146, pp. 40, 41) In order to establish liability against the City not only must it be shown that the investigation was inadequate but that the flaws in the particular investigation were representative of a clear and persistent pattern of illegal activity which the Department knew or should have known about

---

[4] In addition to being a conclusion as to the cause of the shooting, the tactical decisions are immaterial as set out above.

and yet remained deliberately indifference and that this custom was the cause of the claimed injury. Thomas v. City of Chattanooga, 381 F.3d 426, 432-33 (6th Cir. 2005). With regard to deliberate indifference, this does not mean a collection of sloppy or even reckless oversights. It means evidence showing an obvious deliberate indifference to the alleged violation. Doe v. Clayborne County, 103 F.3d 495, 508 (6th Cir. 1996). In the face of an extensive investigation, labeling it as poor and shoddy is insufficient and does not amount to deliberate indifference.

Mr. Knox makes no reference to prior investigations. Without evidence of a pattern of inadequate investigations, there can be no Section 1983 liability based upon one instance of potential misconduct. Thomas, 398 F.2d at 432 citing, Monell v. Dept. of Social Srvs., 436 U.S. 658, 694 (1978). Also see Hysell v. Thorp, 2009 U.S. Dist. Lexis 11597*63; Daniels v. City of Columbus, 2002 U.S. Dist. Lexis 28130*21.

As an adjunct to the failure to investigate contention, since it was after the fact, to say that it caused a violation defies logic. Fox v. VanOosterum, 987 F.Supp. 597 (W.D. Mich. 1997); Thompson v. Frost, 655 F.Supp. 468, 472 (E.D. Mich. 1987); McGuire v. Warner, 2009 U.S. Dist. Lexis 35644*24.

Pushing on, Mr. Knox states that by failing to adequately investigate an officer involved shooting, the Memphis Police Department is rubber stamping the officers' conduct and setting precedent for the use of deadly force investigations. (DE 145, p. 44) The underlying messages to rank and file officers is that any use of deadly force is likely to be

deemed justified as long as the officers assert they were in fear. (DE 145, p. 44) He goes on to say, "When all you do is just say, well here is what they said so we're going to accept that that's what happened, here we go, then that is the message you're communicating to the rank-and-file officers, is just say this is what happened and then you're good. We're not going to really ever investigate to figure out whether you did that or not." (DE 146, p. 40) As the court said in Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994), this assumes "without any basis in fact or logic that police officers will be extravagant in their use of deadly force if they know discipline will not be too severe if a shooting occurs. We're not talking about cheating on overtime here, or some other minor peccadillo, we're talking about taking the life of another person."

Taking everything into consideration, based upon the holdings in Thomas, Berry, Fox and Thompson, Mr. Knox's opinion regarding the investigation is irrelevant and should be excluded.

## TRAINING

Mr. Knox acknowledges that he has received the training records for both the officers which includes basic recruit curriculum and several hundred pages of documents. (DE 146, p. 45) He says that the training records indicate that they got what is fairly standard law enforcement type training. (DE 146, p. 45) In looking at the records, everything appears that they received the type of training that they should receive. (DE 146, p. 45) As to training regarding high risk stops, he states that the Memphis Police Department records are

standard. It is the same kind of training records that you would see in just about any law enforcement agency, you know, of any reasonable size agency around the country. (DE 146, p. 45) He then concludes that if the officers stated that they were following their training in this case as they had testified, then the training must be deficient. (DE 146, p. 46) To follow this line of reasoning, is a reach and an unrealistic conclusion based upon speculation and conjecture. He then leaps to an unsupported conclusion that even though the training materials provided an outline of what topics are to be covered and provides for standard types of training, that does not mean that what they got in the classroom and what they were told corresponds with what is on the outline. (DE 146, p. 46) The curriculum records that are the same are what you would see around the country are obviously acceptable and speak for themselves.

The Supreme Court has said that under Section 1983, municipal liability can be sustained only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. City of Canton, Ohio v. Harris, 498 U.S. 378, 388 (1989). In applying the stringent standard of deliberate indifference, the court has rejected the notion that a negligent training program can create municipal liability noting that Federal Courts should generally refrain from "second-guessing municipal employee-training programs." Id., at 391-92. Mr. Knox's opinion relating to training should be excluded.

# INAPPROPRIATE LEGAL CONCLUSIONS, SPECULATION AND COMMENTS

In reviewing the factual background Mr. Knox opines that "the use of deadly force by both officers cannot be viewed as objectively reasonable." (DE 145, p. 46) Further in his report he again states the use of deadly force by Officers Aufdenkamp and Dyess was excessive and was not objectively reasonable under the circumstances. (DE 145, p. 43) Mr. Knox is expressing a legal conclusion and as the courts have said this is nothing more than telling the jury what result to reach. See Berry v. City of Detroit, 25 F.3d at 1353 citing Hygh v. Jacobs, 961 F.2d 359, 364 (2nd Cir. 1992).

He states the Memphis Police Department failed to conduct a thorough investigation of the shooting and by doing so ratified the officers' conduct without regard to the factual circumstances surrounding the shooting (emphasis added). (DE 145, p. 44) Ratified as used in this context is a legal term and under the holding in Berry this testimony should be excluded.

He says the Memphis Police Department did not address any issues with regard to the officers' pre-shooting handling of their encounter with Mr. Askew and therefore did not address the tactical decisions made by the officers that "likely caused or contributed to this shooting." (DE 145, p. 44) As referred to above, this is an issue for the jury and not an appropriate comment by the expert.

## CONCLUSION

As stated above, Defendant City of Memphis respectfully submits that (1) Mr. Knox's conclusion that Mr. Askew never pointed his gun at the officers is speculative and fails to take into consideration all various scenarios regarding bullet wounds; (2) the sequence of events involving the officers' approach to Mr. Askew's vehicle is immaterial under the Segmenting Rule and should be excluded; (3) his opinion regarding the investigation and training is not relevant in view of applicable legal standards and (4) his report is replete with an expression of legal standards and conclusions which invade the province of the court and jury and should be excluded.

Respectfully submitted,
/s/ Henry L. Klein
Henry L. Klein, #8856

/s Richard J. Myers
Richard J. Myers #15577
APPERSON CRUMP PLC
6070 Poplar Ave., Suite 600
Memphis, TN 38119
Phone: 901-756-6300
hklein@appersoncrump.com
rmyers@appersoncrump.com
Attorneys for City of Memphis

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing has been forwarded to the following via U.S. mail, postage prepaid this the _____ day of October, 2015:

Howard Brett Manis, Esq.
Manis Law Firm
1000 Ridgeway Loop Road
Suite 320
Memphis, TN 38120

Zayid Saleem
City Attorney's Office
125 N. Main Street
Suite 336
Memphis, TN 38103

Jeffrey S. Rosenblum, Esq.
Matthew T. May, Esq.
Rosenblum & Reisman
6070 Poplar Avenue
Suite 500
Memphis, TN 38119

Elijah Noel, Jr., Esq.
Harris Shelton Dunlap Cobb & Ryder
One Commerce Square
Suite 2700
Memphis, TN 38103

Deborah E. Godwin, Esq.
Mary Elizabeth McKinney, Esq.
Godwin Morris Laurenzi & Bloomfield, P.C.
Morgan Keegan Tower
50 N. Front St.
Suite 800
Memphis, TN 38103

/s/ Henry L. Klein