IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

STERLING ASKEW as father, next of Kin and as Administrator Ad Litem/Personal Representative of the Estate of STEVEN ASKEW, Deceased, AND Sylvia Askew as mother and Next of kin of STEVEN ASKEW, Deceased,

    Plaintiffs,

v.

CITY OF MEMPHIS, TONEY ARMSTRONG, in his Individual capacity and official capacity as the Police Director of the Memphis Police Department; OFFICER NED AUFDENKAMP (#11914) Individually and in his official capacity as a Police Officer with the Memphis Police Department; OFFICER MATTHEW DYESS (#12402), Individually
and in his official capacity as a Police Officer of the Memphis Police Department,

    Defendants.

Docket No.: 2:14-cv-02080-STA-tmp

JURY DEMANDED

---

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY
OF PLAINTIFF'S PROPOSED EXPERT MICHAEL A. KNOX
BY DEFENDANT OFFICERS AUFDENKAMP AND DYESS

---

Come now Defendants, Officer Ned Aufdenkamp and Officer Matthew Dyess, individually through Counsel, pursuant to Rule 702 of the Federal Rules of Evidence, and submit this

1

Memorandum in Support of their Motion to Exclude the Testimony of Plaintiff's Witness Michael A. Knox.

I. BACKGROUD

For the purposes of this motion, Defendant Officers Aufdenkamp and Dyess would adopt and incorporate by reference those facts as set forth by the City of Memphis in its Memorandum in Support to Exclude Expert Michael Knox, Docket Entry No. 154, pages 2-3, as if fully set forth herein.

II. APPLICABLE LAW

Rule 702. Testimony by Expert Witness

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The Rule obligates the trial court to act as a gatekeeper and to insure that any expert evidence - scientific or otherwise – is relevant and reliable. *Kumbo Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 147, citing, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589.

In this case, the testimony of Mr. Knox should be excluded under Federal Rule 702 of the Federal Rules of Evidence for a number of reasons. Mr. Knox's opinion is based upon inaccurate facts and insufficient data he collected during his own investigation. Mr. Knox's relies on "facts"

that conflict with those offered by the Medical Examiner in this case, Dr. Miquel Laboy. Mr. Knox ignores relevant and applicable scientific standards, and specifically stated that he did not use any such studies or their scientific standards in relation to this case. Finally Mr. Knox attempts to offer legal conclusions in the form of his "expert opinion" in this matter.

III. KNOX'S OPINION

On January 22, 2015, Mr. Knox submitted his Forensic Analysis & Reconstruction Report. (DE 145). Thereafter on July 17, 2015, Mr. Knox's deposition was taken. (DE 146). According to his report, Mr. Knox was rendering an opinion as a forensic analyst and a reconstructionist dealing with the shooting of Mr. Askew. In addition he was opining on the action of the officers involved and their reasonableness of force together with the training that comes with that. (DE 146, p. 33).

A. Mr. Knox's Own Investigation

The incident in question occurred on January 17, 2013, however according to his testimony, Mr. Knox did not view Mr. Askew's vehicle until November 15, 2014, after it had been stored in a airport hanger for "just shy of two years." (DE 146, p. 177). At that time he spent only approximately two (2) to three (3) hours inspecting the vehicle and maintained no log at the time. (DE 146, p. 178). Knox never visited the apartment complex. (DE 146, p. 184).

Plaintiffs have criticized the City of Memphis' own review of Mr. Askew's vehicle in its warehouse the day after the incident, submitting that one cannot re-create the exact scene of the incident in a warehouse. (DE 159-1, Smith Dep. p. 58). Plaintiffs elicited testimony that in a warehouse you do not have the benefit of knowing where the other vehicles are parked or where casings fell. (DE 159-1, p. 59-60). Such alleged deficiencies in the investigation on the part of the City of Memphis would likewise be applicable to that of Mr. Knox.

During his two (2) to (3) three hour review of Mr. Askew's vehicle, almost two (2) years after the incident in question, Mr. Knox did not position a mannequin in the driver's seat of Mr. Askew's vehicle. According to Mr. Knox he was merely determining where the shots were coming from, where the officers were. (DE 146, p. 184-185). *He was not interested in showing or aligning the wounds to Mr. Askew*. (DE 146, p. 184)(emphasis added). Defendant Officers would submit that as there is very little dispute as to where the officers were standing at the time they fired their weapons, such information will not assist the court and should be excluded. (DE 152-1, pp. 88, 99, Ex. 4, p. 3, 7: DE 151-1, p. 200, Ex. 8, pp. 3, 5, 7).

