**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

STERLING ASKEW, et al,

      Plaintiffs,                         Docket No.: 2:14-cv-02080-STA-tmp

v.

                                        JURY DEMANDED

CITY OF MEMPHIS, et al,

      Defendants.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT**
**THE CITY OF MEMPHIS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFFS'**
**EXPERT MICHAEL KNOX**

COME NOW Plaintiffs, through undersigned counsel, and file this Response in Opposition to Defendant City of Memphis' Motion to Exclude Testimony of Plaintiffs' Expert Michael Knox ("Mr. Knox"), and for the reasons set forth herein, Plaintiffs submit that Mr. Knox is qualified to offer the specific expert opinions referenced in Defendant's motion in this case under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and should therefore be allowed to testify during the trial of this matter and, in support, Plaintiffs state as follows[1]:

Defendant City of Memphis (the "City") contends that certain opinions of Mr. Knox should be excluded, alleging that his opinion with regard to reconstruction is based upon speculation and conjecture; his opinion regarding events leading up to the shooting is irrelevant under the Segmenting Rule; his opinions regarding the investigation are irrelevant based upon existing law under 42 U.S.C 1983; his opinions relating to training are speculation and conjecture and because of his use of legal conclusions with regard to these opinions. Plaintiffs submit that this

---

[1] Plaintiffs have attempted to cite to the record in a manner consistent with that done by Defendant City by citing to the Docket Entry (DE) and the page number generated by the ECF system. Plaintiffs have also attempted to follow the order the City's arguments in providing this response.

Court should have the opportunity to hear testimony from Mr. Knox, whether in a hearing or at trial through a voir dire, prior to ruling on such a motion. Mr. Knox should be given the opportunity to fully testify as to his qualifications to provide such opinions and his basis and reasoning for such opinions, especially with regard to the investigation he performed. Plaintiffs submit, nevertheless, that Mr. Knox's opinions not only meet the reliability standards of *Daubert* and the Federal Rules of Evidence, but are based on his training and experience as a law enforcement officer and are directly supported by the record in this case. Furthermore, Plaintiffs submit that this Court has the discretion to allow all of the opinions and testimony of Mr. Knox addressed in this motion and should exercise that discretion in favor of Plaintiffs and should allow the jury to give whatever weight it deems appropriate to these opinions. There is no question that the testimony of Mr. Knox is reliable and relevant and should be allowed.

## FACTS

This case arises out of a fatal police shooting which occurred on or about January 17, 2013, at the Windsor Place Apartments in Memphis, Tennessee. Plaintiffs retained forensic expert Michael A. Knox who thoroughly summarized the facts set forth in the record (DE 145, 10-27), and Plaintiffs make reference to that report. Mr. Knox travelled to Memphis and conducted a thorough ballistics evaluation of the vehicle at issue in this case and utilized that evaluation together with the other evidence in this case to develop his opinions.

On January 17, 2013, at approximately 9:48 p.m., the Memphis Police Department ("MPD") received a call concerning loud music coming from an apartment located at 3193 Tyrol Court. MPD Officers Ned Aufdenkamp and Matthew Dyess were dispatched to that address regarding the loud music complaint. The officers arrived on the scene of Tyrol Court but, for some reason, decided to leave that location and go to an adjacent apartment complex. While at the

adjacent complex, they saw a black male, later identified as Steven Askew, sitting in the driver's seat of a Ford Crown Victoria automobile who was either passed out or sleeping. There is no allegation that Steven had anything to do with the original 9-1-1 call or that he was observed or even suspected of any illegal activity at the time the officers approached the vehicle. As it turns out, he was simply waiting for his girlfriend, who lived in those apartments to arrive from work.

The MPD officers positioned their patrol car at an angle toward the Crown Victoria and turned on the overhead lights to illuminate Steven's vehicle, but they never activated or used any blue lights, siren, loud speaker, or any other emergency equipment. Looking into the right front passenger window, Officer Aufdenkamp witnessed a firearm in Steven's lap and alerted Officer Dyess who was reportedly at or near the left front door. The officers failed to run Steven's car tags to attempt to identify him. Also, rather than backing off and seeking a position of safety by turning on sirens, flashing lights, using a loud speaker/megaphone, or getting Steven's attention some other way, the officers woke Steven up by shining a flashlight into his car and banging on the window while yelling at him. After that, the officers allege that Steven pointed his gun at one of the officers, and, at which time, both officers fired their firearm at Steven multiple times, 22 times in fact, killing him.

In Mr. Knox's expert opinion, the officers handled the situation improperly and, even if that were not the case, it is his expert opinion as a former law enforcement officer and as an experienced forensic reconstruction consultant, that Steven did not point a gun toward the officers. It is Mr. Knox's opinion that this failure on the part of the officers is the result of inadequate training and a culture of failing to adequately investigate officer-involved shootings, among other things.

Despite the officers originally reporting that Steven fired at them first, the physical evidence proved that Steven never fired his gun at any time during this encounter.  After thoroughly stating the facts, Mr. Knox summarizes his opinions at pp. 32 – 42 of his report, and Plaintiffs make reference to those opinions (DE 145, pp. 35 – 45).

