**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **STERLING ASKEW and SYLVIA ASKEW,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No. 14-cv-02080-STA-tmp** |
| | ) | |
| **CITY OF MEMPHIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING**
**MOTION FOR SUMMARY JUDGMENT**
**OF DEFENDANTS NED AUFDENKAMP AND TIMOTHY DYESS**

Plaintiffs Sterling and Sylvia Askew filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendants City of Memphis and Defendant Officers Ned Aufdenkamp and Timothy Dyess violated the civil rights of their deceased son, Steven Askew, under the Fourth and Fourteenth Amendment Rights to the United States Constitution.[1] Defendant Officers have filed a motion for summary judgment. (ECF No. 179.) Plaintiffs have filed a response to the motion (ECF No. 261), and Defendant Officers have filed a reply to the response. (ECF No. 278.) For the reasons set forth below, the motion for summary judgment is **GRANTED** as to Plaintiff's Fourteenth Amendment claim and **DENIED** as to Plaintiffs' Fourth Amendment

---

[1] (Cmplt., ECF No. 1-2.) Mr. and Mrs. Askew have filed suit as next of kin of Steven Askew, and Mr. Askew has filed suit in his capacity as the Administrator Ad Litem/Personal Representative of the Estate of Steven Askew. (*Id.*)

claim.[2]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant.[4] In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[5]

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[6] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[7] The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a

---

[2] The motion for summary judgment of Defendant City of Memphis remains pending. (ECF No. 178.)

[3] Fed. R. Civ. P. 56(c).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[5] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

jury or whether it is so one-sided that one party must prevail as a matter of law."[8]  The Court

must enter summary judgment "against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will

bear the burden of proof at trial."[9]

Background and Statement of Facts

Magistrate Judge Tu M. Pham previously succinctly summarized the background of the

events giving rising to this action and the positions of the parties as follows:

> On the evening of January 17, 2013, the Memphis Police Department ("MPD") received a call concerning loud music coming from an apartment located at 3193 Tyrol Court in Memphis, Tennessee. MPD Officers Ned Aufdenkamp and Matthew Dyess were dispatched to respond to the call. For reasons unknown, the Officers left the Tyrol Court location after responding to the noise complaint and went to an adjacent apartment complex, the Windsor Place Apartments, located at 3197 Royal Knight Cove. From here, the parties' versions of events diverge drastically.

> The City and the Officers (collectively "Defendants") allege that while checking the same general area around the Tyrol Court apartments on the night in question, the Officers saw Steven Askew passed out behind the wheel of a running vehicle in the parking lot of the Windsor Place Apartments. When the Officers approached the vehicle to assess the situation, Officer Aufdenkamp noticed a handgun in Askew's lap and notified Officer Dyess. The Officers then woke Askew up by tapping loudly on his car window and shouting loud verbal commands, at which time Askew made hand gestures towards the Officers and pointed the gun at Officer Aufdenkamp. Both Officers opened fire on Askew, which ultimately resulted in his death.

> Plaintiffs allege that on the night in question, Askew was asleep in his car in the parking lot of the Windsor Place Apartments, waiting for his girlfriend who resides there to return from work. Upon spotting Askew in his vehicle, the Officers angled their patrol car towards Askew's car and turned on their overhead lights to illuminate his vehicle; however, the Officers never activated any blue lights, sirens, or other emergency equipment to get Askew's attention. Plaintiffs do not dispute that Askew had a gun in the car (which he was legally permitted to

---

[8]  *Id.* at 251 - 52.

[9]  *Celotex*, 477 U.S. at 322.

carry), but assert that he never pointed the gun at the Officers, and certainly did not fire the weapon. Plaintiffs also point out that although one officer reported that he saw Askew with a gun in his right hand, Askew actually had a cigar in his right hand at the time of the incident. The Officers fired a total of twenty-two shots that night, hitting Askew multiple times and killing him.[10]

Defendant Officers have presented the following statement of facts in support of their motion,[11] and Plaintiffs have presented additional facts that they deem material.[12]

On January 17, 2013, Memphis Police Officers Ned Aufdenkamp and Matthew Dyess were assigned to a two man marked squad car while working the Delta Shift (5:00 p.m. until 1:00 a.m.) for the Mt. Moriah Station. Memphis Police Department received a 9-1-1 call at 21:48:55 (approximately 9:49 p.m.) regarding a loud music call at 3193 Tyrol Court in the Aspen Lake Apartments. In response, Defendant Officers were dispatched to the area of Tyrol Court.[13] MPD Dispatch then notified Defendants of an additional complaint about loud music at another apartment complex. Defendant Officers responded that they would "check both complexes." As a result of this call, Defendants went to Windsor Place Apartments.[14]

Both apartment complexes were in Defendants' assigned ward, next to each other, divided only by a fence; however, in order to go from the Aspen Woods Apartments to the

---

[10] (Mag. J. Ord. at pp. 2-4, ECF No. 285.)

[11] (Defs' SOF, ECF No. 179-1.)

[12] (Pl's Resp. to Defs' SOF & Add. Fcts., ECF No. 261-1.) Unless otherwise indicated, each fact stated is not disputed by either party for the purpose of deciding this motion only.

