**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | | |
|---|---|---|
| **STERLING ASKEW and SYLVIA ASKEW,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **No.  14-cv-02080-STA-tmp** |
| | ) | |
| **CITY OF MEMPHIS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER PARTIALLY GRANTING AND PARTIALLY DENYING
MOTION FOR SUMMARY JUDGMENT
OF DEFENDANT CITY OF MEMPHIS**

Plaintiffs Sterling and Sylvia Askew[1] filed this action pursuant to 42 U.S.C. § 1983, alleging that Defendants City of Memphis and Defendant Officers Ned Aufdenkamp and Matthew Dyess[2] violated the civil rights of their deceased son, Steven Askew, under the Fourth Amendment to the United States Constitution.  Defendant City has filed a motion for summary judgment.  (ECF No. 178.)  Plaintiffs have filed a response to the motion (ECF No. 255), and Defendant City has filed a reply to the response.  (ECF No. 271.)  For the reasons set forth below, the motion for summary judgment is **PARTIALLY GRANTED** and **PARTIALLY**

---

[1]  (Cmplt., ECF No. 1-2.)  Mr. and Mrs. Askew have filed suit as next of kin of Steven Askew, and Mr. Askew has filed suit in his capacity as the Administrator Ad Litem/Personal Representative of the Estate of Steven Askew.  (*Id.*)

[2]  Defendant Officer Dyess is listed as both "Timothy Dyess" and "Matthew Dyess" in the record.  At his deposition, Defendant stated that his name is Matthew Dyess, (ECF No. 151-1), and, therefore, the Court has used that name in this order.

**DENIED**.[3]

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[4] When deciding a motion for summary judgment, the court must review all the evidence and draw all reasonable inferences in favor of the non-movant. [5]  In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, and it "may not make credibility determinations or weigh the evidence."[6]

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." [7]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[8]  The Court should ask "whether the evidence presents a sufficient disagreement to require submission to a

---

[3]  The motion for summary judgment of Defendant Officers was partially granted and partially denied on June 21, 2016.  (ECF No. 299.)

[4]  Fed. R. Civ. P. 56(c).

[5]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6]  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[7]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[8]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

jury or whether it is so one-sided that one party must prevail as a matter of law."[9] The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial."[10]

Background and Statement of Facts

The Court has previously quoted Magistrate Judge Tu M. Pham's succinct summarization of the background of the events giving rising to this action and the positions of the parties and now reiterates it:

> On the evening of January 17, 2013, the Memphis Police Department ("MPD") received a call concerning loud music coming from an apartment located at 3193 Tyrol Court in Memphis, Tennessee. MPD Officers Ned Aufdenkamp and Matthew Dyess were dispatched to respond to the call. For reasons unknown, the Officers left the Tyrol Court location after responding to the noise complaint and went to an adjacent apartment complex, the Windsor Place Apartments, located at 3197 Royal Knight Cove. From here, the parties' versions of events diverge drastically.
>
> The City and the Officers (collectively "Defendants") allege that while checking the same general area around the Tyrol Court apartments on the night in question, the Officers saw Steven Askew passed out behind the wheel of a running vehicle in the parking lot of the Windsor Place Apartments. When the Officers approached the vehicle to assess the situation, Officer Aufdenkamp noticed a handgun in Askew's lap and notified Officer Dyess. The Officers then woke Askew up by tapping loudly on his car window and shouting loud verbal commands, at which time Askew made hand gestures towards the Officers and pointed the gun at Officer Aufdenkamp. Both Officers opened fire on Askew, which ultimately resulted in his death.
>
> Plaintiffs allege that on the night in question, Askew was asleep in his car in the parking lot of the Windsor Place Apartments, waiting for his girlfriend who resides there to return from work. Upon spotting Askew in his vehicle, the Officers angled their patrol car towards Askew's car and turned on their overhead lights to illuminate his vehicle; however, the Officers never activated any blue

---

[9] *Id.* at 251 - 52.

[10] *Celotex*, 477 U.S. at 322.

3

lights, sirens, or other emergency equipment to get Askew's attention. Plaintiffs do not dispute that Askew had a gun in the car (which he was legally permitted to carry), but assert that he never pointed the gun at the Officers, and certainly did not fire the weapon. Plaintiffs also point out that although one officer reported that he saw Askew with a gun in his right hand, Askew actually had a cigar in his right hand at the time of the incident. The Officers fired a total of twenty-two shots that night, hitting Askew multiple times and killing him.[11]

Defendant City has presented the following statement of facts in support of its motion,[12] and Plaintiffs have presented additional facts that they deem material.[13]

Shooting

On January 17, 2013, Memphis Police Officers Ned Aufdenkamp and Matthew Dyess were assigned to a two man marked squad car while working the Delta Shift (5:00 p.m. until 1:00 a.m.) for the Mt. Moriah Station. Memphis Police Department received a 9-1-1 call at approximately 9:48 p.m. regarding a loud music call at 3193 Tyrol Court in the Aspen Lake Apartments. In response, Defendant Officers were dispatched to the area of Tyrol Court.[14] MPD Dispatch then notified Defendant Officers of an additional complaint about loud music at another apartment complex. Defendant Officers responded that they would "check both complexes." As

_____

[11] (Ord. P. Grt'ing & P. Dny'ing Mot. Summ. J., pp. 3 – 4, ECF No. 299 (quoting Mag. J. Ord. at pp. 2-4, ECF No. 285.)).

[12] (Def's SOF, ECF No. 178-2.)

[13] (Pls' Resp. to Def's SOF & Add. Fcts., ECF No. 255-1.) Unless otherwise indicated, each fact stated is not disputed by either party for the purpose of deciding this motion only.

[14] It is unclear from the record whether Defendant Officers actually went to the Tyrol Court location before going to the Windsor Place Apartment Complex. Whether Defendants did or did not go and whether there was any discrepancy in Defendants' statements about whether they did or did not go does not affect the Court's decision.

a result of this call, Defendants went to Windsor Place Apartments.[15]

Both apartment complexes were in Defendants' assigned ward, next to each other, divided only by a fence; however, in order to go from the Aspen Woods Apartments to the Windsor Place Apartments, Defendants had to exit Aspen Woods onto Mendenhall Road, travel to the traffic light at the intersection of Mendenhall and Knight Arnold, and enter the Windsor Place Apartments on Knight Arnold.

As Defendant Officers made their way around the apartment complex, they observed a 1995 Ford vehicle backed into a parking space with a man in the driver's seat.[16]  According to Defendant Officers, they approached the vehicle to perform a welfare check.[17]  Defendants pointed the overhead lights of their police car toward the vehicle and approached the vehicle with their flashlights shining.  Defendants did not have their patrol car's blue lights or their siren on, did not check the car's license plates and call the plate numbers into Dispatch, and did not use their PA system; none of this was in violation of the City of Memphis' policy, but for safety they should have run the plate numbers.