Moreover, in analyzing Mr. Askew's vehicle, Mr. Knox could not give a full accounting for all of the shots fired in this case. (DE 146, p. 181-182). Mr. Knox was only able to account for eleven (11) out of the twenty two (22) shots fired. (DE 146, p. 182). Although he did use trajectory rods to determine the angles of the shots that penetrated Mr. Askew's vehicle, he could only use these rods in reference to eight (8) of the twenty two (22) total shots that were fired. (DE 146, p. 179-180). Mr. Knox could not account for the rounds that may have struck Mr. Askew and ended up in the car, those which may have gone through the car and hit him, those on the ground or those that simply went through the glass. (DE 146, p. 179-180). According to Mr. Knox, he could only account for shots that actually hit something. (DE 146, p. 181). Again he was not interested in showing or aligning the wounds to Mr. Askew. (DE 146, p. 184).

As Defendant Officers submit that there is very little dispute as to where they were standing during the incident in question, such information from Mr. Knox will not assist the trier of fact in this matter.

    B.  The Shooting

The can be no dispute that the majority of Mr. Knox's opinion is based upon after acquired

4

information. Although Mr. Knox states that he was not interested in showing or aligning the wounds of Mr. Askew, he does just that in offering his own interpretation of the Medical Examiner, Dr. Miquel Laboy's Autopsy Report regarding the death of Steven Askew.

Mr. Knox never physically viewed the body of Steven Askew and Defendants submit Dr. Laboy's report and testimony regarding his report is the best evidence in this case. (DE 156-1, Ex. 2 and 3). Mr. Knox stated he was not interested in showing or aligning the wounds to Mr. Askew, and yet according to Mr. Knox, the wounds to Mr. Askew's arms are inconsistent with the assertion that Mr. Askew ever pointed a firearm at Officer Aufdenkamp. (DE 146, p. 24).

Mr. Knox's opinion however was clearly disputed by the testimony of Dr. Miquel Laboy, who conducted the actually autopsy of Mr. Askew, including a review of each of the bullet wounds. As an initial matter, Dr. Laboy confirmed that there is no possible way to determine the order of the shots Mr. Askew sustained. (DE 156-1, p. 80). Mr. Knox agreed there was no way of determining which shots struck Mr. Askew first. (DE 146, p. 187).

　　　1. The Injury to the Right Arm.

Dr. Laboy testified that the wound to Mr. Askew's right arm was consistent with Mr. Askew having his right arm stretched out towards the shooter. (DE 156-1, p. 47). So although Mr. Knox states that there is "no conceivable way" that Askew had a weapon in his hand when the Officers fired at him, Dr. Laboy clearly testified to at least one "conceivable way."

Furthermore, Mr. Knox's description of the wound to Mr. Askew's right forearm was inaccurate. (DE 146, p. 79). According to Mr. Knox, the bullet to Mr. Askew's right arm was "coming thumb side through." (DE 146, p. 84). Mr. Knox also describes it as coming down from the thumb side and exiting the pinky side of the arm. (DE 146, Dep. 90). This statement regarding the injury to Mr. Askew's right arm is simply inaccurate. Not only does a picture of Mr. Askew's

right arm, which includes his right thumb, fail to indicate this particular wound to Mr. Askew's arm (DE 156-1, Ex. 11), but Dr. Laboy described this wound as entering the back of Mr. Askew's forearm in line with his ring finger and exiting in line with his pinky. (DE 156-1, p. 67). Again, Dr. Laboy confirmed that the wound to Mr. Askew's right arm is consistent with Askew having his right arm stretched out towards the shooter. (DE 156-1, p. 47).

Mr. Knox reports that Mr. Askew's hands could have been on the steering wheel. (DE 146, p. 84). However Dr. Laboy confirmed that if the shooter was positioned either to the side or behind Mr. Askew, the wound to Askew's right arm would be inconsistent with Mr. Askew having his hands on the steering wheel. (DE 156-1, p. 48). This wound would also be inconsistent with Mr. Askew having his hands up as if surrendering. (DE 156-1, p. 63). Mr. Askew was found with his right arm positioned across the console, holding a cigarillo. (DE 158-1, Kant Dep. p. 60; DE 159-1, Smith Dep. p. 49). Mr. Knox admitted that the wound to Mr. Askew's right arm was inconsistent with the position in which it was ultimately found in the car. (DE 146, pp. 186-187). At some point the arm would have to have been raised. (DE 146, pp. 186-187). There was definitely some kind of movement of the arm before it ended up in the position it was found. (DE 146, p. 187).