## LAW

Under Rule 702 of the Federal Rules of Evidence, the trial court has an obligation to ensure that expert testimony is not only relevant, but reliable.   *See Daubert v. Merrell Dow Pharmeceuticals, Inc.*, 509 U.S. 579 (1993).   The Federal Rules of Evidence provide as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Fed. R. Evid.* 702.  The bases for expert opinion testimony are governed by Rule 703.  When applying these two Rules, the Court's only task is to determine whether the proffered opinion testimony (1) "rests on a reliable foundation" and (2) "is relevant to the task at hand."  *Newell Rubbermaid, Inc. Vs. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012), quoting *Daubert vs. Merrill Dow*, 509 U.S. at 597.

*Daubert* "suggested a 'flexible' list of factors for a district court to consider" when deciding whether scientific testimony is reliable: "(1)whether a theory or technique . . . can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance."  *U.S. vs. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997), citing *Daubert* at 593-94.   The *Daubert* factors do apply "to

all expert testimony," including non-scientific expert testimony. *Kumho Tire Co., Ltd. vs. Carmichael*, *supra*, 526 U.S. at 147. Also, they "are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2008), quoting *Gross vs. Comm'r of Internal Revenue*, 272 F.3d 333, 339 (6th Cir. 2001). The Sixth Circuit has recognized that in the particular case of "technical or other specialized knowledge" outside of the hard sciences, these factors often "cannot readily be applied to measure the reliability of such testimony." *Surles ex rel. Johnson vs. Greyhound Lines, Inc.*, *supra*, 474 F.3d at 295, citing *Kumho Tire* at 150 and *First Tennessee Bank Nat. Ass'n vs. Barreto*, 268 F.3d 319, 334 (6th Cir. 2001) ("the four specific factors utilized in *Daubert* may be of limited utility in the context of non-scientific expert testimony").

A more befitting reliability test for non-scientific experts is whether they adequately explain how their experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Surles ex rel. Johnson* at 296, citing the Advisory Committee's Note to *Fed R. Evid.* 702. "Experience is to nonscientific experts as experimentation is to scientists." *U.S. vs. Jones*, 107 F.3d 1147, 1155 (6th Cir. 1997).[2] Thus, the "relevant reliability concerns may focus upon personal knowledge or experience" rather than traditional scientific testing. *Surles ex. Rel Johnson* at 295, quoting *Barreto*, 268 F.3d at 335. The qualifications of an expert are his experience and education that qualifies him to be an expert, not his experiences after becoming an expert. *See U.S. vs. Jones*, 107 F.3d at 1155. "A court can consider the expert's credentials and knowledge of the espoused field. However, an expert need not have total knowledge of a specific field to qualify, and a lack of

---

[2] Citing Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L. Rev. 2271, 2289 (1994).

knowledge of certain aspects of the field may comment on the credibility of the expert, rather than the admissibility of his testimony." *Trollinger v. Tyson Foods, Inc.*, 2008 WL 305032, at *3-4 (E.D. Tenn. Jan. 31, 2008).

Rightfully so, the City does not seem to question the qualifications of Michael Knox as a law enforcement and forensic reconstruction expert. Mr. Knox's education and professional background is set forth in his CV (DE 209) and in his report (DE 145, pp. 5 – 7). His educational background includes a Bachelor's Degree in mechanical engineering, a Master's Degree in forensic science, and Ph.D. level courses in criminal justice. He was a police officer/detective for the Jacksonville, Florida, Sheriff's Department from 1994 through 2010 and has been the chief forensic consultant for Knox & Associates, LLC since 2010. He has received extensive instruction and training on homicide investigations and crime scene reconstruction, is a certified crime scene reconstructionist, is a member of numerous relevant professional associations in his area of study and research which include, but are not limited to, computational analysis in crime scene reconstruction, kinematic biomechanics in crime scene reconstruction, human factors in shooting incidents, crime scene reconstruction, and crime scene behaviors of homicide offenders. He has written extensively on crime scene reconstruction and has served as a presenter, lecturer, and teacher on forensic science and crime scene reconstruction, among other subject matters. Without question, he is a "witness who is qualified as an expert by knowledge, skill, experience, training [and] education. . . ." Rule 702, F.R.Evid. Accordingly, pursuant to Rule 702, Mr. Knox is qualified to provide expert opinions in this case.

**Mr. Knox is Qualified to give Opinions regarding the Shooting and those Opinions are Relevant and Reliable.**

In this portion of Plaintiffs' response, they address the section entitled "The Shooting" in the City of Memphis' Motion (see Memo., pp. 5 – 10). The City sets out approximately 5

criticisms of Mr. Knox's opinions. None of the City's criticism actually relates to the admissibility or qualifications of Mr. Knox's testimony, but rather can be addressed at trial in the nature of argument or cross examination.   Clearly, the City does not agree with his conclusions but has not shown the Court that his opinions are inadmissible.

In the first paragraph of this argument, the City points out that it is Mr. Knox's opinion that Steven did not reach his arm out and point a gun at one of the defendant officers.   After summarizing some of Mr. Knox's opinions about this issue, the City concludes, "this begs the question of how the gun got to the floor either from his lap or otherwise without handling it" (see City's Memo, p. 6).   This argument makes no sense. The officers testified that they witnessed Steven's gun (which was lawfully in his possession) between his legs on the car's seat.   The evidence is undisputed that they shot at Steven 22 times, hitting him at least 8 times. It was not Mr. Knox's responsibility to say exactly how the gun got on the floorboard on the left side of the car. What is important is that it was not on the right side of the car or in the backseat where one would expect it to be if Steven extended his arm in that direction towards an officer. It is Mr. Knox's opinion that the gun being on the driver's side is one of the items of physical evidence which is inconsistent with the officers' statement that Steven was shot while he was reaching across the front seat while pointing a gun at one of the officers. Again, this is an issue the City may address on cross-examination and the jury can ultimately determine the credibility and weight of his opinions.