[13] It is unclear from the record whether Defendants actually went to the Tyrol Court location before going to the Windsor Place Apartment Complex. Whether Defendants did or did not go and whether there was any discrepancy in Defendants' statements about whether they did or did not go does not affect the Court's decision.

[14] The parties have referred to this apartment complex as both "Windsor Place" and "Windsor Court."

Windsor Place Apartments, Defendants had to exit Aspen Woods onto Mendenhall Road, travel to the traffic light at the intersection of Mendenhall and Knight Arnold, and enter the Windsor Place Apartments on Knight Arnold.

As Defendants made their way around the apartment complex, they observed a vehicle backed into a parking space with a man in the driver's seat.[15] According to Defendants, because this was a high crime area and because they had concerns for the safety of the man in the car, they approached the vehicle.[16] Defendants pointed the overhead lights of their police car toward the vehicle and approached the vehicle with their flashlights. Defendants did not have their patrol car's blue lights or their siren on, did not check the car's license plates and call the plate numbers into Dispatch, and did not use their PA system; none of this was in violation of the City of Memphis' policy, but for safety they should have run the plate numbers.

According to Defendants, they were prepared for danger as they approached the vehicle as this was an unknown risk stop, but they did not call for back-up. Defendant Officer Aufdenkamp went around to the passenger side of the vehicle, while Defendant Officer Dyess went to the driver's side. A partially full bottle of liquor was in the car.[17] Defendant Officer

---

[15] At this point, the parties' versions of events begin to differ drastically. Defendants maintain that the car was running and that the man, later identified as Stephen Askew, was "slumped back, passed out in the driver's seat which caused them concern." (Defs' SOF, ¶ 7, ECF No. 179-1.) Plaintiffs contend that Askew was sitting in his car, asleep, with the windows rolled up and the engine off, just prior to the shooting. (Pl's Resp. to Defs' SOF & Add. Fcts., ¶ 7, ECF No. 261-1.)

[16] Although Plaintiffs argue that there was no need for Defendants to approach the vehicle, (Pl's Resp. to Defs' SOF & Add. Fcts., ¶ 8, ECF No. 261-1.), they have presented no evidence that Defendants' stated reason was not their actual motivation in approaching the car, although Plaintiffs continue to dispute that the car was running as Defendants approached it.

[17] The parties dispute whether Defendants could see the bottle when they approached the vehicle and whether the bottle was open. (*Id.* at ¶ 13.)

Dyess knocked on the driver's side window.[18]  Defendant Officer Aufdenkamp knocked on the passenger side window.  Both Defendants were shining their flashlights into the car.  As a result, Askew began to stir and move a little.  Askew looked at Defendant Officers and made some type of sign or gesture with his left hand.

Defendant Officer Aufdenkamp later testified that, when Askew moved his hands, he thought he saw the handle of a handgun in the man's lap between his legs, and he alerted Defendant Officer Dyess to this fact.[19]  After the shooting, a gun belonging to Askew was found on the floor of the car by his legs with a portion of it being under the seat and a portion protruding from under the seat.

Both Defendant Officers took a step back and drew their weapons.[20]  Defendant Officers can be heard on an audio recording with Dispatch two times during the relevant time period of this incident.  During the first interaction, Defendant Officer Aufdenkamp reported seeing a weapon and asked for back-up, and then fifteen to twenty-four seconds later Defendant Officer Aufdenkamp reported that shots had been fired.  Dispatch recorded the "shots fired, shots fired" call at approximately 10:00 p.m.  At 10:01 p.m. Defendants requested an ambulance because a suspect was down.

Defendant Officers fired twenty-two shots and hit Askew nine times resulting in Askew's death.  Askew was shot six times in the back and one time in the back of his neck. One or more

---

[18]  Plaintiffs dispute whether Defendants called to Askew in addition to knocking on the window. (*Id.* at ¶¶ 16, 17.)

[19]  Plaintiffs do not dispute that this was Defendant Officer's testimony.  (*Id.* at ¶ 21.)

[20]  Plaintiffs dispute whether Defendants gave "loud commands" to Askew to not touch the gun and to put his hands up. (*Id.* at ¶ 26.)

of these seven shots was the fatal shot.  Neither Defendant went to check on Askew after the shooting.

Other officers and an ambulance and paramedic arrived on the scene.  Askew was found dead with a cigar or cigarette between his index finger and middle finger of his right hand. He was right handed and trained to shoot with his right hand; he had a handgun carry permit. Askew was transported to the forensic center by attendants with the Shelby County Medical Examiner's Office.