Defendant Officers did not call for back-up before approaching the vehicle.  Defendant

---

[15]  The parties have referred to this apartment complex as both "Windsor Place" and "Windsor Court."

[16]  At this point, the parties' versions of events begin to differ drastically.  Defendant maintains that the car was running and that the man, later identified as Stephen Askew, was "slumped over in the driver's seat."  (Def's SOF, ¶ 5, ECF No. 178-2.)  Plaintiffs contend that Askew was sitting in his car, asleep, with the windows rolled up and the engine off, just prior to the shooting.  (Pls' Resp. to Def's SOF & Add. Fcts., ¶ 5, ECF No. 255-1.)

[17]  Although Plaintiffs argue that there was no need for Defendant Officers to approach the vehicle, (id. at ¶ 8), they have presented no evidence that Defendants' stated reason was not their actual motivation in approaching the car; Plaintiffs continue to dispute that the car was running as Defendants approached it.

Officer Dyess went to the driver's side and knocked on the driver's side window.[18] Defendant Officer Aufdenkamp moved toward the passenger side rear window and began tapping on it. A partially full bottle of liquor was in the car.

Both Defendants were shining their flashlights into the car. As a result, Askew began to stir and move a little. Askew looked at Defendant Officers and made some type of sign or gesture with his left hand.

Defendant Officer Aufdenkamp later testified that, when Askew moved his hands, he thought he saw the handle of a handgun in the man's lap between his legs, and he alerted Defendant Officer Dyess to this fact.[19] After the shooting, a gun belonging to Askew was found on the floor of the car by his legs with a portion of it being under the seat and a portion protruding from under the seat.[20]

Both Defendant Officers took a step back and drew their weapons.[21] Defendant Officers can be heard on an audio recording with Dispatch two times during the relevant time period of this incident. During the first interaction, Defendant Officer Aufdenkamp reported seeing a

---

[18] Plaintiffs dispute whether Defendant Officers called to Askew in addition to knocking on the window. (*Id.* at ¶¶ 10, 13.)

[19] Plaintiffs dispute whether Defendant Officers saw Askew make a hand gesture before they saw the gun or after they saw the gun. (*Id.* at ¶¶ 16, 17.) Any dispute as to this fact does not affect the Court's decision.

[20] The Court has previously found that there is a disputed issue of fact as to whether Askew pointed his gun at Defendant Officers as they have claimed. (Ord. P. Grt'ing & P. Dny'ing Mot. Summ. J., p. 23, ECF No. 299.)

[21] Plaintiffs dispute whether Defendant Officers gave "loud commands" to Askew to not touch the gun and to put his hands up. (Pls' Resp. to Def's SOF & Add. Fcts., ¶ 20, ECF No. 255-1.) Defendant City has objected to two of Plaintiffs' witnesses who have submitted affidavits stating that they did not hear Defendant Officers give loud commands. That objection is discussed below.

weapon and asked for back-up,[22] and then fifteen to twenty-four seconds later Defendant Officer Aufdenkamp reported that shots had been fired. Dispatch recorded the "shots fired, shots fired" call at approximately 10:00 p.m. Defendants requested an ambulance because a suspect was down. Defendant Officers fired twenty-two shots and hit Askew nine times resulting in Askew's death. Askew was shot six times in the back and one time in the back of his neck. One or more of these seven shots was the fatal shot.

Other officers and an ambulance and paramedic arrived on the scene. Askew was found dead with a cigar or cigarette between his index finger and middle finger of his right hand. He was right handed and trained to shoot with his right hand; he had a handgun carry permit.

Investigation

Subsequently, personnel from Memphis Police Department Inspectional Services Bureau ("ISB"),[23] the Homicide Bureau, Felony Response, Crime Scene, and Uniformed Patrol Supervisors arrived at the scene. Whenever an officer involved shooting occurs, there is a criminal investigation by the Homicide Unit to determine if the officers committed a crime and an administrative investigation by ISB to determine if the officers violated MPD policy.[24] Homicide is in charge of the scene in an officer involved shooting.

---

[22] Plaintiffs contend that Defendant Officer Aufdenkamp used a "calm" voice during the first audio recording, and, thus, they reason that Askew could not have been awake and making allegedly threatening gestures and/or pointing his gun at that point during the encounter. (*Id.* at ¶ 16.)

[23] ISB is MPD's internal oversight bureau that investigates officer involved shootings.

[24] Joint Homicide and ISB investigations are intended to serve as a "checks and balances" system to make sure each does a proper investigation. (*Id.* at ¶ 48.)

An investigation into the shooting then ensued.[25]  Major Mark Winters, a lieutenant with ISB and a twenty-five year MPD veteran, was called to the scene shortly after the shooting to make certain the crime scene was properly processed, officers were assigned to assist the Homicide and Crime Scene Investigation Units ("CSI"), a witness canvas occurred, and the officers were drug tested.[26]

Winters assigned Jason Randolph, an eighteen year veteran and seven year ISB veteran, as lead ISB investigator.  Randolph was trained at the University of Tennessee's Internal Affairs Investigative School and had investigated approximately fifty officer involved shootings, four to five which were fatal.[27]  Randolph came to the scene after the shooting and conducted his investigation according to his training.  Randolph spoke briefly with Defendant Officers, checked their weapons, and counted rounds.  He was assisted by J.B. Cobb, an MPD veteran of twenty years and ISB detective for seven years.  Cobb did separate "walk-throughs" with Defendant Officers to get general information about what happened in order to assist the investigation.  No notes were taken during Defendants' walk-throughs of the incident.[28]

---

[25]  Plaintiffs dispute whether Defendant Officers were separated and/or allowed to talk to each other after the shooting, although it is MPD's policy to separate the participants in an officer shooting and not allow them to talk to each other.  (*Id.* at ¶¶ 26 - 27.)  It is undisputed that Defendant Officers talked to one another and others in a debriefing session before giving their formal statements.  (Def's Reply to Add Fcts, ¶ 7, ECF No. 271-1.)

[26]  Plaintiffs contend that the crime scene was not processed correctly and that a thorough investigation, including locating all witnesses and interviewing them, was not conducted.  (Pls' Resp. to Def's SOF & Add. Fcts., ¶¶ 28, 33,  ECF No. 255-1.)

[27]  Plaintiffs point to Randolph's testimony that some of his training was "on the job" with MPD, and they reason that Randolph learned poor investigative techniques from Defendant City's "pattern of poor investigations of officer involved shootings."  (*Id.* at ¶ 35.)

[28]  The parties dispute the extent to which notes were made the night of the shooting.  However, if notes were actually made, they no longer exist.  (*Id.* at ¶¶ 43, 44.)

Homicide Lieutenant, Mark Miller, a twenty-eight year MPD veteran, came to the scene to supervise the Homicide investigation, but neither Miller nor any of the homicide detectives spoke to Defendant Officers or were allowed to follow the ISB detective when he walked through the crime scene with Defendant Officers.[29]

Miller assigned Homicide detective, Sergeant W.D. Merritt, as lead investigator. Merritt was a twenty-eight year MPD veteran and had been a homicide investigator for thirteen years. Merritt had been involved in ten to twenty officer involved shooting investigations resulting in death.