2. The Injury to the Left Arm

The wound to Mr. Askew's left arm superficially penetrated his forearm and fractured the radius, however the bullet was visible from outside Mr. Askew's clothing and was recovered at the sleeve. (DE 156-1, pp. 77, 88, 104, Ex. 12 and 14). According to Dr. Laboy the bullet lacked the energy to pass through Mr. Askew's arm, most likely the result of having passed through some intermediary target like perhaps the car. (DE 156-1, pp. 77-78, 104-1050). There were also abrasions to Mr. Askew's left hand especially in the area of the ring finger. (DE 156-1, p. 57,

6

Exhibit 7). According to the Medical Examiner, these wounds were inconsistent with Mr. Askew having his hands up like he was surrendering. (DE 156-1, p. 58). Such abrasions could have been caused by glass shards or pieces of glass. (DE 156-1, pp. 74-78). The Officers's shots were coming through the rear and back windows that were shattered. (DE 146, p. 31). These wounds to Mr. Askew's hands are consistent with the officer's contention that the gun was pointed at him as he fired. (DE 156-1, p. 77-78). Mr. Knox did not consider these abrasions in reaching his opinion.

Mr. Knox states that the injury to Mr. Askew's left arm does not coincide with Mr. Askew reaching across with a gun in his left hand and pointing it at an officer. (DE 146, p. 24). Knox said Askew could not have had a weapon in this hand at the time the officers fired. (DE 146, p. 25). This assumes that Mr. Askew was shot at the exact time that he pointed a weapon at the officer. As previously discussed, there is no way to determine the order in which Mr. Askew sustained his wounds from the gunfire.

Following the incident, Mr. Askew was found with his left arm resting on the driver's seat next to his left side. (DE 158-1, Kant Dep. p. 60; DE 159-1, Smith Dep. p. 49). Bullet holes were found in both the front driver's side door and the back driver's side door and the front windshield near the steering wheel. (Merritt Scene Investigation, Bates Stamped 3181-3182, Attached hereto as Exhibit "A"). When asked about whether any of the shots fired through the driver's side door could have actually struck Mr. Askew, Mr. Knox responds that "it is possible for something like that to occur." (DE 146, p. 183). Therefore it is very possible that the wound to Mr. Askew's left arm could have been caused after he dropped his arm down as a bullet passed through the driver's side door.

   3. The Gun

According to Mr. Knox, the location of the gun on the driver's side floor board under Mr. Askew's feet is not anywhere near the area where it would be if he had reached over and then was shot while he has his firearm pointing at the officer. (DE 146, pp. 23, 24). Again Mr. Knox assumes that Mr. Askew was in fact shot at this exact moment. All agree there is no way to determine the order in which Mr. Askew sustained his wounds, so it is mere conjecture to assert that Mr. Askew was shot at this exact moment.

The evidence shows that Mr. Askew's left arm was eventually found resting on the driver's seat next to his side. Although Mr. Knox asserted, "bullets don't move bodies," he did admit that a body can continue to move after being shot. (DE 146, p. 81). Dr. Laboy confirmed that pain sustained from a gunshot wound could cause an individual to move their body in response. (DE 156-1, pp. 68-69). It is possible that Mr. Askew could have continued moving after being shot because there is no way to determine the order of those shots. (DE 156-1, pp. 65-68). At any point, injury to Mr. Askew could have caused his body and arms to turn or rotate, causing the gun to drop to the floor. Such possibilities refute the conclusions of Mr. Knox. Mr. Knox offers no explanation as to how the firearm went from Mr. Askew's lap to the floorboard of the car near his feet.

Because of the various possibilities that now dispute Mr. Knox's positions, Mr. Knox's opinion is based upon mere conjecture and speculation which is not within the province of an expert. See Federal Rules of Evidence 702, and *Tamraz v. Lincoln Elec. Co.,* 620 F.3d 665, 677 (6th Cir. 2010).