The next two paragraphs of the City's Memorandum point out Mr. Knox's opinion that the location of Steven's wounds, primarily the two shots that lacerated his spine as well as the errant shots that missed Steven, support a conclusion that Steven was not pointing a gun at the officers when he was shot.   The City contends that the problem with this analysis is that it does not take into account "the possibility that earlier rounds which struck him may have caused the body to

7

twist and turn, therefore causing the arms to rotate or flail around moving them in various positions when they were struck." (City's Memo, pp. 7 – 8).   The City then goes on to acknowledge that its scenario (quoted in the previous sentence) is "all speculation, but not out of the realm of possibility and would tend to refute the conclusions of Mr. Knox" (City's Memo, p. 8).   The City should not be permitted to successfully seek to exclude the testimony of an experienced officer and trained forensic scientist by positing speculative scenarios which are supposedly "not out of the realm of possibility."   Counsel for the City can certainly inquire about this on cross examination at trial, perhaps giving the jury two options from which to choose, but simply being "possible" certainly does not support the instant motion.[3]

The City almost seems to be insinuating that there is a possibility that the first shot struck Steven in the arm resulting in him recoiling and dropping the gun onto the floorboard directly under him. Then, while unarmed, the officers shot him an additional 7 or 8 times, killing him, which certainly suggests excessive force and this is what the City is arguing? Nonetheless, Mr. Knox did an extensive investigation and analysis of the physical evidence endeavoring to determine the origination point, the trajectory, the damage caused, and the resting point of each bullet fired by Officers Aufdenkamp and Dyess in reaching his conclusions.   Mr. Knox explained the science behind and the bases of each of his opinions.

In the next paragraph of the City's Argument, the City proposes "another scenario" that it believes is "as logical if not more so than the conclusion of Mr. Knox," (City's Memo., p. 8). Plaintiffs do not fully understand that "scenario," but it does not matter.   That is simply something to be argued at trial or addressed on cross examination.   It is not a basis for exclusion of a qualified expert.

---

[3] It is disingenuous for the City to argue speculation is a reason to exclude Mr. Knox's opinions by arguing that he should have considered other speculation.

The City contends in the next paragraph (City's Memo, p. 8) that "another relevant factor is the abrasion to the ring finger on Steven's left hand."   It appears that the City's theory is that a gunshot came through a back window forcing glass shards to disperse through the car and cut Steven's left ring finger; and apparently, the City does not believe that would be possible unless he was pointing a gun at Officer Aufdenkamp.   There is no evidence in the record to support this theory, and the City cites the deposition of Medical Examiner Miguel Laboy, M. D. in an attempt to support its theory. However, it cites Dr. Laboy's testimony completely out of context.   Dr. Laboy performed the autopsy on Steven Askew.   Dr. Laboy did not say that the abrasion to Steven's finger or the injury to his other hand was consistent with Steven pointing a gun at Officer Aufdenkamp.   After counsel for the City provided Dr. Laboy with a hypothetical situation, he asked Dr. Laboy "could this wound that we just talked about, could that be the result of his having [ ] hand across his body and pointing toward the passenger's side of the car?"   (Laboy Depo., p. 75; DE 156-1, p. 77(emphasis added)). Dr. Laboy responded, "Due to that glasses can come in close to him, if that can be due to glasses coming to him and affecting only that area, that could be consistent . . . with that."   (Laboy Depo., p. 76; DE 156-1, p. 78.)   Dr. Laboy has not been retained nor disclosed as an expert by the City and he has acknowledged that he is not qualified to give crime scene reconstruction opinions. He testified as follows:

Q.   [By counsel for Plaintiffs]:   Dr., have you ever served as an expert in the field of ballistics in any court?
A.   [By Dr. Laboy]:   No.
Q.   Do you consider yourself to be a ballistics expert?
A.   No.
Q.   Have you ever served as an expert or been determined to be an expert by a court in the field of crime scene reenactment?
A.   No.
Q.   Do you consider yourself to be an expert in the field of crime scene reenactment?
A.   No.
Q.   Do you consider yourself to be an expert in the field of crime scene reenactment?
A.   No.

Q.      Dr., are you solely here today in your capacity as a medical examiner concerning
the cause of death of this young man, Steven Askew?
A.      Yes (DE 156-1, pp. 12 – 13; Laboy Depo., pp. 10 – 11).

His testimony continued as follows:

Q.      Were you able to make a determination as to which bullets came from a gun fired
by Aufdenkamp verses which bullets came from a gun fired by Officer Dyess?
[Mr. Klein – objection.   Form.]
A.       I did not determine where the bullets came from.
Q.      Were you able or asked to determine how many bullets came from the right side of
the car and how many bullets came from the left side of the car?
A.      No.
Q.      Were you asked to evaluate how many bullets, if any, came from the rear of the car?
A.      No.
Q.      Were you asked to offer any opinions as to where the bullets were coming from or
where the guns were fired?
A.      No (DE 156-1, pp. 18 – 19; Laboy Depo., pp. 16 – 17).