Eventually personnel from Memphis Police Department Inspectional Services Bureau ("ISB"), the Homicide Bureau, Felony Response, Crime Scene, and Uniformed Patrol Supervisors arrived at the scene. Additionally, Zayid Saleem, the police legal advisor for the Memphis Police Department, arrived, as did a police union representative.  An investigation into the shooting then ensued.[21]

Both Defendants participated in walk-throughs of the incident with ISB although no notes were made from these interactions.  The parties dispute what is contained in the initial statements of Defendants and whether the initial statements were consistent with Defendant Officers' later statements.   Both Defendants were relieved of duty that night pending the outcome of the investigation. In keeping with MPD Policy and Procedures, each Defendant Officer gave his formal statement ("Garrity Statement") to ISB on January 21, 2013.[22]

The Homicide Bureau of the Memphis Police Department conducted a criminal

---

[21] ISB is MPD's internal oversight bureau that investigates officer involved shootings.   Plaintiffs dispute that ISB conducted a "fair and thorough" investigation.  (*Id.* at ¶ 61.)

[22]  MPD has a policy in which homicide detectives must wait forty-eight hours before obtaining information from officers involved in a shooting.  (Order, p. 3., ECF No. 295.)

investigation into the incident concurrently with the IBS investigation.[23]

At the conclusion of the investigations by ISB and the Homicide Bureau, the files were submitted to the Shelby County Attorney General's Office. The Attorney General declined to charge or prosecute either Defendant.

MPD policy does not require an officer to wait and allow someone to fire a weapon at him before the officer is allowed to fire his own weapon, although, in this case, it is disputed as to whether a weapon was ever pointed at the officers. If a person points a weapon at an officer, that officer is allowed to defend himself and fire his weapon under MPD policy.

Dr. Miguel Laboy, the Medical Examiner with Shelby County, conducted the autopsy of Steven Askew and prepared a report.

A toxicology report was performed on specimens gathered from Askew at the time of his autopsy on January 18, 2013. Askew was determined to have had a blood alcohol concentration of .119 which is in excess of the legal limit. A small amount of marijuana was also present in Askew's system.

Nothing in the ISB or Homicide file shows that ISB contacted the medical examiners' office about its findings or to discuss this case and, in fact, ISB made its findings before the final autopsy was complete, and no outside consultant was hired to verify the stories of Defendant Officers for ISB. Further, there was no investigation or inquiry by ISB into the trajectory of bullets and entrance and exit wounds on Askew's body.

Michael Knox, who does forensic reconstruction of shooting incidents and was retained by Plaintiffs as an expert, gathered data, including testimony and physical evidence - which

---

[23] Plaintiffs dispute that this investigation was "complete" or "thorough." (Pl's Resp. to Defs' SOF & Add. Fcts., ¶ 62, ECF No. 261-1.)

included observing bullet holes, trajectories, and other things - to reconstruct the scene of Askew's death and to analyze the procedures used by Memphis Police Department officers before, during, and after a shooting.

On April 27, 2016, this Court affirmed the decision of the Magistrate Judge which granted in part and denied in part the motions of Defendant Officers and Defendant City to strike Knox's expert report.[24] Specifically, as it related to the claim against Defendant Officers, the Court determined that Knox could testify that "physical evidence indicated that Askew could not have pointed his pistol at either officer."[25] The Court allowed Knox's opinion that Defendant Officers' tactical decisions likely "caused or contributed to this shooting"[26] However, Knox's opinion that "[t]he use of deadly force by Officers Aufdenkamp and Dyess was excessive and was not objectively reasonable under the circumstances" was stricken.[27]

The Court also allowed Knox's opinion that "[w]hen approaching a person who is sleeping in a vehicle, it is reasonable and prudent to assume that, if startled or awakened quickly, the individual's immediate perception of his surroundings might not be clear. The individual may not immediately recognize that he has been awakened by police officers but may instead assume that he has been approach[ed] by someone wishing to do him harm."[28] Although Knox may not opine about Askew's actual state of mine, he may testify about the likely reaction of a person in

---

[24] (Order, ECF No. 296.)

[25] (*Id.* at pp. 5, 13 - 14.)

[26] (*Id.*)

[27]  (*Id.* at p. 12.)

[28] (*Id.* at pp. 5 - 6.)

Askew's position, i.e., someone sleeping in a vehicle who is "startled or awakened quickly."[29]

In looking at the "segmenting" rule, the Court found that Knox may not rely on the events that occurred before Defendant Officers' use of force when opining about Plaintiffs' excessive force claim.[30]

The Court has incorporated its decision regarding the Knox's expert opinion in determining whether there are material issues of disputed fact that would defeat Defendant Officers' motion for summary judgment.

Analysis

In support of their motion for summary judgment, Defendant Officers make the following arguments: (1) they are entitled to qualified immunity;[31] (2) Plaintiffs have failed to state a claim under the Fourteenth Amendment;[32] (3) and their behavior under the Fourth Amendment was reasonable.[33] Defendant Officers deny violating Askew's constitutional rights but argue that, even if they did, they are entitled to the defense of qualified immunity. According to Defendants, Askew threatened Defendant Officer Aufdenkamp with deadly force when he pointed a gun at Aufdenkamp, and Defendants reasonably used deadly force in response to the threat of deadly force.

---

[29] (*Id.* at p. 15.)

[30] (*Id.* at pp. 15 - 16.) The Court affirmed the Magistrate Judge's decision that Knox could consider Defendant Officers' conduct leading up to Askew's death in relation to Plaintiffs' failure to train claim against the City because the segmenting rule does not apply to such claims. (*Id.*)

[31] (Defs' Memo. at p. 15, ECF No. 179-2.)