CSI Lieutenant, Aaron Kant, came to the scene after the shooting and supervised the work of his two scene officers, J.P. Smith and Marcus Mosby. Kant was a thirty year MPD veteran. CSI's job was to locate, document, collect and preserve scene evidence, through photos and otherwise, including taking custody of and tagging the officer's weapons. Kant made Smith lead CSI investigator but also directly participated in the investigation. Smith, an eighteen year MPD veteran, came to the scene after the shooting.

Smith's primary task was to photograph and tag evidence pertaining to Askew, the vehicle and the shell casings; make sure that photos were taken; identify people on the scene; and make sure that evidence, including shell casings and bullet fragments, was recorded and collected.[30] He also took custody of Askew's weapon from the vehicle. Smith wrote a CSI report that was then given to Merritt.

Mosby, a twenty year MPD veteran, involved in five officer involved shooting

---

[29]  (*Id.* at ¶ 46.)

[30]  Plaintiffs dispute that all people on the scene were identified and that the bullet fragments were collected. (*Id.* at ¶ 73.)  However, they do not dispute that this was Smith's job.

investigations, arrived after the scene had already been secured. Mosby's main responsibility was securing and photographing the officers' weapons, but he also assisted Smith in securing Askew's weapon, taking photos, tagging evidence, and drafting a sketch of the crime scene, noting the location of evidence.

Both Defendants were relieved of duty that night pending the outcome of the investigation. In keeping with MPD Policy and Procedures, each Defendant Officer gave his formal statement ("Garrity Statement") to Randolph and Cobb on January 21, 2013.[31]

An aggravated assault report was prepared by an MPD officer the night of the shooting based on an initial report by Defendant Officer Dyess that Askew had fired his weapon at Defendant Officers. Randolph did not receive a copy of the aggravated assault report; thus, he did not include it in his ISB report. Homicide files included the officer's statement concerning the report but not the report itself. Plaintiffs did not receive a copy of the report until May 2015.[32]

MPD should have conducted a canvass to obtain witnesses on the night of the shooting and should have properly documented such attempts. The canvassing of witnesses on the scene should have been done the night of the incident and statements taken then. It is important to do a

---

[31] MPD has a policy in which detectives must wait forty-eight hours before obtaining information from officers involved in a shooting. (Order, p. 3., ECF No. 295.) Defendant Officers gave their statements to ISB representatives Randolph and Cobb but did not speak to homicide detectives because they had invoked their *Miranda* rights. Before Defendant City adopted the forty-eight hour waiting rule, Lieutenant. Miller would routinely talk to the officers involved in shootings on the night of the incident while it was fresh in their minds and before they had a chance to talk with others. (Def's Reply to Add Fcts, ¶ 12, ECF No. 271-1.)

[32] (Pls' Resp. to Def's SOF & Add. Fcts., ¶¶ 32, 52, ECF No. 255-1.) Plaintiffs claim that the failure to include the aggravated assault report in the ISB and Homicide records was part of an intentional "cover-up" while Defendant City terms it mere "inadvertence." (Def's Reply at pp. 9 - 10, ECF No. 271.)

complete canvass of the area as soon as possible following a shooting to make sure any potential witnesses are located.[33] The investigative techniques for an administrative investigation are the same as those for when handling a criminal investigation.

Deneshia Bowen, a witness, told Merritt that, prior to the shooting, she saw Askew's hands on the vehicle's steering wheel. Merritt stated that he did not think Bowen would be able to see Askew's hands from her apartment window.[34]

Merritt had Askew's gun processed for fingerprints,[35] had the vehicle inspected, obtained the CSI's investigation report, reviewed the autopsy report, including the information about the drug and alcohol present in Askew's system, and reviewed the officer's drug tests. Merritt delivered his file to his supervisor for submission to the District Attorney and gave a copy to ISB to assist ISB in its administrative investigation.

Randolph supervised the preparation of the ISB report documenting the investigation of the shooting. Randolph submitted his ISB report to Winters, who approved it, and passed it on to his Major, who approved it. ISB concluded that the shooting was "justified" and not a violation of MPD policy.

At the conclusion of the investigations by ISB and the Homicide Bureau, the files were submitted to the Shelby County District Attorney General's Office. The District Attorney

---

[33] Plaintiffs dispute whether all witnesses were located and whether Defendant City made reasonable efforts to locate all the witnesses. (Pls' Resp. to Def's SOF & Add. Fcts., ¶¶ 56 - 57, 63, ECF No. 255-1.)

[34] (Def's Reply to Add Fcts, ¶ 31, ECF No. 271-1.) Merritt acknowledged that, when he interviewed Bowen, there was not a car parked where Askew's car was parked and that he never thought about parking a car in that spot to see if he could see into the car to determine whether the witness was being truthful. (Pls' Resp. to Def's SOF & Add. Fcts., ¶ 58, ECF No. 255-1.)

[35] Plaintiffs dispute whether fingerprints were taken from the gun. (*Id.* at ¶¶ 84 – 85.)

General declined to charge or prosecute either Defendant Officer.

MPD policy does not require an officer to wait and allow someone to fire a weapon at him before the officer is allowed to fire his own weapon, although, in this case, it is disputed as to whether a weapon was ever pointed at the officers. If a person points a weapon at an officer, that officer is allowed to defend himself and fire his weapon under MPD policy.

Dr. Miguel Laboy, the Medical Examiner with Shelby County, conducted the autopsy of Steven Askew and prepared a report. A toxicology report was performed on specimens gathered from Askew at the time of his autopsy on January 18, 2013. Askew was determined to have had a blood alcohol concentration of .119 which is in excess of the legal limit. A small amount of marijuana was also present in Askew's system.

Nothing in the ISB or Homicide file shows that ISB contacted the medical examiners' office about its findings or to discuss this case, and, in fact, ISB made its findings before the final autopsy was complete, and no outside consultant was hired to verify the stories of Defendant Officers for ISB. Further, there was no investigation or inquiry by ISB into the trajectory of bullets and entrance and exit wounds on Askew's body. No analysis was done to determine how the gun got from the passenger side window where the officers say Askew was pointing the gun to the floorboard of the driver's side.

Officer Training

Defendant Officers Aufdenkamp and Dyess both graduated from MPD's Training Academy having each completed 840 hours of education in MPD's policies and training in such areas as use of firearms, use of force, approaching vehicles, DUI detection, and civil rights protection. MPD's policies and its training of Aufdenkamp and Dyess were consistent with the

State of Tennessee's Police officer certification standards and were approved by the State. Lieutenant Colonel Gregory Sanders, commander at the training academy, testified that training alone without consistent reinforcement of the training is not enough and it would be irresponsible to provide initial training and not reinforce it.[36]

Winters testified that, following the investigation of the conduct of the officers in this shooting, ISB did not recommend any additional training for Dyess and Aufdenkamp. According to Winters, all twenty-two bullets fired by Aufdenkamp and Dyess were justified. MPD Director Armstrong testified that Officers Aufdenkamp and Dyess acted in conformity with their training in killing Steven Askew. Aufdenkamp testified that his superiors affirmed that his actions were proper in this shooting.