IV. KNOX OPINION IGNORES SCIENTIFIC STUDIES RELEVANT TO THIS CASE

Perhaps most telling of all in regards to Mr. Knox's "opinion" in this case, is the exchange that occurred during his deposition when he was asked about specific studies regarding officers'

distorted perceptions during shooting incidents. (DE 146, p. 98). Although Mr. Knox testified that he was "familiar with a number of studies in that area," when asked to name any such studies he simply responded, "I don't have any of them in front of me right now." (DE 146, p. 99). Knox then confirmed that he "did not use any studies in relation to this case" because this case is not about "misperceiving seeing an object and thinking it was something else." (DE 146, pp. 99-100). It would appear that Mr. Knox simply chose to ignore the depth of such studies, studies which he himself has participated in an article entitled "The Dynamics of Shooting Incidents" published in *Crime Scene Journal* (June 5, 2012)(Attached hereto as Exhibit B), an article which this counsel was unable to locate on Mr. Knox's proffered curriculum vitae. (DE 146, Exhibit 1, Attached hereto as Exhibit C).

A review of Mr. Knox's article reveals that an officer's perceptual distortion during critical incidents goes way beyond an officer merely "misperceiving a wallet for a gun." (DE 146, p. 100). In his article, Mr. Knox opines that "The dynamics of police-involved shootings, including an understanding of the human factors, physiology, and biomechanical aspects of police-involved shooting incidents is a standard part of law enforcement firearms training, and knowledge of these topics is common among law enforcement firearms trainers and experts." (Exhibit B, page 1). Despite this written pronouncement by Mr. Knox, neither Officer Dyess nor Officer Aufdenkamp benefit from such "common knowledge" from Mr. Knox.

Both Officer Aufdenkamp and Officer Dyess sought counseling following this event. (DE 152-1, pp. 100-101; DE 151-1, pp. 77-81). Officer Dyess also spoke specifically about the psychological effects he has experienced as a result of having been involved in this deadly incident including; anxiety, wondering if he remembers things correctly, difficulty remembering certain details of the incident, as well as a variety of other emotions that he sought help in dealing with.

9

(DE 151-1, p. 92). Dyess had never been in a position of having to utilize deadly force and has not been in such a position since this incident. (DE 15101, pp. 112-113).

It's often said that "you get what you pay for." In this case it is apparent that Mr. Knox limits his expert opinions depending upon which party is paying for those opinions. Mr. Knox is willing to compromise his position as a potential expert and completely ignores the scientific knowledge that he himself defines as "standard" and "common knowledge...among experts."

In the past when Mr. Knox has been retained to represent the interests of law enforcement officers involved in critical shooting incidents, Mr. Knox provides in depth analysis of officers' perception distortion during the critical shooting incidents in question. (DE 146, Knox Exhibit 3, pages 15-22; Knox Exhibit 4, pages 15-22, in which Mr. Knox quotes his article "The Dynamics of Shooting Incidents" verbatim)(Both are attached hereto as Exhibits D and E respectively). In this case the concept of officer perception distortion is notably absent from Mr. Knox's report. The standard seven pages of analysis regarding the dynamics of police involved shootings offered in his opinions in support of law enforcement, analysis that he himself describes as standard "common knowledge…among experts," is purposely omitted in this case. Officers Aufdenkamp and Dyess received no benefit of such vital analysis.

When Officer Dyess first reported that he heard Mr. Askew's fire his weapon, confusing the sound of Officer Aufdenkamp actually having firing his weapon first, Officer Dyess is accused of telling an inconsistent story as Mr. Askew never fired a weapon. (DE 146, pp. 147-149). There is no consideration by Mr. Knox for the "diminished sound" that 88% of 72 officers involved in shooting incidents complained of when surveyed, and which Mr. Knox clearly outlined in his article on the subject. (Exhibit B, page 1). These officers advised that during these critical incidents they had not heard sounds such as gunfire, shouting, sirens, or that the sounds had "an

unusual distant, muffled quality." (Exhibit B, page 1). When surveyed further these same officers confirmed other perceptual distortions such as experiencing instances of tunnel vision, acting on automatic pilot, experiencing heightened visual clarity, feeling time was moving in slow motion, memory loss for parts of the event, and even memory loss for some of their own actions. (Id., page 1-2).