The City cites *Tamarez vs. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 210) for a proposition
that an expert may not base his opinion upon conjecture and speculation. *Tamarez* is
distinguishable. In *Tamarez*, the court found that the opinion of the expert physician not only
contained one speculation, "but a string of them."   In the court's words, "A suggests by analogy
the possibility of B which might also apply to C, which, if we speculate about D, could eventually
trigger E, so perhaps that happened here.   At some point, the train becomes too long to pull, and
the couplings too weak to hold the cars together."   *Id.* at 672.   In fact, the expert physician readily
acknowledged the "speculative jumps" involved in many of his opinions.   *Id.* at 670. It is
important to note that in *Tamarez*, the Sixth Circuit clearly held that "Rule 702 . . . <u>does not require</u>
<u>anything approaching absolute certainty</u> [and] where one person sees speculation, . . . another may
see knowledge, which is why the district court enjoys broad discretion over where to draw the
line." *Id.* at 671 – 672 (emphasis added).   Thus, simply because the City disagrees with Mr.
Knox's opinions and conclusions, that does not make Mr. Knox's opinions conjecture.

Finally, in the last paragraph of this argument (City's Memo., p. 9), the City apparently contends that Mr. Knox should be stricken as an expert because at his deposition he elaborated on his opinions set forth in Plaintiffs' expert disclosures. The City's argument is simply wrong. The nuance raised by the City is that in Mr. Knox's deposition, he elaborated on his opinion that the manner in which Steven's arm was shot is inconsistent with him pointing a gun at Officer Aufdenkamp.  He most certainly did include this forensic evidence in his report by showing where Steven was shot (DE 145, pp. 29 – 30), pointing out that he had a cigar in his right hand, and not a gun (DE 145, p. 29), reported the direction from which the bullets came, and gave a myriad of other rationales for his conclusion that Steven never did point a lawfully possessed gun at Officer Aufdenkamp (De. 145, p. 45).   The City contends, "It is only after his deposition is taken, for the first time he elaborates using the wounds to Mr. Askew's arms as the basis for his conclusion." (City's Memo., p. 9.)  There are many flaws in this single sentence.  First, it is not after his deposition is taken, but during his deposition that he elaborates on his report and the City has cited no authority to support its allegation that such elaboration renders his opinions inadmissible. Second, he does not utilize the wounds to Steven's arms as "the basis for his conclusion." He uses this evidence as one of the bases for his conclusion.   Third, there is absolutely nothing wrong with elaborating on a report.   In fact, he was actually asked to elaborate by counsel for the City. (Knox Depo., p. 79; DE 145, p. 24 – 25).   The City cites Dunkin' Donuts, Inc. vs. Patel, 174 F.Supp. 2d 202 (D. NJ 2001), apparently for the proposition that an expert can be stricken if he elaborates on his report during a deposition.[4]  The Dunkin' Donuts case does not support the City's position. The Sixth Circuit has held:

---

[4] Actually, the City provided the following cite.  *Dunkin Donuts, Inc. vs. Patel*, 175 F.Supp. 2d 202, 210 (6th Cir. 2001).  Plaintiffs only point out this inaccurate cite on the part of the City because the City's citation indicates that this is a Sixth Circuit. Actually, however, it is a district

> Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report.

*Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203-04 (6th Cir. 2006). Additionally, the court in *U.S. v. Roberts*, 830 F.Supp.2d 372 (M.D. Tenn. 2011) held as follows:

> Crawford was deposed in this case, and he was extensively questioned about the basis for his opinion during the *Daubert* hearing. While Rule 26(a) seeks to prevent "ambush at trial" and to "shorten or decrease the need for expert deposition," (citation omitted) those concerns can become moot when a deposition is actually taken. *E.E.O.C. v. Freeman*, 626 F.Supp. 811, 821 (M.D. Tenn. 2009). Moreover, because one purpose of Rule 26(a)(2) is to provide notice, a "deposition disclosure may be curative," *id.* and a *Daubert* hearing can serve to elucidate the basis for an expert opinion.

In summary, Mr. Knox's report is thorough and anything but deficient. However, even if it were, any deficiencies are moot by virtue of the fact that the City chose to take Mr. Knox's deposition, asked for him to elaborate, he did elaborate and provided an answer to the questions.

### Mr. Knox's Opinions regarding the Investigation by the City of Memphis are Relevant and Should be Allowed.

Mr. Knox sets forth in detail his opinions on the bad investigation in this case following the shooting of Steven as follows:

15.    Investigation

15.1.    This shooting was investigated by the Memphis Police Department.

15.2.    There was no apparent effort put forth to analyze or reconstruct the shooting based on the physical evidence to determine if, in fact, the shooting took place as described by the officers.

    1.    Understanding the physical evidence in light of the officers' statements is key to determining if, in fact, the officers have given an honest accounting of the circumstances surrounding a shooting incident or if they have fabricated any portion of their testimony.

    2.    Failure to appropriately consider the physical evidence is tantamount to rubber stamping any portion of their testimony.

15.3.    During the course of the investigation, the reporting process was sloppy.

    1.    Steven Askew was driving a green, four-door 1995 Ford Crown Victoria

---

court opinion out of New Jersey.

bearing Tennessee tag 202-ZSJ and VIN 2FALP74WXSX118194 (MPD Incident Report, Vehicle Section, p. 6).