[32] (*Id.* at p. 16.)

[33] (*Id.* at p. 17.)

Plaintiffs do not appear to contest Defendants' argument that their claim is properly brought under the Fourth Amendment, rather than the Fourteenth Amendment ("Plaintiffs in the instant case allege that Defendant Officers violated their son's Fourth Amendment right to be free from unreasonable seizures by using deadly force.")[34] Therefore, to the extent that Plaintiffs have brought a claim under the Fourteenth Amendment, Defendants are entitled to judgment as a matter of law on this claim.[35]

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."[36] In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law."[37] "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."[38]

Defendant Officers' contention that Plaintiffs cannot prove that they violated Askew's Fourth Amendment rights is a threshold issue for the Court.[39] If no genuine dispute of material

---

[34] (Pls' Resp., p. 4, ECF No. 261.)

[35] *See Wells v. City of Dearborn Heights,* 538 F. App'x 631, 637 (6th Cir. 2013) (determining that the "Fourth Amendment prohibits the use of excessive force by arresting or investigating officers").

[36] 42 U.S.C. § 1983.

[37] *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[38] *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

[39] *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (quoting *Scott v. Harris,* 550 U.S. 372 (2007)) ("The first step must be viewed as the threshold inquiry: 'Taken in the light most

facts exists as to whether Defendants violated Askew's constitutional rights, then all other issues in this case become moot. Therefore, the Court will first analyze the merits of Defendants' motion for summary judgment on that issue, and, only if Plaintiffs have sufficiently supported their claim that Askew's Fourth Amendment rights were violated, will the Court consider the issue of qualified immunity.

Plaintiffs claim that Defendants violated their deceased son's Fourth Amendment right to be free from an unreasonable seizure by using deadly force. The Fourth Amendment guarantees that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment is violated unless the "governmental interests" in effectuating a particular kind of seizure outweigh the "nature and quality of the intrusion on the individual's Fourth Amendment interests."[40] There must be a "governmental interest" not only in effectuating the seizure but also in "how the [seizure] is carried out."[41] Furthermore, "given the extreme intrusion caused by use of deadly force, the countervailing governmental interest must be weighty indeed; only in rare instances may an officer seize a suspect by use of deadly force."[42]

---

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'").

[40] *Scott*, 550 U.S. at 383; *United States vs. Place*, 462 U.S. 696, 703 (1983).

[41] *Tennessee vs. Garner*, 471 U.S. 1, 8 (1985).

[42] *Davenport vs. Causey*, 521 F.3d 544, 551 (6th Cir. 2008).

Balancing a particular governmental interest in the use of deadly force against the intrusion occasioned by the use of that force is inherently a fact specific inquiry.[43] There are certain facts and circumstances which are important when evaluating whether an officer has probable cause to believe that deadly force is necessary, and a claim under the Fourth Amendment requires an objective standard of reasonableness with respect to the facts and circumstances as encountered by the officer or officers at the time of the incident.[44] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."[45] This calculus includes consideration of such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[46] "These factors are not an exhaustive list, as the ultimate inquiry is 'whether the totality of the circumstances justifies a particular sort of seizure.'"[47] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[48]

---

[43] *Baynes vs. Cleland*, 799 F.3d 600 (6th Cir. 2015).

[44] *Graham vs. Connor*, 490 U.S. 386, 395 (1989); *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham*, 490 U.S. at 395–96).

[45] *Graham*, 490 U.S. at 396–97.

[46] *Id.* at 396 (citing *Tennessee v. Garner*).

[47] *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 404 (6th Cir. 2007) (quoting *St. John v. Hickey,* 411 F.3d 762, 771 (6th Cir. 2005)).

[48] *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

When "the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care."[49]

In excessive and deadly force cases, the Sixth Circuit generally applies a "temporally segmented analysis to the possible erroneous actions taken by police officers."[50] Referred to as the "segmenting rule" or "segmenting approach," the Sixth Circuit "embrace[s] a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force is used."[51] Thus, under the segmenting rule, a court is to "'carve up' the events surrounding the challenged police action and evaluate the reasonableness of the force by looking only at the moments immediately preceding the officer's use of force," an approach that "applies even to encounters lasting very short periods of time."[52]

In *Dickerson v. McClellan*,[53] the Sixth Circuit acknowledged that "[s]ome of [its] cases analyze[d] excessive force claims in segments." In that case, the defendant-appellants were two police officers that had responded to a call where a reportedly intoxicated man had fired nine

---

[49] *Burnett vs. Gee*, 137 F. App'x 806, 809 (6th Cir. 2005) (citing *Plakas vs. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) (holding that "defendant knows that the only person likely to contradict him or her is beyond reach . . . [s]o a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements, and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial."). *Accord Scott vs. Henrich*, 39 F.3d 912, 914-915 (9th Cir. 1994) (pointing out that the Court may not simply accept what may be a self-serving account by the police officer; instead, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence would convince a rational fact finder that the officer acted unreasonably.).

[50] *Chappell v. City of Cleveland*, 585 F.3d 901, 914 (6th Cir. 2009).