Randolph handles all investigations of officer involved shooting incidents in the same general manner with the same methodology as in this case, and he uses the same procedures and gives the same level of attention to all of them. The ISB investigation in this case was done according to the training provided to lead detective Randolph.

Prior Officer Discipline

Prior to this incident, MPD officer performance monitoring programs noted that Aufdenkamp had performance issues that suggested a need for intervention. Aufdenkamp's flagged performance issues were four "work station complaints" for "courtesy," specifically, accusations that he was "rude." Aufdenkamp received a one day suspension for the last courtesy violation in March 2012 and was referred to anger management issues. After this suspension and anger management referral in March 2012 through January 17, 2013, Aufdenkamp had no

---

[36] Defendant City notes that MPD officers receive annual in-service training. (Def's Reply to Add Fcts, ¶ 35, ECF No. 271-1.)

disciplinary issues. Aufdenkamp served part of this time on a desk job.[37]

Expert Reports

Michael Knox, who does forensic reconstruction of shooting incidents and was retained by Plaintiffs as an expert, gathered data, including testimony and physical evidence - which included observing bullet holes, trajectories, and other things - to reconstruct the scene of Askew's death and to analyze the procedures used by Memphis Police Department officers before, during, and after a shooting.

On April 27, 2016, this Court affirmed the decision of the Magistrate Judge which granted in part and denied in part the motions of Defendant Officers and Defendant City to strike Knox's expert report.[38] Specifically, as it related to the claims against Defendant City, the Court allowed Knox's opinion that "[w]hen approaching a person who is sleeping in a vehicle, it is reasonable and prudent to assume that, if startled or awakened quickly, the individual's immediate perception of his surroundings might not be clear. The individual may not immediately recognize that he has been awakened by police officers but may instead assume that he has been approach[ed] by someone wishing to do him harm."[39] Although Knox may not opine about Askew's actual state of mine, he may testify about the likely reaction of a person in Askew's position, i.e., someone sleeping in a vehicle who is "startled or awakened quickly."[40]

---

[37] Plaintiffs contend that these issues were anger management and maturity issues rather than mere "courtesy" issues and that Aufdenkamp had other personnel issues that were not determined to warrant intervention. (Pl's Resp. to Def's SOF & Add. Fcts., ¶¶ 81-82, ECF No. 255-1.)

[38] (Order, ECF No. 296.)

[39] (*Id.* at pp. 5 - 6.)

[40] (*Id.* at p. 15.)

In looking at the "segmenting" rule, the Court affirmed the Magistrate Judge's decision that Knox could consider Defendant Officers' conduct leading up to Askew's death in relation to Plaintiffs' failure to train claim against the City because the segmenting rule does not apply to such claims.[41]

The Court allowed Knox's testimony that "Officers Aufdenkamp and Dyess testified that they handled this incident in accordance with their training and that they were told they did a good job with regard to this shooting . . . Assuming the officers' testimony to be true and accurate, the Memphis Police Department failed to train the officers properly with respect to handling incidents of this nature."[42]

The Court also allowed Knox's testimony that "[t]he Memphis Police Department failed to conduct a thorough investigation of this shooting and, by doing so, ratified the officers' conduct without regard to the factual circumstances surrounding the shooting."[43]  Additionally, Knox may testify that Defendant Officers' tactical decisions likely "caused or contributed to this shooting."[44]

Plaintiffs retained the services of Garry L. McFadden to provide expert testimony concerning the adequacy of the MPD investigation of Askew's death, as well as the adequacy of

---

[41] (*Id.* at pp. 15 - 16.)

[42] (*Id.* at pp. 6 – 7.)  Knox may not testify that "[b]y failing to adequately investigate an officer-involved shooting, the Memphis Police Department is rubberstamping the officers' conduct and setting precedent for use of deadly force investigations. The underlying message to rank-and-file officers is that any use of deadly force is likely to be deemed justified as long as the officers assert that they were in fear" because that portion of Knox's opinion is speculative.

[43] (*Id.* at p. 9.)

[44] (*Id.* at pp. 9 – 10.)

the MPD's training of its officers generally. On April 25, 2016, this Court affirmed the decision of the Magistrate Judge which granted in part and denied in part the motion of Defendant City to strike McFadden's expert report.[45]

The Court allowed McFadden's opinion that the MPD's policy that homicide detectives must wait forty-eight hours before getting information from officers involved in a shooting hinders the detectives from properly investigating the incident.[46] The Court also allowed McFadden's opinion that the investigation of Askew's death was inadequate because officers did not interview potential witnesses and individuals who lived at the apartment complex where the incident occurred until several days later; investigators did not properly follow up on a tip provided by a witness who said there was another individual who saw the entire incident and they did not attempt to locate the individual; investigating officers never explored the inconsistency between various officers' statements; and Defendant Officer Dyess was in a "panicked state" when he fired his weapon.[47]

As with Knox's testimony, the segmenting rule did not prevent McFadden from considering Defendant Officers' conduct leading up to Askew's death in relation to Plaintiffs' failure to train claim because the segmenting rule does not apply to such claims, as previously noted.[48]

---

[45] (Order, ECF No. 295.)

[46] (*Id.* at p. 5.)

[47] (*Id.* at p. 6.) The Court did not allow McFadden's opinions concerning the motivation behind the thoroughness of the investigation of Askew's death; the reason the officers' stories might have changed; and the effects of the purported inadequate investigation and inadequate training.

[48] (*Id.* at p. 7.)

McFadden is also allowed to testify that "[t]he officers testified that no supervising officer had been critical of their conduct on the night in question and as the MPD chose not to discipline them for any of their actions, the MPD has ratified their conduct"; "I think [the Officers] purposely changed their statement after getting the information from the scene and realizing that the scene evidence, forensic evidence or the ballistic evidence did not support what they had first told Officer Drew;" and "Discovery Documents, including the statements and testimony of Officers Dyess and Aufdenkamp, demonstrated that their own unreliable and deliberate conduct created the high risk aspect of this encounter."[49]

The Court has incorporated its decision regarding the expert opinions of Knox and McFadden in determining whether there are material issues of disputed fact that would defeat Defendant City's motion for summary judgment.

Objection to Plaintiffs' Affidavits

In its reply, Defendant City objects to Plaintiffs' reliance on the affidavits of Denicia Davis and Billy Ray Kelley as to the events of the night of the shooting on the ground that Plaintiffs' attachment of the affidavits to their response was Defendant's first notice that the affiants had first-hand knowledge of that night.[50] Defendant acknowledges having notice of Davis and Kelley as potential witnesses but state that the notice given limited Davis and Kelley's knowledge to Askew's presence at the apartment complex prior to the night of the shooting.