But in this case, according to Knox none of this analysis is relevant because "we're not talking about officers who misperceived an object to be something other than it was." (DE 146, p. 101). The suggestion that the numerous studies regarding a law enforcement officer's perceptual distortions during shooting incidents is limited to only those situations where an object is misperceived for a gun is simple disingenuous on the part of Mr. Knox. (See attached paper by Alexis Artwohl Ph.D, "Perceptual and Memory Distortions During Officer Involved Shootings" (2008) Mr. Knox quotes Dr. Artwohl work on this issue extensively in his own article.)(Attached hereto as Exhibit F).

In her studies on the issue, Dr. Alexis Artwohl has stated that the "most important implication for investigators to remember is that *if an officer's recollection of an event is not a totally accurate representation of reality, it does not necessarily mean the officer is lying or trying to engage in a cover up.*" (Exhibit F, p. 6.) Mr. Knox affirmed this same principle in his own article when he confirmed that "*Inaccurate statements are not necessarily deceptive ones.*" (Exhibit B, page 4)(emphasis added). Mr. Knox appears to have forgotten this "important implication" when focused on the statements of Officers Aufdenkamp and Dyess.

Mr. Knox denies the applicability of distorted perception studies to this case because the Officers were "pretty specific about" what they saw. (DE, p. 189). He states that Dyess was very specific in stating that the saw a gun coming towards Aufdenkamp, and given their descriptions

there's no allowance for such statements under the perceptual distortion studies. (DE, p. 189). Again this is simply inaccurate. Dr. Artwohl outlined a very specific incident in her paper in which an officer that was involved in a critical incident stated that he saw the suspect pointing a gun at this partner, and as the he shot the suspect, he saw the suspect shoot his partner. According to the officer he watched as his partner went down in a "spray of blood." (Exhibit F, page 1). However when he ran over to help his partner, his partner was standing there unharmed. The suspect had never even fired a shot, despite what the officer was sure that he saw. (Id.). An almost identical incident as the case before us, but according to Mr. Knox because the Officers were specific in this case there should be no allowance for distorted perception.

V. THE TACTICS UTILIZED BY OFFICERS AUFDENKAMP AND DYESS SHOULD NOT BE CONSIDERED UNDER THE LAW APPLICABLE TO THIS CASE

Knox clearly questions certain tactics utilized by the Officers. (DE 146, pp. 113, 129-130; DE 145, p. 32). Knox criticizes them for attempting to wake Mr. Askew up instead of running the vehicle tags and then running the name of the registered owner in order to determine if Mr. Askew had a valid concealed weapon permit.[1] (DE, p. 121). Knox remarks that, "[Y]ou have to use

---

[1] In error Knox characterizes the issue as "is he legal or not" in regards to the firearm. (DE 146, p. 123). The testimony of both Officers' makes it abundantly clear, that was not in fact the issue confronting them at the time they approached Mr. Askew's vehicle. Although Mr. Knox testified that Askew was not breaking the law by having the gun on his lap (DE 146, p. 124), there is no dispute that Mr. Askew was in fact breaking Tennessee law by having an open container of alcohol in his vehicle, by being in control of a running vehicle while under the influence of alcohol, and by possessing a weapon while under the influence of alcohol. Although Mr. Knox testified that the Officers did not know that Mr. Askew's BAC was in fact above the legal limit at the time of the shooting, the Supreme Court has specifically held that law enforcement officers are allowed to make certain inferences based upon objective facts in light of their training. *United States v. Cortez,* 449 U.S. 411, 418 (1980). Moreover, "Knowledge of facts and circumstances gained after the fact. . . has no place in the trial court's or jury's post-hoc analysis." *Sherod v. Berry,* 856 F.2d 802, 804-5 (5th Cir. 1991). Mr. Knox is guilty of the very type of "Monday morning quarterbacking" that the United States Supreme Court ruled must not occur in these circumstances. According to Knox, "I would have run not just that. I would have run for wants [sic] and warrants." (DE 146, p. 127). What Mr. Knox would have done with the benefit of hindsight is irrelevant.

tactics that are appropriate to the fact that they may not react the way that they would react to you if they were awake when you approach them." (DE, p. 129-130).