2. Det./Sgt. William D. Merritt described the vehicle as a green, four-door, 1995 Ford Crown Victoria, bearing Tennessee tag 202-ZSJ, VIN 2C3CDXAT3CH237265 (Scene Investigation, January 18, 2013, pp. 1-2).

3. In another report, the color of the vehicle was described as black (MPD Inspectional Services Memorandum, Det. Randolph, Security Squad, pp. 1-2).

4. In another report, the vehicle was described with the incorrect Tennessee tag of 205-ZSJ and VIN 2FALP74WX5X118194 (MPD Police Involved Shootings Scene Supplement, Inspectional Services Bureau, Det. J. Randolph, pp. 1-2).

5. In another report, the VIN was incorrectly stated as 2C3CDXAT3CH237265 (Scene Investigation Supplement, Det./Sgt. W.D. Merritt, p. 1).

6. In another report, the vehicle was described with the incorrect Tennessee tag of 202-ZST and VIN ZFALP74WX118194 (MPD Crime Scene Investigation Report, J.P. Smith, p. 1).

Report of Knox, pp. 35-36; DE, 38

Needless to say, Mr. Knox has set forth in his report how the investigation conducted by Defendant City was poor and "shoddy". *See also* Depo. of Knox, pp. 102-103. His deposition testimony is even more telling about how the investigation was inadequate and was deliberately indifferent to the rights of citizens:

A. [KNOX] . . . Well, the investigation in this case is – I think I used the term poor before. I mean, it's just – it's like going through the motions. Not really trying to investigate anything. It's a matter of, Okay. You have officers that's making these statements. All right. Well, the guy had a gun. So, okay. We'll accept what he said and that's what it is. The problem with that is that if that's the way you conduct your investigations into police-involved shootings, then essentially the officers are going to come to believe, well, you know, that's all I've got to do is say that the guy pointed a gun at me and then, therefore, we'll be cleared and everything will be fine. That's not the point of your investigation. I mean, when I worked for the Jacksonville Sheriff's Office and was involved in the crime scene investigations of officer-involved shootings, it was our mandate to properly collect and document the evidence to determine what happened. And it wasn't a matter of, you know, rectifying that against what the officer said or just accepting that. I mean, we—I've done things where I had two officers shoot into a vehicle where I had the vehicle at the warehouse, drew all the trajectories back, put strings up and had all the upper admin come in and look at those bullet trajectories, where we've done, you know, all sorts of reconstruction as to what took place so that they would know. **You know, when it comes to the agency making a determination about what happened, when it comes to the prosecutor's office making a decision about what happened, and anybody else that has to look at it, you would have a thorough investigation. When you don't do that, when all you do is just say, Well, here is what they said so we're going to accept that that's**

13

**what happened, here we go, then that is the message you're communicating to the rank-and-file officers, is just say that this is what happened and then you're good. We're not going to really ever investigate to figure out whether you did that or not.   (Depo of Knox, pp. 143-144, DE 146, p ).**

Mr. Knox has shown throughout his report and testimony how the City's investigation was insufficient.   Defendant City further argues that Mr. Knox does not make any reference to prior investigations and cannot show that Section 1983 liability should attach because this one instance of a bad investigation does not amount to liability for the City. Plaintiffs do not dispute that they must show a pattern or practice of bad investigations for municipal liability to attach. Plaintiffs, however, submit that Mr. Knox's opinion is that the investigation in this case was inadequate. It is not his job to prove that there is a pattern or practice of bad investigations. He does not have to even reference prior investigations to give this opinion. However, it is telling that this investigation was done in accordance with training from the City of Memphis for how to conduct investigations. (Depo of Randolph, p. 136). Further, Major Mark Winters said that the investigation in this case was thorough. This itself shows a pattern of inadequate investigations if this was done as previous investigations were done. Mr. Knox can also rely upon the opinion of Plaintiffs' other expert Mr. McFadden who has reviewed almost forty previous MPD investigations involving officer involved shootings and is prepared to testify that such investigations created a pattern of inadequate investigations in violation of citizens' civil rights and how that lead to the actions of the officers here, and Plaintiffs can introduce these prior investigations through other witnesses as well. (DE134, p. 24, McFadden Depo., pp. 161-165, pp. 248-249). Ultimately, it will be Plaintiffs' burden to show the pattern and/or practice, but it is not Mr. Knox's obligation.

Defendant is critical of Mr. Knox's opinion that officers who know their self-serving reasons for using deadly force will be rubber-stamped without an adequate investigation sends the absolute wrong message to the force. However, Police Director Toney Armstrong agrees 100%

14

with that opinion.   Armstrong testified that failing to do an impartial and thorough investigation, sends a message to officers that there is a culture of lawlessness. It is important to send a strong message to officers that thorough investigations will be done and police misconduct will not be tolerated. (Dep. of Armstrong, pp. 31, 64-65).