[51] *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001).

[52] *Greathouse v. Couch*, 433 F. App'x 370, 372 (6th Cir. 2011).

[53] 101 F.3d 1151 (6th Cir. 1996).

shots.[54]  "Without knocking or announcing their presence, the officers entered the house with their guns drawn through an unlocked storm door," and then, moving through the house, the officers heard the suspect yell out two threats before running toward the front door.[55]  While the events that occurred next were disputed by the parties, the officers shot the suspect a total of nine times, though the suspect did not fire at either of the officers.[56]

The Sixth Circuit analyzed the case by "carving up the incident into segments and judg[ing] each on its own terms to see if the officer was reasonable at each stage."[57]  The Court of Appeals independently analyzed the reasonableness of the defendant officers' decisions to enter into the suspect's home unannounced and then shoot the suspect as separate potential violations of the Fourth Amendment and, thus, separate claims under § 1983.[58]

In *Livermore ex rel. Rohm v. Lubelan*, the Sixth Circuit likewise decided that viewing "excessive force claims in segments" was the "proper approach."[59]  In that case, a stand-off arose after police confronted an individual who had failed to appear for a contempt hearing.[60]  The contemnor lived in a campground and barricaded himself in his residence and set fire to auxiliary

---

[54] *Id.* at 1154.

[55] *Id.*

[56] *Id.* at 1154–55.

[57] *Id.* (quoting *Plakas,* 19 F.3d  at 1150).

[58] *Id.* at 1162.

[59] *Livermore*, 476 F.3d at 406 (citing *Gaddis v. Redford Twp.,* 364 F.3d 763, 772 (6th Cir. 2004); *Dickerson*, 101 F.3d at 1161).

[60] *Id.* at 400–02.

buildings on the campground.[61]  The local sheriff's department surrounded the campground and requested assistance from the Michigan State Police's Emergency Services team "to resolve the standoff."[62]  A sniper with the Emergency Services team ultimately shot and killed the man when he saw the decedent "in a crouched or kneeling position, holding his rifle at waist level and turning his torso back and forth as if looking for someone."[63]  The sniper believed that the decedent was pointing his gun at another police officer.[64]

The Sixth Circuit analyzed the plaintiff's claim that the commander of the Emergency Services team had violated the decedent's constitutional rights by recklessly creating the circumstances that resulted in the decedent's death.  Applying the segmented analysis adopted in *Dickerson*, the Sixth Circuit held that the plaintiff's claim against the commanding officer failed because the commander's decisions preceding the seizure were immaterial.[65]  The Court of Appeals explained that courts "scrutinize only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment" because "[t]he Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general."[66]

---

[61] *Id.* at 401.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.* at 407.

[66] *Cole v. Bone*, 993 F.2d 1328, 1333 (8th Cir. 1993) (citing *Carter v. Buscher*, 973 F.2d 1328, 1332 (7th Cir. 1992)).  In both *Livermore* and *Dickerson*, the Sixth Circuit cited the reasoning of the Eighth Circuit with approval.  *Livermore*, 476 F.3d at 407; *Dickerson*, 101 F.3d at 1162.

In the present case, relying on *Livermore* and its progeny in ruling on the motion for summary judgment, the Court will look only at the reasonableness of Defendant Officers' decision to shoot Askew because a Fourth Amendment segmented analysis renders the reasonableness of other actions, such as the decision to go to Windsor Place Apartments, immaterial at this juncture.

Defendant Officers contend that their decision to shoot Askew was reasonable because Askew allegedly pointed his gun at Defendant Officer Aufdenkamp and did not put down the gun and put his hands up when commanded by Defendants to do so. Defendants argue that they were merely defending themselves and, thus, the shooting of Askew was reasonable under the circumstances and did not violate Askew's Fourth Amendment Rights. According to Defendants, their own testimony and the physical evidence support their account of the shooting.[67]

In response, Plaintiffs have pointed to the following evidence in the record, which the Court finds creates material disputed issues of fact from which the trier of fact could find that Defendants violated Askew's rights under the Fourth Amendment. Whether merely asleep (as Plaintiffs contend) or intoxicated (as Defendants contend), Askew was not awake as Defendants approached his vehicle. Although Defendants contend that the car was running, Plaintiffs have presented countervailing evidence that it was not running.[68]

---

[67] (Defs' Memo., p. 9, ECF No. 179-2.)