Plaintiffs disclosed that Davis and Kelley "saw Mr. Askew in the complex prior to the

---

[49] (*Id.* at pp. 7 – 8.)

[50] (Def's Reply at p. 1, ECF No. 271.)

night of the incident.  They saw Mr. Askew in his car on the night prior to the incident."[51] Defendant reads both statements as pertaining to dates before the incident with "prior to the night of the incident" in the first sentence and "night prior to the incident" in the second sentence meaning the same.

Plaintiffs would not have needed to make two statements about the same information and would not have changed the position of the modifier "prior" in each sentence if those sentences were meant to mean the same.  The Court reads the first sentence as stating that the affiants saw Askew in the apartment complex sometime "prior to the night of the incident," i.e., before the night of the shooting. The second sentence reads that they saw Askew in his vehicle "on the night" (which relates back to "the night of the incident" in the first sentence) "prior to the incident" (with "prior to" modifying "the incident.")  Thus, Plaintiffs properly disclosed that Davis and Kelley saw Askew in his car on the night in question before ("prior to") the shooting occurred, and Defendant's objection to the affidavits is overruled.

<u>Analysis</u>

In support of its motion for summary judgment, Defendant City makes the following arguments:  (1) Plaintiffs cannot prove a pattern of constitutional violations by the Memphis Police Department in the training of MPD Officers in use of force; (2) Plaintiffs cannot prove a pattern of constitutional violations by the Memphis Police Department in investigating use of force by MPD officers; (3) Plaintiffs cannot prove a pattern of constitutional violations by the Memphis Police Department in terminating and/or disciplining MPD officers; (4) Plaintiffs cannot prove a causal link between MPD's use of force training, investigations of excessive

---

[51] (*Id.* at p. 2 (quoting Pls' Supp. Interr. Ans. and Supp. Int. Discl.)).

force by MPD officers, and/or the termination and/or disciplining of MPD officers and Officers Aufdenkamp and Dyess' use of deadly force against Askew; and (5) Plaintiffs cannot prove that Officers Aufdenkamp and Dyess violated Askew's constitutional rights.[52]

The Court has previously found that there is a disputed issue of fact as to whether Defendant Officers violated Askew's constitutional rights.[53] Therefore, Defendant City's fifth ground, i.e., Plaintiffs cannot prove that Defendant Officers Aufdenkamp and Dyess violated Askew's constitutional rights, is without merit.

Section 1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws."[54]  In order to prevail on such a claim, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law."[55]  "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred."[56]

Generally, local governments such as Defendant City are not considered to be "persons" under § 1983 and, thus, are not subject to suit.[57]  However, when "execution of a government's

---

[52] (Def's Mot. at p. 2, ECF No. 178.)

[53] (Ord. P. Grt'ing & P. Dny'ing Mot. Summ. J., ECF No. 299.)

[54] 42 U.S.C. § 1983.

[55] *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003).

[56] *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001).

[57] *Monell v. N.Y.C. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978).

policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of] injury [,]" municipalities and other local governments are considered a "person" for purposes of § 1983.[58]  Section 1983 liability does not attach to a municipality based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability may only be imposed on the basis of the municipality's own custom or policy.[59]  "Under § 1983, local governments are responsible only for their own illegal acts" and may not be held vicariously liable for the actions of their employees.[60]

Plaintiffs who seek to impose liability on local governments under § 1983 must prove that an action pursuant to an official policy or custom caused their injury.[61]  Official municipal policy includes the decisions of a government's lawmakers or the acts of its policymaking officials.[62]  That is, a municipality's "policies" are "decisions of its duly constituted legislative body or those officials whose acts may fairly be said to be those of the municipality."[63]  Alternatively, a "custom" is a practice that, while not formally approved, "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the

---

[58] *Id.* at 694; *see also Bd. Of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*).

[59] *Id.* at 691.

[60] *D' Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

[61] *Monell*, 436 U.S. at 691.

[62] *See Pembaur v. Cincinnati*, 475 U.S. 469, 480 – 481 (1986).

[63] *Bryan Cnty.*, 520 U.S. at 403-04.

force of law."[64]

Absent proof it resulted from an unconstitutional policy, a city is not liable for a single incident resulting in a constitutional violation.[65] Furthermore, a city is not liable unless there is an "affirmative link between the policy and the particular constitutional violation alleged" or "causal connection."[66]

Failure to Train Claim

In the present case, Plaintiffs contend that Defendant City failed to train its officers "regarding the proper manner of investigating a situation where they happen upon an individual who has fallen asleep in a parked vehicle"[67] and that this failure resulted in Askew's death. According to Plaintiffs, when Defendant Officers saw Askew in his vehicle, they "escalated this situation and used deadly force without a proper investigation, without provocation, and without using alternative measures to deadly force."[68] Defendant City contends that Plaintiffs cannot show a pattern of constitutional violations by the Memphis Police Department in the training of its officers in the use of force or that Defendant City was on notice that any lack of training on its part would lead to the violation of Askew's constitutional rights.

When a municipality arms its officers so that they can effectively perform arrests, a need

---

[64] *Id.* at 404.

[65] *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985).

[66] *Id.* The Court has discussed the "causal connection" requirement with each claim rather than separately.

[67] (Pls' Resp. at p. 17, ECF No. 255.)

[68] (Cmplt. at ¶ 27, ECF No. 1-2.)

arises to train them regarding "the constitutional limitations on the use of deadly force."[69]  In

*Connick v. Thompson*, the Supreme Court discussed the contours of a § 1983 failure to train

claim.

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S. Ct. 2427, 85 L. Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton* [*v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197 (1989)]. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S. Ct. 1197.
>
> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410, 117 S. Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.* at 407, 117 S. Ct. 1382. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." *Id.* at 392, 109 S. Ct. 1197; *see also Pembaur, supra*, at 483, 106 S. Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ...").[70]

To establish liability, Plaintiffs acknowledge that they must prove that "(1) [Defendant

Officers'] training was inadequate for the tasks performed; (2) the inadequacy was the result of

---

[69]  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n. 10 (1989).

[70]  *Connick*, 563 U.S. at 61-62.

[Defendant City's] deliberate indifference; and (3) the inadequacy was closely related to or closely caused [Askew's] injury."[71] For a finding of deliberate indifference, a plaintiff ordinarily must "show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."[72] "Alternatively, [a] plaintiff[ ] could show deliberate indifference through evidence of a single violation of federal rights, accompanied by a showing that the [c]ity had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation."[73]

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.[74]

Here, there is no evidence in the record showing "prior instances of unconstitutional conduct demonstrating that [Defendant City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury."[75]

---

[71] (Pls' Resp. at p. 18, ECF No. 255 (quoting *Ellis vs. Cleveland Mun. School Dist.*, 455 F.3d 690, 700 (2006).)