Despite their being in uniform, Knox criticizes the Officers for not providing "some type of visual reference" such as flashing their blue lights or using their siren while giving Mr. Askew verbal commands. (DE 146, pp. 133, 140, 141). Knox comments there were a number of things they could have done to wake him up without having to be standing right there by his window where you're in potential danger of being shot if he pulls a gun." (DE, pp. 134, 156). According to Knox "[Y]ou put yourself in a dangerous position." (DE 146, p. 138). They're criticized by Knox for standing where they were while giving the verbal commands. (DE 146, p. 139). According to Knox the Officers put themselves at risk, because they were now in immediate danger…having a gun pointed at them, they would not have had any other way to handle that. (DE 146, p. 158). He continually second guesses the Officers and instead offers what he would have done under the circumstances. (DE 146, pp. 142, 143, 160). Knowledge of facts and circumstances gained after the fact. . . has no place in the trial court's or jury's post-hoc analysis." *Sherod v. Berry,* 856 F.2d 802, 804-5 (5th Cir. 1991).

The question of whether Officers Aufdenkamp and Dyess could have avoided the situation had they used different tactics *should not* be considered when determining the constitutionality of their use of force. The Sixth Circuit specifically warned against this kind of "armchair quarterbacking" when it stated, "[W]e must avoid substituting our personal notions of proper police procedures for the instantaneous decision of the police officer on the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freeland,* 954 F.2d 343, 347 (6th Cir. 1992).

"Other than random attacks, all such cases begin with the decision of a police officer to do

something, to help, to arrest, to inquire. If the officer had decided to do nothing then no force would have been used. In this sense the police always cause the trouble. But it is the trouble which the police officer is sworn to cause, which society pays him to cause and which, if kept in constitutional limits, society praises the officer for causing." *Plakas v. Drinski,* 19 F.3d 1143, 1150 (7th Cir. 1994)(see also, *California v. Hodari, D.,* 111 S.Ct. 1547 (1991).

Ultimately Mr. Knox opines that when you combine all the facts and the issues *with regard to the tactics* that the officers used their use of force was not objectively reasonable. (DE 146, p. 195-196)(emphasis added). Mr. Knox's opinion relative to the tactics utilized by Officers Aufdenkamp and Dyess is completely irrelevant based upon the existing law under 42 U.S.C. Section 1983 and the defense of qualified immunity.

VI. THE LEGAL CONCLUSIONS OF MR. KNOX ARE IMPROPER AND SHOULD BE EXCLUDED

In reviewing the overall facts and tactics utilized in this case, Mr. Knox opines that "the use of Deadly force by both officers cannot be viewed as objectively reasonable." (DE 145, p. 46). Additionally he states that the use of deadly force by Officers Aufdenkamp and Dyess was excessive and was not objectively reasonable under the circumstances. (DE 145, p. 43).

When claims of a constitutional deprivation are based on allegations of excessive force during the course of an arrest, investigatory stop, or other type of seizure, the courts examine an officer's conduct under the Fourth Amendment's reasonableness standard. *Graham v. Conner,* 490 U.S. 386, 395 (1989). The standard for reasonableness is objective and "depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008).

14

In regards to this case, Mr. Knox has clearly expressed a legal conclusion, which the courts have determined is nothing more than telling the jury what result reach. *See, Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994), citing, *Hygh v. Jacobs,* 961, f.2d 359, 364 (2nd Cir. 1992). Any opinion by Mr. Knox that the actions of the Officers in this case were "objectively reasonable" or that the amount of force they utilized was "excessive" is improper and should be excluded. Mr. Knox is merely attempting to provide conclusions of law under the guise of an "opinion." Such matters are for a potential jury and for this Court to determine.

VII. CONCLUSION

Wherefore based upon all of the above, Defendant Officers Aufdenkamp and Dyess respectfully submit that, pursuant to Rule 702 of the Federal Rules of Evidence, the testimony of Plaintiff's proposed expert, Michael A. Knox, should be excluded.

Respectfully Submitted,

s/ Betsy McKinney
BETSY MCKINNEY #21597
DEBORAH GODWIN #9972
Attorneys for Defendant Officers Aufdenkamp and Dyess
Godwin, Morris, Laurenzi & Bloomfield, P.C.
50 N. Front Street, Suite 800
Memphis, TN 38103
Telephone: 901-528-1702
bmckinney@gmlblaw.com
dgodwin@gmlblaw.com

CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2015, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, and that upon filing such system will serve a copy of the forgoing upon every CM/ECF registered party in this case.

I also hereby certify that there are no non-registered CM/ECF parties requiring service by other means.

                                                    s/ Betsy McKinney
                                                    BETSY MCKINNEY