The evidence in this case will show that the pattern for Memphis Police Department is to shoot first and ask questions later because the officers know they can change their story to match the evidence and get away with it because of the "shoddy" way officer involved shooting investigations are handled. Overall, this case has revealed the following: (1) Director Armstrong, and others, believe it would be unacceptable to handle officer involved shooting investigations differently than other shooting investigations (yet, it is undisputed that the City does exactly that in every officer involved shooting investigation); (2) Director Armstrong and others believes it would be unacceptable to allow suspects to talk with one another before giving a statement in a homicide investigation (yet, it is undisputed that the City that in this case) as it is undisputed that the Memphis Police Department allowed these officers (suspects) to talk with one another between the shooting and their statements and (3) the officers gave statements on the scene to a first responding officer and the report written by that officer was not provided to Plaintiffs at the beginning of their investigation and was withheld until 2 ½ years after the shooting. Plaintiffs submit that the Defendant Officers gave inconsistent statements in this case about Steven shooting first and then the City did not follow-up on eye-witness statements or properly canvas the crime scene. Plaintiffs submit this is evidence that officer involved shootings are handled much differently by the city than those involving other citizens and this is done with deliberate indifference to the rights of citizens.

**Mr. Knox is qualified to offer opinions regarding Training.**

A municipality such as Defendant City may be held liable for a civil rights' violation pursuant to 42 U.S.C. §1983 where a person's civil rights have been violated as a direct result of a municipality's custom, policy, lack of policy, lack of training, or poor training. *Monell vs. Dept. of Soc. Servs., City of New York*, 436 U.S. 658; *City of Canton vs. Harris*, 489 U.S. 378 (1989); and *Blackmore vs. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004). Accordingly, a local government's decision not to train certain employees about illegal duty may rise to the level of an official government policy for §1983 purposes when the failure to train amounts to deliberate indifference to the rights of persons with whom the untrained employees come in contact. *Canton vs. Harris*, *Supra*. Deliberate indifference in this contact exists when the municipality disregarded the "known or obvious consequence" that a particular omission in its training program would cause city employees to violate citizens' constitutional rights. *Connick vs. Thompson*, 563 US 51, 131 S.Ct. 1350, 1359 - 60 (2011). Mr. Knox intends to offer opinions that although the City has produced training records with outlines of courses for training, that is not proof that the officers were adequately trained. (Report of Knox, DE 145, p. 45). Officer Aufdenkamp testified that he handled this situation in accordance with the training he received and that he would not have changed anything he did.  (Depo. of Audenkamp, pp. 91, 95, 101-103). Additionally, Officer Dyess testified that he did not deviate from the training that he received from Defendant City at all in his handling of the situation involving Mr. Askew. (Depo. of Dyess, pp. 84-85). This is indeed a scary thought. In fact, Officer Dyess testified that their actions, including those such as shining a flashlight into the car and knocking on the window of the car with a sleeping individual, were fully consistent with training and he "can't imagine a better way to do it than what [he] did." *Id.* at pp.

183-184. Mr. Knox testified in a detailed manner, without speculation or conjecture, as alleged by

Defendants, about how this lack of training is apparent as follows:

A.  [Knox] . . . **but the point is with this is that if they acted in accordance with their training and as they say, then they weren't trained properly because, you know, they should know to go to a high-risk stop procedure, to – there's a number of things that – as we've discussed, that they should have known to do, and not just from the standpoint of Mr. Askew's safety but from their own.**

So, that's the point, is if they followed their training and they're being accurate in their testimony, then their training would be deficient in terms of that area....

But the point is, is that what they're testifying to is this – **I did it in accordance with my training.   Okay.   Well, that means that what you were trained to do was if you see a man with a gun in a car is to stand there and stay in a position where they could point the gun at you.   That's not an appropriate training. . . .**
***
**If you're facing a known high-risk, which would be an individual in a vehicle with a firearm that you're concerned for your safety, then you would initiate high-risk vehicle stop procedures, not just stand there and challenge them with a gun pointed at them.   That's not the appropriate way to handle that situation.   And so if they were following their training, then their training's deficient. . . .**

**If they were taught to handle it that way, somebody pulls a gun on you in a car, you stand right there and you deal with the situation there.   You wake the guy up when you see that he's got a gun in his lap, those sorts of things.   If that's what they were trained to do, then the training has to be deficient.**

Knox Depo., pp. 162-166, (emphasis added).

Mr. Knox makes a logical and well-reasoned opinion based on a thorough review of the

record and based on the statements of the Defendant Officers. The City has presented no

countervailing evidence to show that its officers are not telling the truth in testifying that they acted

in accordance with their training.

**This is not a case for Segmentation and his Opinions regarding Police Practices are relevant.**

Mr. Knox, based on his police experience, training, and knowledge, is critical of the

Defendant Officers for the manner in which they handled the events minutes, if not seconds, before

their shooting of Mr. Askew.   He is critical of their approach, tactics and use of force. Defendant

City does not argue that Mr. Knox is not qualified to give opinions regarding the officers' conduct leading up to the killing of Steven Askew.   Mr. Knox's opinions are reliable and based in solid training and experience in being a police officer.   Defendant City simply argues these opinions are not relevant due to the "Segmenting Rule" for excessive force cases.