[68] (Pl's Resp. to Defs' SOF & Add. Fcts., ¶ 7, ECF No. 261-1 (citing Aff. Billy Ray Kelly, ECF No. 261-2; Aff. Denicia Davis, ECF No. 261-3.)). Defendant Officers contend that the testimony of the affiants should be excluded because (1) Plaintiffs did not previously disclose that the affiants had knowledge of the events of the night in question; (2) even though the affiants state that the car was running on the night in question, they do not provide a time frame for when they noticed that the car was running; and (3) they do not state if they were inside or outside their

As Defendant Officers shone their flashlights into the car, they saw a closed, partially consumed bottle of alcohol in the car. If the car was not running, there was nothing wrong or illegal about having a previously-opened bottle of alcohol in the car.[69]

Defendant Officers walked toward the driver's side of the vehicle and remained in a position of caution, to the side but behind Askew. Defendant Officer Aufdenkamp went around the vehicle to the passenger side, still remaining behind the front seat because it was a safer position. At this point, Askew had done nothing to alert Defendant to any inappropriate conduct or any dangerous conduct.[70]

While looking in the car and while Askew was still asleep, Defendant Officer Aufendkamp allegedly noticed a gun resting between Askew's legs in the car seat. Askew still had his eyes closed when Defendant Officers first saw the gun.[71] According to Defendant Officers, immediately upon witnessing the gun, they began yelling commands, and Askew became uncooperative. Defendant Officer Dyess testified that, immediately after being alerted to

---

apartment when they noticed that the car was running. (Defs' Reply, pp. 5 – 6, ECF No. 278.) As for Defendants' "late disclosure" argument, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" because it does not suffice "for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 619 (6th Cir. 2014) (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997)). However, even if the Court were to strike the affidavits in question, there is still enough evidence in the record showing disputed issues of fact that defeat summary judgment. Defendants' other arguments about the affidavits go to the weight of the testimony of the affiants and can be argued at trial.

[69] (Pls' Resp., p. 9, ECF No. 261 (citing Tenn. Code. Ann. § 55-10-416(a)(1) ("No driver shall consume any alcoholic beverage or beer or possess an open container of alcoholic beverage or beer while operating a motor vehicle in this state.")).

[70] (*Id.* at pp. 9-10 (citing Aufdenkamp Dep., pp. 46-51, ECF No. 262-19.))

[71] (*Id.* at p. 11 (citing Aufdenkamp Dep., p. 79.))

the gun, he began using "extremely loud verbal commands" at the "top of his voice," as did his partner.[72]  Defendant Officer Aufdenkamp testified that upon seeing the gun, "We started giving him loud commands. I started giving him commands to put his hands up, police, police, put your hands up, put your hands on the ceiling, don't touch that gun, don't touch your gun, put your hands up."  Defendant testified that he was yelling authoritatively and loudly until Askew was dead.[73]  Plaintiffs, however, have presented evidence, including the Dispatch Audio Recording, that creates a factual dispute as to whether Defendants actually issued "loud commands."[74]

However, even if Defendants' testimony is believed, a jury could find that it was unreasonable for Defendant Officers to shine flashlights into a car with a sleeping man, who might or might not have been intoxicated, rapping on the car window and calling loudly to him – despite believing that Askew had a gun in his lap.  Based on Knox's expert testimony, a jury could find that Defendant Officers should have retreated to a position of safety, announced their presence either over a Public Address System or their squad car sirens, and allowed Askew an opportunity to wake up and cooperate with any commands they might have deemed necessary.[75]

Viewing the evidence in the light most favorable to Plaintiffs, the jury could also find Defendants' version of the events not to be credible.  It is undisputed that Askew was asleep at the time of Defendant Officer Aufdenkamp's first radio dispatch. Defendant Officers saw the gun in the car but had not begun yelling commands, nor had Askew become aware of anyone's

---

[72]  (*Id.* at p. 10 (citing Dyess Dep., pp. 193 - 198, ECF No. 262-17.)).

[73]  (*Id.* (citing Aufdenkamp Dep., pp. 79 - 83.)).

[74]  (*Id.* (citing Aff. Billy Ray Kelly, ECF No. 261-2; Aff. Denicia Davis, ECF No. 261-3; Dispatch Audio Recording, ECF No. 239; Minor Dep., pp. 40-41, ECF No. 262-22.)).

[75]  (Knox Expert Report, ECF No. 243; Knox Dep., ECF No. 262-18.)

presence around him. After that call, according to Defendant Officers, the following actions allegedly took place: (1) Defendant Officers stepped back, grabbed their weapons, and began yelling commands; (2) Askew turned his head to the back left to look at Defendant Officer Dyess; (3) Askew then looked over to Defendant Officer Aufdenkamp at his back right and made a hand signal that Defendant Officer Aufdenkamp thought might be a gang sign; (4) Askew looked back at Defendant Officer Dyess and made a different hand signal; (5) Askew then looked down and shook his head; (6) after that, Askew reached for his gun and pointed it across his body to his right toward Defendant Officer Aufdenkamp; (7) Defendant Officers then fired their guns twenty-two times; (8) Defendant Officer Aufdenkamp made a "tactical reload" of his weapon; and (9) Defendant Officer Aufdenkamp called Dispatch and announced shots fired. A jury could find that all these actions could not have taken place in the matter of second between the first call to Dispatch and the second "shots fired" call.

Additionally, Defendant Officers contend that Askew reached for his gun, twisted his body to the right, and pointed it back at Aufdenkamp who was on the side, but toward the rear, of the vehicle. Defendant Officer Dyess first stated that Askew pointed the gun at Aufdenkamp with his right hand.[76] However, it is undisputed that Askew had a cigar in his right hand. At his deposition, Defendant Officer Dyess testified that Askew had the gun in his left hand as he reached across his body and behind him to point the gun at Aufdenkamp.[77] Dyess later testified

---

[76] (Statement of Dyess to ISB, 1/21/13, Ex. 8 to Dyess Dep, pp. 311-318, ECF No. 151-1.)