[72] *Savoie v. Martin*, 673 F.3d 488, 495 (6th Cir. 2012) (citation omitted).

[73] *Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 794 (6th Cir. 2012) (citing *Plinton v. Cnty. of Summit*, 540 F.3d 459, 464 (6th Cir. 2008) (requiring a "showing that the [c]ity had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation" under a single-violation theory).

[74] *City of Canton*, 489 U.S. at 390.

[75] Defendant City argues that Plaintiffs cannot prove that Defendant was on notice that Askew's rights would likely be violated by how Defendant Officers approached him under the particular

Therefore, to survive summary judgment, Plaintiffs must point to evidence in the record showing (1) disputed issues of fact as to whether Askew's rights were violated when he was shot, which, as noted previously, they have already done, and (2) disputed issues of fact showing that Defendant City failed to train Defendant Officers "to handle recurring situations presenting an obvious potential for such a violation." Plaintiffs must set forth facts to indicate that there was a "likelihood that the situation would recur" and that it was predictable "that an officer lacking specific tools to handle that situation would violate citizens' rights."[76]

The Court finds that there is evidence in the record which, if believed by the trier of fact, shows "a likelihood that the situation would recur." Officer Randolph testified that he had been confronted with the situation of "a guy passed out behind the wheel dozens of times."[77] Additionally, Defendant Officer Aufdenkamp testified that "while being a police officer, I've dealt with people slumped back" in a vehicle.[78]

There is also evidence in the record from which the trier of fact could find that Defendant Officers lacked the "specific tools" or training to handle the situation of such a high risk stop. The evidence shows that Defendant Officers Aufdenkamp and Dyess received basic training on search and seizure and the use of force, including deadly force, under the Fourth Amendment,

---

circumstances presented by this case and, thus, cannot prove that Defendant "made a deliberate choice to follow a course of action that it had notice would lead to a rights violation." (Def's Memo. at p. 12, ECF No. 178-1.) The "recurring situation" theory of liability does not require Plaintiffs to show that Defendant had actual or constructive notice that its officers were deficiently trained. *See Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (citing *Connick*, 131 S. Ct. at 1360–61).

[76] *Bryan Cnty.*, 520 U.S. at 409.

[77] (Randolph Depo. at p. 130, ECF No. 256-7.)

[78] (Aufdenkamp Depo. at pp. 42 – 43, ECF No. 152-1.)

and this training complies with the State of Tennessee's requirements for training.[79]  Each officer also received forty hours of in-service training each calendar year of employment.[80]

Defendant Officer Dyess testified in his deposition that he had received training in how to approach a vehicle in an unknown situation, DUI detection, and the use of force in a deadly force situation.[81]  However, he acknowledged that "[t]here is no specific guideline for an unknown risk traffic stop where the occupant may be drunk.  The training that we have is unknown or high risk traffic stops.  We are trained in DUI detection, but we are not trained in how to approach a vehicle of un – with an unknown risk while we're on [an] unknown risk stop where the occupant might be drunk."[82]  He also received no training in the use of a flashlight in arousing someone believed to be passed out from intoxication.[83]  Additionally, he testified that he had never been trained to put his blue lights on to notify an individual in a vehicle believed to be passed out from intoxication that he was a police officer.[84]

Defendant Officer Aufdenkamp testified that he was trained in how to make a traffic stop but acknowledged receiving no specific training on how to deal with a suspicious vehicle with unknown risk with a possible intoxicated person in it.[85]

---

[79] (Beasley Aff., ECF No. 174-1.)  Major Vincent Beasley is the commander of MPD's Training Academy.  (*Id.*)

[80] (*Id.*)

[81] (Dyess Depo. at pp. 174 - 175, 200, ECF No 151-1.)

[82] (*Id.* at p. 175.)

[83] (*Id.* at p. 177.)

[84] (*Id.* at p. 179.) ("I don't think that I've ever been trained to do that in that specific situation.")

[85] (Aufdenkamp Depo. at pp. 56 – 59, ECF No. 152-1.)

Lieutenant Colonel Gregory Sanders, the commander of MPD's training academy in January 2013, testified in his deposition that it is "within the discretion of the officers on how to wake up an individual who's passed out behind the wheel of a suspicious vehicle with unknown risk."[86] Sanders was asked, "[D]o you believe that it is wise to wake up a drunk individual by rapping on his window and shining a flashlight in his face?" He answered, "No, not necessarily."[87]

Plaintiffs' experts have opined that the training provided by Defendant City to its officers was inadequate.[88] Knox opined that "Officers Aufdenkamp and Dyess testified that they handled this incident in accordance with their training and that they were told they did a good job with regard to this shooting . . . Assuming the officers' testimony to be true and accurate, the Memphis Police Department failed to train the officers properly with respect to handling incidents of this nature."[89] According to Knox, if Defendant Officers handled the stop in accordance with their training, then "what [they] were trained to do was if you see a man with a gun in a car is to stand there and stay in a position where they could point the gun at you."[90] Knox also testified that, when an officer is placed in a known, high-risk situation such as "an

---

[86] (Sanders Depo. at pp. 91 – 92, ECF No. 203.)

[87] (*Id.* at p. 94.) Sanders stated that this approach might be used to give the officer a tactical advantage. (*Id.* at p. 95.)

[88] The Sixth Circuit permits the use of expert testimony in establishing failure to train claims. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) ("Especially in the context of a failure to train claim, expert testimony may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures.").

[89] (Knox Report, ¶ 16.16, ECF No. 145.) In his deposition, Knox referred to the incident as a "high risk stop." (Knox Depo. at p. 163, ECF No. 256-19.)

[90] (*Id.*)

individual in a vehicle with a firearm, and you are concerned for your safety, then you would initiate high risk vehicle stop procedures, not just stand there and challenge them with a gun pointed at them. That's not the appropriate way to handle that situation. And so, if they were following their training, then their training's deficient."[91]

Garry L. McFadden opined that, if Defendant Officers acted in accordance with their training in "standing right at the car windows with their guns pointed and with [their] voices raised" in non-exigent circumstances, rather than first seeking cover, then their training was inadequate.[92]

From this evidence, the trier of fact could find that Defendant City failed to adequately train MPD officers in how to effectuate high risk stops and that failure was the "moving force" that resulted in Askew's death and the violation of his constitutional rights.[93] Thus, Plaintiffs have presented sufficient evidence to survive summary judgment on their failure to train claim, and this portion of Defendant City's motion is DENIED.

Failure to Investigate Claim

A municipality may be held liable under § 1983 when the responsible law enforcement official has "ratified" unconstitutional conduct by failing to investigate complaints of constitutional violations,[94] although the failure to investigate alleged wrongful conduct does not

---

[91] (*Id.* at pp. 163 – 164.)

[92] (McFadden Report at p. 16, ECF No. 134.)