Defendant City relies upon *Livermore v. Lubelan*, 476 F.3d 397 (6th Cir. 2007). This case is easily distinguishable from the *Livermore* case as that case involved actions which occurred hours leading up to the use of excessive force. *Id.* at 407.   Additionally, this is a case where it is undisputed that at most a couple of minutes passed by from the time the officers approached Mr. Askew's vehicle and then shooting.   "'The time-frame is a crucial aspect of excessive force cases.' *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996). Where the events preceding the shooting occurred in close temporal proximity to the shooting, those events have been considered in analyzing whether excessive force was used." *Bletz v. Gribble*, 641 F.3d 743 (6th Cir. 2011). Defendants want this Court to ignore all of the actions of the officers from the time they approached Mr. Askew's vehicle and the tactics involved leading up to the use of excessive force. This is simply minutes and not hours of planning. (Depo. of Roney, pp. 36-38). In fact, from the time the officers notified dispatch they were on the scene until they alerted dispatch that there was a gun approximately three (3) minutes and four seconds elapsed and another twenty four seconds passed from the time they said a man had a gun until they advised that they had fired shots. (Depo. of Dyess, p. 199; Depo. of Aufdenkamp, pp. 72-74; DE 145, pp. 16-17; *See also* Dispatch Audio and Event Chronology). Under the City's interpretations of *Livermore*, there could never be a case for excessive force in a situation such as this.

Mr. Knox should be allowed to give opinions concerning the conduct of the officers in how they handled this interaction with Mr. Askew, especially as this behavior is the very issue in this

case. Mr. Knox goes precisely through the record in this case and he is critical of the officers for their use of excessive force in shooting Mr. Askew in doing the following: (1) investigating Mr. Askew's vehicle when dispatched to a loud music complaint that did not indicate Mr. Askew's involvement; (2) deciding to make contact with Askew to investigate his whereabouts without any specific information he was involved in any crime; (3) failing to inquire whether Mr. Askew was committing a crime by possessing a firearm in his vehicle (which he was not); (4) failing to account for the possibility that a person awakened quickly may not immediately perceive his surroundings; (5) failing to use alternative methods to verbal commands, such as police lights, to notify Mr. Askew that they were police; (6) failure to use other less dangerous methods (such as a siren) to arouse Mr. Askew; (7) failure to engage in high-risk traffic stop procedures, which involve retreating to a police vehicle for cover and giving commands through a loud speaker, when noticing he was armed in a vehicle; and (8) failing to use high-risk traffic stop procedures to require Mr. Askew to exit the vehicle with specific commands.   (DE 145, pp. 35-37 (pp. 32-34 from report). Defendants would have this Court believe that the actions of the officers in approaching Mr. Askew's vehicle and prior to shooting Mr. Askew were separate events that evolved over an extended amount of time. This is simply not the case and misleading. All of the actions of the officers from the time they arrived at the apartment complex until the time they shot Mr. Askew were one continuous set of actions that led to his death.

The City is particularly critical of Mr. Knox's opinions regarding how the officers awakened Mr. Askew. Mr. Knox believes, based on years of experience and training, that the officers should have taken actions to protect themselves and Mr. Askew once they noticed he was asleep and especially if they noticed he had a gun. Mr. Knox illustrates that proper police tactics required that the officers use their squad car's siren and loudspeaker to arouse Mr. Askew while

they were in a place of safety away from his vehicle and not standing directly above him with lights shining into his face. Defendant takes Mr. Knox's testimony regarding the reactions that persons have when being awakened and tries to say that it is speculation and conjecture and that he is attempting to testify about state of mind. This is untrue and misleading. Before offering his opinion about how people will react when being awakened in a fashion similar to that done by these officers, Mr. Knox testified:

> A. [T]he point is that you have to expect that he's going to react to whatever he's perceiving at that moment; and because you're bringing him out of a sleep, what he perceives may not be what's really going on around him.   Give him some time to be able to come – become alert and realize what's going on before you, you know, have to make that reaction.
>
> Q. All right. Was that based on your personal experience or any studies that you've made?
>
> A. Well, I mean, **that's based on the 15 years of law enforcement.   I've approached a few people that were passed out behind the wheel of a car, that were passed out on the ground sleeping.   I mean, I've done that before.   And I'm – I mean, I know what people do and how they react and the kinds of things that they do, and it's not always rational.**   But the thing you have to do as an officer is realize that if I put myself in a position where if this guy does come up with a gun that is pointed right in my face, well, then you're not going to have any choice.   But if you put yourself in a position where if he does come around with a gun you're not standing right there with it in your face, then, you know, you may be able to give him a few seconds to get alert before you end up having to shoot him.   Depo. of Knox, pp. 130-131.

This is not speculation. It is experience. Mr. Knox testifying as to what police officers should do.

Defendant City makes a blanket statement that Mr. Knox conceded that if a gun is pointed at officers they have no other choice but to shoot. This is taken completely out of context from Mr. Knox's deposition. Defendant cites to pp. 133 through 135. (DE 146, p. 38). Mr. Knox was testifying about how the officers failed to properly notify Mr. Askew that they were police while waking him up and in how they were right up on Mr. Askew's vehicle while arousing him yelling at him and pointing a flashlight into the car.   (DE 146, p. 38).   He stated, "the only way [Mr. Askew would have seen] the uniform . . . is if you're up close to him where you are in a position where if he raises a gun you're going to be forced to shoot him; whereas, if you get back away, turn

on blue lights, use your PA, there's other ways to be able to arouse him and get him. . . ." Additionally, he testified that the bad police practices of Defendant Officers, consistent with their training from the City and the City's policies, created this lethal situation and dangerous situation. If when the officers awoke Mr. Askew and he didn't realize they were police officers, then "he reaches for his gun because he thinks somebody may be trying to rob him, may be trying to attack him in some way, you've put yourself in a position where you're not going to have any choice but to shoot if he points a gun at you.   You don't need to do that.   There isn't any reason to do that." *Id.*   Bad police work which put the officers in a dangerous situation does not then justify their shooting at a young man 22 times when he never fired a shot. This statement by Defendant City also fails to take into account that it is Mr. Knox's forensic opinion that there is no way the gun was pointed at the officers (Knox Report, 14.5-14.8, DE 145, p. 37).