[77] (*Id.* at pp. 197-198).

that he did not remember which hand Askew pointed the gun with.[78] A jury could find that these inconsistences impeach Defendant Officers' account of the shooting.[79]

Additionally, as noted by Plaintiffs, a jury could find that, in order for Defendant Officers' version of the events to be correct, Askew would have had to pick up the gun with his left, non-dominant hand and point it toward Defendant Officer Aufdenkamp who was standing toward the back of vehicle, and not at the front passenger window, thus requiring Askew to move the gun past the front passenger seat and into the back seat compartment in order to actually point toward Aufdenkamp.

Plaintiff's expert Michael Knox has opined that the physical evidence does not support the statement of Defendant Officers as to how the shooting occurred.[80] According to Knox, the physical evidence does not support the statement that Askew pointed his firearm at Defendant Officer Aufdenkamp due, in part, to the fact that the gun was found on the floorboard below Askew's legs and was not resting where it should have been if Askew had reached over and was shot while his firearm pointed toward Aufdenkamp.[81]

Further, if Knox's testimony is believed, the gunshot wounds to Askew's arms are not consistent with the assertion that he was pointing a gun at Defendant Officer Aufdenkamp because the wound to the left arm is to the posterior side (back of the arm) and slightly above the wrist. In order for the wounds to be consistent, according to Knox, Askew would have had to

---

[78] (*Id.* at p. 199.)

[79] *Oregon v. Haas*, 420 U.S. 714, 722 (1975) (stating that credibility may be impeached by the use of a witness's earlier conflicting statements).

[80] (Knox Dep., pp. 75-76, 85-86, ECF No. 262-18.)

[81] (*Id.* at pp. 76-77.)

have his arm upside down for it to be in the direction of the shots coming toward him.[82]  Neither Officer described Askew holding the gun in that position.

Knox concluded that the wound to Askew's left arm was inconsistent with Aufdenkamp's version that Askew reached around with his left arm to point the firearm at Aufdenkamp.[83] Knox stated that there is "no conceivable way" that Askew had a gun in his hand at the time that he was shot.[84]

Knox explained why, when Askew was shot, he could not have then brought the gun back to his lap and dropped it on the floorboard.

> Well, first, the impact of the bullet isn't going to move him. Bullets don't move bodies. It doesn't turn people around. It doesn't do things. The only movement that could occur from any person shot – it would be from their own movement of their body. . . .
>
> But you also have in this particular case that there are two shots that he sustained in the back that actually lacerate the spine. So you have one that lacerates it in the thoracic – I believe it's the T-4 area, and then you have one that actually lacerates between the C-3 and C-4 here in the cervical vertebrae. The laceration in the spine in shooting cases will result in very rapid incapacitation. That's one of the few ways that you could actually rapidly incapacitate a person, is central nervous system damage. So, that limits the mobility. That limits the ability of a person to turn back around and move their hands in a position to drop a firearm.
>
> ….
>
> Because the problem is that for him to get his hands back in that position, he would have to bring them back over [the passenger seat back], under the steering wheel, down into his lap, and then drop the gun between his legs – between his legs at his lap.
>
> And given the wounds that he has, the number of gunshot wounds that he suffered, the fact that he suffered gunshot wounds to both arms, you would not be able to accomplish that. He would not be able to get shot with a gun pointed over this way, come back, bring it between his legs, and drop it. It just wouldn't

---

[82]  (*Id.* at pp. 76-78.)

[83]  (*Id.* at pp. 78-79.)

[84]  (*Id.* at pp. 86-87.)

happen. I certainly have never seen anything like that in all of the shootings I've ever looked at.[85]

In light of the inconsistencies in Defendant Officers' statements and the opinion of Plaintiff's expert, Michael Knox, that the shooting could not have occurred in the manner described by Defendants, the Court finds that a jury could find that the death of Askew resulted from an unreasonable seizure, i.e., excessive force, in violation of Askew's Fourth Amendments rights.

Defendants contend that, even if Askew's rights were violated, they are entitled to qualified immunity. When confronting a claim of qualified immunity, a Court is faced with two general questions. First, viewing the facts in the light most favorable to the plaintiff, the court considers whether the officer violated a constitutional right. Second, the Court must ask whether the contours of the right were sufficiently clear that a reasonable official would have understood that what he was doing violated that right.[86]

The essence of the qualified immunity test is whether the officers had "fair notice" that they were acting unconstitutionally.[87] The qualified immunity doctrine "seeks to balance two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield the officials from harassment, distraction and liability when they perform their duties reasonably."[88] Accordingly, when a court is faced with a motion for summary judgment alleging qualified immunity, the motion should only be granted if a

---

[85] (*Id.* at pp. 82-83.)

[86] *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson vs. Callahan*, 555 U.S. 223 (2009).

[87] *Hope vs. Pelzer*, 536 U.S. 730, 739 (2002).