[93] *See Amerson v. Waterford Twp.,* 562 F. App'x 484, 491 (6th Cir. 2014) (reiterating that, to sustain § 1983 municipal liability, the plaintiff must establish that the inadequate training was the moving force behind the violation of his constitutional rights).

[94] *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985) (concluding that the failure to investigate a complaint "served to confirm the existence of an unstated 'policy' of toleration of illegal

*per se* mandate a conclusion that the municipality has a policy of tolerating violations of citizens' rights. Instead, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."[95] Thus, to be liable under a ratification theory, the municipality's failure to investigate must be indicative of an official policy.

> *Marchese*, read in light of *Monell* and its progeny, makes a post-injury failure to investigate a fact which may permit an inference that the misconduct which injured the plaintiff was pursuant to an official policy or custom. Any other reading would permit respondeat superior liability for the failure to undertake an investigation and would thus by-pass the stringent proximate cause requirements discussed in [*City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L.Ed.2d 791 (1985) and *City of Springfield v. Kibbe*, 480 U.S. 257, 107 S. Ct. 1114, 94 L.Ed.2d 293 (1987).][96]

Accordingly, as noted by Defendant City, courts have consistently held that one failure to investigate is insufficient to establish municipal liability under the theory of inaction due, in part, to lack of notice to the municipality.[97]

In the present case, Plaintiffs contend that there are facts in the record that show the existence of a pattern of Defendant City's failure to adequately investigate officer involved

---

brutality toward any county prisoner who had threatened the life of a sheriff's deputy"). *See also Leach vs. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989) (finding that a sheriff's failure to investigate an incident of abuse of a paraplegic inmate demonstrated a policy or custom of deliberate indifference to the needs of paraplegic inmates).

[95] *Monell*, 436 U.S. at 694.

[96] *Tompkins v. Frost*, 655 F. Supp. 468 (E.D. Mich. 1987).

[97] (Def's Memo. at p. 13, ECF No. 178-1 (citing, *inter alia*, *Burgess v. Fisher*, 735 F.3d 462, 478-479 (6th Cir. 2013) and *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-435 (6th Cir. 2005)).

shootings, and they contend that the City's repeated failure to do so was the moving force behind Askew's death. According to Plaintiffs, this pattern shows deliberate indifference tantamount to an official policy of inaction on the part of the City.

In support of their argument, Plaintiffs have pointed to evidence, which if believed by the trier of fact, tends to show inadequate scene and subsequent separation of Defendant Officers, the failure to find and interview all potential witnesses, the failure to test the reliability of a witness's perception by parking a vehicle in the same spot that Askew's vehicle was parked while standing with the witness at her viewing spot, the lack of ballistic or forensic work performed on the vehicle to determine the trajectory of the bullets or to determine Defendant Officers' location at the time of the shooting, and the failure to include in the investigative record (and timely provide to Plaintiffs' counsel) an aggravated assault report prepared on the night of the shooting which contained statements indicating that Defendant Officers thought that Askew had fired his gun at them.[98]

The Court agrees with Defendant City that, even if true, standing alone these failures show a "collection of sloppy, or even reckless, oversights" during the investigation which does not support a claim of deliberate indifference.[99] However, these alleged investigative deficiencies do not stand alone.

It is undisputed that none of the investigating officers who came to the scene of the shooting were allowed to speak to or interview Defendant Officers that night or were allowed to follow the ISB detective when he walked through the crime scene with Defendant Officers

---

[98] (Pls' Resp. at pp. 14 – 17, ECF No. 255.)

[99] (Def's Reply at p. 6, ECF No. 271 (quoting *Doe v. Claiborne*, 103 F.3d 495, 508 (6th Cir. 1996).)

pursuant to Defendant City's official policy that detectives must wait forty-eight hours before obtaining information from officers involved in a shooting. It is also undisputed that, if notes were made during Defendants' walk-throughs of the incident, those notes were not provided to the investigating officers and were destroyed at some point. Jason Randolph, ISB investigator, testified that the investigation in this case was handled the same as all other officer-involved shootings.[100]

Plaintiffs' expert, Garry McFadden, has opined that the policy that homicide detectives must wait forty-eight hours before getting information from officers involved in a shooting hinders the detectives from properly investigating the incident.[101] Additionally, McFadden opined that the investigation of Askew's death was inadequate because officers did not interview potential witnesses and individuals who lived at the apartment complex where the incident occurred until several days later; investigators did not properly follow up on a tip provided by a witness who said there was another individual who saw the entire incident and they did not attempt to locate the individual; and investigating officers never explored the inconsistency between various officers' statements.[102] McFadden also opined that: "[t]he officers testified that no supervising officer had been critical of their conduct on the night in question and as the MPD

---

[100] (Randolph Depo. at pp. 35, 40 – 41, ECF No. 256-7.)

[101] (McFadden Depo. at pp. 37 – 38, 46 – 51, ECF No. 131.) In its reply, Defendant argues that the Court should reject McFadden's opinion as to the adequacy of the investigation and its constitutionality. (Def's Reply at p. 7, ECF No. 271.) The reply was filed before Magistrate Judge Pham's decision that the cited portions of McFadden's opinion were admissible and before this Court affirmed that decision. Defendant's arguments go to the weight that should be given to McFadden's opinion at trial.

[102] (McFadden Depo. at pp. 51 – 55, ECF No. 131); (McFadden Aff. at p. 6, ECF No. 134.)

chose not to discipline them for any of their actions, the MPD has ratified their conduct."[103]

Michael Knox, also Plaintiffs' expert, has opined that "[t]he Memphis Police Department failed to conduct a thorough investigation of this shooting and, by doing so, ratified the officers' conduct without regard to the factual circumstances surrounding the shooting."[104]

Based on this evidence, if the trier of fact finds that Defendant Officers used excessive force against Askew, the trier of fact could then find that Defendant City ratified Defendant Officers' actions by failing meaningfully to investigate those acts.[105] "Viewed in this light, evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence of a policy that would condone the conduct at issue."[106] For these reasons, Defendant City's motion for judgment as a matter of law on its failure to investigate claim is DENIED.

Failure to Discipline and Supervise Claims

Plaintiffs have alleged that Defendant Officer Aufdenkamp had "a history of aggression" and that the failure to discipline him resulted in Askew's death.[107] Plaintiffs appear to argue that every act of alleged on-the-job misconduct on the part of Defendant Officer Aufdenkamp should have been subject to discipline leading ultimately to his termination so that he would not have

---

[103] (McFadden Aff. at p. 15, ECF No. 134.)

[104] (Knox Report, ¶ 16.15, ECF No. 145.)

[105] *See Otero v. Wood*, 316 F. Supp.2d 612, 627-28 (S.D. Ohio 2004) (citing *Wright v. City of Canton*, 138 F. Supp.2d 955, 966 (N.D. Ohio 2001); *Leach*, 891 F.2d at 1246–48; *Marchese*, 758 F.2d at 188) (discussing that a failure to investigate can be proof of inaction, thereby ratifying the deprivation resulting in municipal liability for it).