### Mr. Knox did not reach Inappropriate Legal Conclusions, apply Speculation, or Make Inappropriate Comments.

Mr. Knox is not attempting to offer a legal opinion or to define legal terms that will be defined by the Court to the jury, but rather he is offering an expert opinions which may encompass language which is regularly used in civil rights cases brought pursuant to 42 U.S.C. § 1983. Defendant has objected to terms such as "objectively reasonable" or "ratified" or "caused or contributed".   Plaintiffs note from the outset that it is disingenuous on the part of Defendant City to file a motion on this issue when their very own expert uses language in his affidavit/report which encompasses what could be construed as legal conclusions.   Defendant's expert Ken Katsaris states, "[t]he investigation by the MPD was appropriate and <u>reasonable</u>."   (Report of Ken Katsaris, p. 9)(Emphasis added).   "The policies, procedures, and training of the MPD that were involved in this evaluation reflect <u>deliberate</u> and precise information that comports with the generally recognized police practices that are utilized throughout the United States." (Report of

Katsaris, p. 11) (emphasis added).

In *Heflin v. Stewart County*, 958 F.2d 709, 715 (6th 1992), the Sixth Circuit determined that an expert was allowed to testify how, based on the expert's review of the record, the conduct of officers "demonstrated deliberate indifference" to the needs of the injured party.   The Court in that case explained regarding the expert's opinion that "[t]he testimony merely emphasized the witness's view of the seriousness of the defendants' failures." *Id.*   Defendant is critical of Mr. Knox for stating in his report that the Memphis Police Department's failure to conduct an adequate investigation essentially "ratified" the officers' conduct.   Plaintiffs submit that Mr. Knox is using the word to show that the City approved of this behavior by failing to investigate this action.   This testimony and use of these terms should be allowed in accordance with Sixth Circuit law and the broad standards of Rules 702 and 704 of the Federal Rules of Evidence. "Courts also have overruled objections to testimony couched in legal terms by observing that a jury of lay persons would not be misled by the use of a legal term because its plain meaning in every day speech matches its legal meaning." Fed. Prac. & Proc. Evid. 6284 (2015)(citing, "The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?", 1988, 42 U.Miami L.Rev 831, 872). Mr. Knox should be allowed to testify in a manner that will help the jury understand and identify the behaviour of Defendants that violates the Constitution and especially regarding the conduct that he believes, based on his experience, led to the shooting death of Mr. Askew.

It is well settled that the failure of a municipality to censure and punish unconstitutional conduct by law enforcement officers confirms the existence of an unstated "policy" of tolerating such conduct.   *See Marchese vs. Lucas*, 758 F.2d 181 (6th Cir. 1985). "Undisciplined conduct on the part of law enforcement officers speaks *ab initio* of lack of training and discipline."   *Id*. at 188. In using a term like ratified, Mr. Knox is simply trying to express that the lack of investigation into

the officers' conduct by Defendant City sent a message that whatever the officers did in the shooting of Mr. Askew, such conduct would not be punished or even fully investigated. Although the term "ratified" is not an ultimate issue and should be allowed, Defendant City would be critical of Mr. Knox if he did not state all of his opinions and how he believes those are relevant to the shooting of Mr. Askew. Mr. Knox went on to say that "by failing to adequately investigate an officer-involved shooting, the Memphis Police Department is rubber-stamping the officers' conduct and setting precedent for use of deadly force investigations."

Plaintiffs submit that should this Court determine that certain terms should not be used by Mr. Knox in providing his opinions, then this can certainly be handled through a limiting instruction.   This does not warrant excluding the testimony of Mr. Knox completely.

Defendant further seeks to have Mr. Knox's testimony limited or excluded because it contains speculation and because of "comments". Defendant does not specifically address which portions of Mr. Knox's reports or testimony contain speculation nor do they specifically point out in this last section what "comments" they take issue with, other than the alleged legal conclusions. Mr. Knox set forth in his report the basis for his opinions and gave great detail why he believes the use of force against Mr. Askew was not warranted and why the incident did not occur as the officers would now have this Court believe. Defendant will have the opportunity to present countervailing expert proof at trial and cross-examine Mr. Knox regarding his opinions. His opinions are based on his long career as an officer, not speculation.

## <u>CONCLUSION</u>

In conclusion, the City's Motion to Exclude the Testimony of Michael A. Knox should be denied. Plaintiffs request an evidentiary hearing on this issue. Plaintiffs request such further relief to which they may be entitled.

Respectfully submitted,

s/Jeffrey Rosenblum
Jeffrey S. Rosenblum, #13626
Matthew T. May #25547
ROSENBLUM & REISMAN, PC
6070 Poplar Avenue, Suite 550
Memphis TN 38119
(901) 527-9600

Howard B. Manis #16202
60 S. Main Street, Suite 102
Memphis TN 38103
(901) 682-0069

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been forwarded to all counsel of record via this court's ECF Filing System this the 13th day of November, 2015:

s/Jeffrey Rosenblum
Jeffrey S. Rosenblum
Matthew T. May