[88] *Pearson*, 555 U.S. at 231.

reasonable juror could find that the evidence "viewed in the light most favorable to plaintiff" did not violate a constitutional right that was clearly established.[89] Furthermore, "all reasonable inferences are drawn in favor of the plaintiff."[90]

The right to be free from excessive force has long been "clearly established."

When making a qualified immunity analysis, it is important to remember that the defendant is, in essence, saying: 'If the plaintiff's version is credited, what I did, judged today, arguendo would be wrongful, but at the time I acted, no reasonable officer would have known he was acting wrongfully' (citation omitted). As this circuit has analyzed the qualified immunity issue in excessive force cases, the question of whether the reasonable officer would have known his conduct violated clearly established constitutional rights can be answered by the initial inquiry of whether the officer's use of force was objectively reasonable (citations omitted). It is clear from this circuit's analyses in various excessive force decisions that, having concluded that the right to be free from excessive force is clearly established, whether we grant qualified immunity in a particular case depends upon whether the officer did, in fact, use excessive force (i.e., force that was not objectively reasonable) (citations omitted). To put it another way, if there is a genuine issue of fact as to whether an officer's use of force was objectively reasonable, then there naturally is a genuine issue of fact with respect to whether a reasonable officer would have known such conduct was wrongful.[91]

Similar to the present case is that of *King vs. Taylor*,[92] in which an arrestee was shot and killed by a state police trooper. The trooper claimed qualified immunity which was denied by the Sixth Circuit Court of Appeals.[93] There was an arrest warrant for the arrestee, King, on felony and misdemeanor charges. The trooper and others were sent to serve the warrant on King and

---

[89] *Cole*, 448 F. App'x at 574.

[90] *Chapel vs. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009).

[91] *Kostrzewa vs. City of Troy*, 247 F.3d 633, 641-642 (6th Cir. 2001) (citations and internal quotation marks omitted).

[92] 694 F.3d 650 (6th Cir. 2013).

[93] *Id.* at 665.

knocked on his home door, but no one answered. The officers went to the back of the home and, through a glass door, saw King lying on his couch with a blanket partially covering him. Two officers knocked on the glass door and announced their identities as the trooper provided cover. They showed a badge to King, and, according to the trooper, King sat up, turned to the officers, and gave them "a look of contempt."[94] King turned away from the window, the trooper saw King's back, and King turned back toward the officers, and the trooper allegedly saw King's right hand come up with a gun and point it directly towards the officers. The trooper shot and killed King.

The plaintiffs' expert called into question the officer's account of the incident, particularly, the question of whether King pointed a gun at the officers prior to being shot. The Sixth Circuit held as follows:

> Viewing the record in the light most favorable to plaintiffs, we conclude that a factual dispute exists whether Taylor reasonably believed that King posed a threat of serious physical harm to Taylor or the other officers. In our view, a jury could find, based on the forensic evidence, expert testimony, and common sense, that King did not threaten the officers by pointing a gun at them just before he was shot.
> ….
> While the presence of a gun in King's right hand is consistent with the officers' testimony, that it was found resting on his right hip decidedly is not. . . . Moreover, the officers (including Taylor) said they believed at first that King might have shot at them. They could have plausibly believed this only if King had his gun pointed directly at them, which would have required King to have his right arm extended toward the officers, somewhat parallel to the floor. But a jury could find such arm positioning entirely inconsistent with expert testimony and common sense.[95]

---

[94] *Id.* at 655.

[95] *Id.* at 662 - 63. *See also Brandenburg vs. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989) (finding that, although a detective claimed that the decedent pointed his weapon "directly" at him and the other officers, there were facts which might show otherwise, including expert testimony that the position of the body indicated that the right hand was not grasping the trigger and the position of the left arm could not prove that the decedent was aiming his weapon at the officers).

Because in the present case, "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury,"[96] the Court denies Defendants' claim to qualified immunity. As noted by the Court of Appeals in *King*, "[w]hat exactly happened just before King was shot is a question for the jury, as both sides' theories of what transpired are sufficiently supported by evidence in the record."[97]

As in *King vs. Taylor*, there is a dispute as to whether Askew was pointing a gun at Defendant Officers immediately prior to being shot. As noted in *King*:

> With respect to this . . . question and the qualified-immunity analysis, we have little trouble concluding that if Taylor shot King while he was lying on his couch and not pointing a gun at the officers, Taylor violated King's clearly-established right to be free from deadly force. It has been clearly established in this circuit for some that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others" (citations omitted). Genuine disputes of material fact preclude upholding the district courts entry of summary judgment on Taylor's defense of qualified immunity.[98]

Accordingly, a reasonable officer would know that the right to be free from the use of excessive force is a clearly established constitutional right. Thus, because the Court finds that there is a factual dispute as to whether Defendant Officers used excessive force, Defendants are not entitled to qualified immunity, and their motion for summary judgment is **DENIED**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. Thomas Anderson
UNITED STATES DISTRICT JUDGE

---

[96] *Brandenburg*, 882 F.2d at 216.

[97] *King*, 694 F.3d at 663.

[98] *Id.* at 664.

Date:     June 21, 2016.