[106] (*Id.*)

[107] (Cmplt. at ¶ 62, ECF No.1-2.)

been on the job on the night of the shooting.

Defendant City contends that it is entitled to summary judgment on this claim because there is no evidence of a clear and consistent pattern of Aufdenkamp's violating the constitutional rights of others, notice by Defendant City of that pattern, and a deliberate indifference by Defendant City resulting in a failure to discipline and/or terminate Aufdenkamp proximately causing the alleged violation of Askew's rights.[108]

While a municipality's failure to investigate an officer's use of force may create an inference that the alleged misconduct was pursuant to an official policy or custom,[109] no such inference is warranted in this case because Officer Aufdenkamp's disciplinary history prior to January 17, 2013, contains no verified, excessive force incidents in violation of a citizen's constitutional rights.[110]  Plaintiffs' argument that Defendant Officer Aufdenkamp "had a pitiful

---

[108]  (Def's Memo. at p. 16,  ECF No. 178-1.)

[109]  *See Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (describing a type of deliberate indifference which establishes municipal liability when a city fails to act in response to repeated complaints of constitutional violations by its officers).

[110]  (Aufdenkamp Personnel File, ECF No. 246-1.)  Although it does appear that Aufdenkamp had some anger management issues, the Court's ability to discern the extent of those issues is hampered by the poor quality of the copies of the personnel documents submitted by Plaintiffs and Plaintiffs' reliance on a "List of Job Performance Problems" purportedly found at ECF No. 246.  ECF No. 246 is merely a "Notice of Filing Personnel File of Defendant Ned Aufdenkamp." No list is attached. Plaintiffs also refer to ECF No. 245, which is the personnel file of Defendant Officer Dyess, and does not support the statement made by Plaintiffs concerning Officer Aufdenkamp.  (Pls' Resp. at p. 21, ECF No. 255.)  As noted in *Lukic v. Eisai Corp. of N. Am.*, 919 F. Supp.2d 936, 942 (W.D. Tenn. 2013),

"The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also Emerson v. Novartis Pharm. Corp*., 446 Fed. Appx. 733, 736 (6th Cir. 2011) ("'[J]udges are not like pigs, hunting for truffles that might be buried in the record."); *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 995 (6th Cir. 2007) ("A district court is not

32

history of immaturity, disciplinary issues, anger issues and perhaps even evidence of racism" and "should have been partnered with someone who had more seniority than him to supervise" instead of Defendant Officer Dyess is speculative at best.[111]

As explained in *Lucijanic v. City of Columbus, Div. of Police*,

The failure to investigate and discipline may give rise to § 1983 supervisory liability. *Walker* [*v. Norris*, 917 F.2d 1449, 1457 (6th Cir. 1990)]. However, this liability arises where no serious investigation is conducted. *See Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985). A governmental entity is subject to liability for failing to act on complaints of misconduct by police officers only if it had a policy or custom of failing to act upon prior similar complaints of unconstitutional conduct. *Andrews v. Fowler*, 98 F.2d 1069, 1074-75 (8th Cir. 1996); *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999) (city not liable where plaintiffs produced no evidence that city, on present occasion or in the past, failed to investigate and discipline the use of excessive force by its police personnel where such discipline was justified). Plaintiff must also establish that the failure to investigate misconduct or to discipline in the past was the "moving force" behind the plaintiff's injury. *Searcy v. City of Dayton*, 38 F.3d 282, 287 (6 th Cir. 1994).[112]

In the present case, Plaintiffs have pointed to no evidence showing that Defendant City failed to act upon "prior similar complaints of unconstitutional conduct." Instead, Defendant Officer Aufdenkamp was in fact disciplined at various points in his career.[113] Therefore, Defendant City is entitled to summary judgment on Plaintiffs' failure to discipline claim, and this

___

required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'").

[111] (Pls' Resp. at p. 24, ECF No. 255.)

[112] *Lucijanic*, 2006 WL 1000225 at *10 (S.D. Ohio Apr. 13, 2006).

[113] *See, e.g.,* Aufdenkamp Personnel File, Statement of Charges, P. 42, 1/26/2012, ECF No. 246-1 (finding that Officer Audenkamp should receive a one day suspension and attend an anger management class because of a confrontation with another officer).

portion of the motion is GRANTED.[114]

Although Plaintiffs contend that they have also brought a failure to supervise claim,[115] they have merely recited the law concerning their claim.  In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial."[116]  Because Plaintiffs have not done so, Defendant City is GRANTED summary judgment on the failure to supervise claim.

Plaintiffs also allege that Defendant City violated Askew's constitutional rights by failing to have a policy to counsel its officers after another officer has been killed in the line of duty.[117] According to Plaintiffs, MPD Officer Martoiya Lang was killed approximately two months before Askew's death and Defendant Officers were not provided with guidance by Defendant City "to not be quick to shoot and not to retaliate for Officer Lang's death."[118]

To the contrary, Lieutenant Colonel Sanders testified that Defendant City did offer its

---

[114] *See Allen v. City of Benton Harbor*, 2013 WL 6512950 at *10 (W.D. Mich. Dec. 12, 2013) (determining that, to the degree the City was aware of the misconduct of the officers, "it did not tacitly approve of, let alone condone, such. To the contrary, both [officers] were punished for their misdeeds in accordance with the terms of the union contract and after due deliberation between the investigators, the chief of police, and the city manager. Because there was not a custom of condoning violations of federal rights, Plaintiff cannot show a direct causal link between her injury and Defendant's conduct.").
.
[115] (Pls' Resp. at pp. 24 – 25, ECF No. 255.)

[116] *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citation omitted).

[117]  (Pls' Resp. at p. 25, ECF No. 255.)

[118]  (*Id.*)

officers counseling after the death of Officer Lang.[119]  Although counseling is not mandatory for officers not directly involved with an officer's death, supervising personnel may formally recommend counseling for officers "obviously affected" by the death.[120]  Moreover, Plaintiffs' suggestion that Defendant Officers shot Askew in retaliation for Officer Lang's death is mere speculation.  Plaintiffs have pointed to no evidence showing a causal link between Defendant Officers' alleged failure to attend counseling after Officer Lang's death and the shooting of Askew, and, thus, this claim fails.

<u>Summary and Conclusion</u>

The motion for summary judgment of Defendant City of Memphis is **PARTIALLY GRANTED** and **PARTIALLY DENIED**.  Defendant City is entitled to judgment as a matter of law on Plaintiffs' failure to discipline and supervise claims, and the motion is **GRANTED** on these claims. Defendant City is not entitled to judgment as a matter of law on Plaintiffs' failure to train and failure to investigate claims, and the motion is **DENIED** on these claims.

IT IS SO ORDERED.

**s/  S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:  July 8, 2016.

---

[119]  (Sanders Depo. at pp. 139 – 140, ECF No. 203.)

[120]  (*Id.* at p. 140.)